KIRBY AISNER & CURLEY LLP
*Proposed Attorneys for the Debtors*
700 Post Road, Suite 237
Scarsdale, New York 10583
(914) 401-9500
Dawn Kirby, Esq.
Erica R. Aisner, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:

DENARDO CAPITAL MANAGEMENT LLC
and DENARDO CAPITAL II LLC,

          Debtors.
------------------------------------------------------------X

Chapter 11
Lead Case No. 21-22098(shl)

## DECLARATION OF JOSEPH DENARDO
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

JOSEPH DENARDO, hereby declares under penalties of perjury:

I am a Member of Denardo Capital Management LLC ("Management") and the Manager of Denardo Capital II LLC ("Capital"), the above-referenced debtors and debtors-in-possession (Management and Capital are sometimes referred to herein as, the "Debtors"). As such, I am fully familiar with the Debtors' assets and liabilities, legal and financial affairs.

I submit this declaration pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York.

**BACKGROUND**

1. Capital is the owner of certain real property located in Irvington, New York which is intended for a residential development of twenty-one (21) single family luxury condominium townhouses and six (6) affordable housing units located in Irvington, New York (the "Project").

Management is the sole member of Capital.

2.  On or about December 28, 2018, Specialty Credit Holdings, LLC and Zee Bridge Capital LLC, as lenders, Silver Point Finance, LLC ("Silver Point"), as agent for the lenders, (collectively referred to as the "Lenders"), and the Debtors entered into a certain Acquisition Loan and Security Agreement dated as of that date (the "Loan Agreement"), whereby the Lenders agreed to loan to the Debtors the maximum aggregate principal amount of $18,000,000.00, to be comprised of two amounts: (i) $10,000,000.00 (the "Acquisition Loan"); and (ii) $8,000,000.00 (the "Building Loan", and along with the Acquisition Loan are, collectively, the "Loan").

3.  The proceeds of the Loan were used to refinance existing secured debt on the Project and to provide construction financing going forward. The Loan was collateralized with the Project as well as real property located in Long Island City owned by an affiliate non-debtor entity (the "LIC Property").

4.  Additionally, Management obtained mezzanine financing in the maximum principal amount of $1,000,000.00 which was secured by a pledge of Management's one hundred percent (100%) membership interest in Capital.

5.  Pursuant to the Loan Agreement, the LIC Property, which was in contract to be sold to the existing tenant, was required to be sold before February 28, 2019. Unfortunately, the sale fell through after the buyer was unable to secure financing and the property needed to be remarketed for sale. Based upon this failure to close on the sale, the Lenders served a Notice of Default on the Debtors.

6.  What followed was a series of Forbearance Agreements, presented to the Debtors without any opportunity for negotiation of terms, missing schedules containing payoff amounts

to which the Debtors were being asked to agree, and which held the Debtors to a number of overly harsh restrictions, onerous terms and costly fees. The Debtors, fearing the suspension of critical construction funding and the derailment of the Project, believing they had no alternative, signed the Agreements.

7. Before and during the entrance into the Forbearance Agreements, the LIC Property was feverously marketed, despite constant pressure and interference from Silver Point who seemed intent on thwarting their efforts. Ultimately a buyer was located for the LIC Property for $8.2 million. Unfortunately, closing did not occur as planned in March of 2020 due to the pandemic and his bank temporarily halting all closings. All efforts were made to successfully close on the sale, including noticing and appearing for a *time of the essence* closing in May, 2020 but the buyer's financing was still stalled.

8. As a result of the Debtors' principals' diligent efforts, the buyer for the LIC Property finally came "back to the table" in June of 2020 and the parties began negotiating terms for an amended contract of sale. In light of the current state of affairs and challenging commercial real estate market caused by the pandemic, the contract of sale for the LIC Property was amended to provide for a reduced purchase price from $8.2 million to $7.6 million and a new closing date set on or before September 30, 2020, *time of the essence*. Silver Point was well aware of the reduction in purchase price and the Debtors' principals had no reason to believe that it would be objectionable to Silver Point given that earlier that month they were scolded by counsel for Silver Point for "dragging their feet" in responding to an offer from another buyer at $7.1 million.

9. Notwithstanding clear progress being made by the Debtors and the challenges of the pandemic, in July 2020 Silver Point served another Notice of Default and retroactively

3

imposed default interest at twenty-four percent (24%) retroactively to March 1, 2019.

10.     Citing various alleged forbearance defaults, on August 17, 2020, Silver Point accelerated repayment of the Loan and declared all of obligations due thereunder immediately due and payable.

11.     Just *10 days* prior to the scheduled closing on the LIC Property, of which Silver Point was well aware, a Notice of Disposition of Collateral was issued with respect to a public sale of Management's membership interests in Capital under the Uniform Commercial Code (the "UCC Sale Notice"). The UCC sale was noticed for October 19, 2020. The UCC Sale Notice was ultimately withdrawn as defective having only provided a mere thirty-two (32) days advance notice during the COVID-19 pandemic which was wholly insufficient and commercially unreasonable under the UCC and New York law.

12.     Silver Point also raised objections because the purchase price was less than $8.2 million, which was not only absurd, but jeopardized a substantial sale during one of the most difficult commercial real estate markets in New York City history. Despite efforts to refute this position, Silver Point was unmoved.

13.     On September 22, 2020, just *6 days* prior to the scheduled closing on the LIC Property, Silver Point filed a foreclosure complaint against the LIC Property[1], along with a notice of pendency.

---

[1] The foreclosure action is currently pending in the Supreme Court of the State of New York, County of Queens, and captioned *Silver Point Finance, LLC v. 34th Street Capital LLC et al.*, Index No. 716506/2020.

14. Silver Point further stonewalled efforts to obtain a satisfaction of mortgage and release of lien with respect to the LIC Property unless the Debtors and their principals relinquished control of the Project to Silver Point and agreed to "get out of the way" so that they could quickly seize control and ownership. As a result of these actions, the September 28, 2020 closing for the LIC Property was cancelled.

15. On October 16, 2020, Silver Point filed a foreclosure complaint against the Project in the Supreme Court of the State of New York, County of Westchester, and captioned *Silver Point Finance, LLC v. DeNardoCapital II LLC et al.*, Index No. 62987/2020.

16. In an effort to preserve the remaining value in the Project and payoff Silver Point, the Debtors were also exploring the possibility of a sale of the entire Project. By the end of June 2020, the Debtors and were actively negotiating the terms for a sale of the Project to a well-known real estate developer ("Prospective Buyer") and were exchanging comments to a draft contract of sale during the following months.

17. In early October 2020, however, as the Debtors and the Prospective Buyer inched closer towards finalizing the deal, the Debtors were told by a credible source that Silver Point had contacted the Prospective Buyer to solicit and encourage them to terminate their relationship with the Debtors and their affiliates so that Silver Point could potentially develop the Project with the Prospective Buyer after Silver Point took control of the Project. Soon thereafter, the Prospective Buyer went "radio silent" and ceased negotiations with the Debtors and their affiliates, resulting in another failed attempt to close on the sale of the Project.

18. On October 7, 2020, Silver Point issued another defective notice of disposition of collateral by public sale under the UCC (the "Second UCC Sale Notice") which was noticed for December 17, 2020. The Second UCC Sale Notice failed to identify Silver Point's marketing

5

efforts, plans, publications, strategies or methods of advertising in connection with its rushed UCC sale process, and was, particularly during the COVID-19 pandemic, insufficient and commercially unreasonable under the Mezzanine Loan Agreement, UCC and New York law.

19.    In response, the Debtors commenced an action in Westchester Supreme Court and simultaneously moved for a preliminary injunction and temporary restraining order staying the public sale of Management's membership interests in Capital. The action was consensually resolved by the parties' agreement to adjourn the auction for a period of no more than sixty (60) days. Ultimately, the auction was re-noticed for February 18, 2021.

20.    I am advised by counsel that the purchase of a membership interest as opposed to the physical real property, especially at a UCC "fire sale", is far less desirable and rarely, if ever, fetches the highest and best price for an asset. Faced with the possible loss of ownership and control of the Project as a result of the pending public auction, the Debtors elected to file these Chapter 11 cases.

21.    The Debtors' primary goal is to secure replacement financing for the Silver Point indebtedness which will enable them to finish the Project, satisfy their creditors and realize on their millions of dollars invested and years of hard work. Alternatively, if a refinance cannot be accomplished, the Debtors shall seek a sale of the Project under the supervision and with the protection of the Bankruptcy Court, for the highest and best price. The Debtors have been trying to resolve their financial issues outside of a Bankruptcy for many months and have unfortunately been forced to seek State Court intervention to ensure that the process is fair and commercially reasonable and have had to contend with interference and back channeling. Proceeding with the protection of the Bankruptcy Court will help put an end to what the Debtors believe are bad faith tactics and achieve the best outcome for all constituencies.

## INFORMATION REQUIRED BY LOCAL BANKRUTPCY RULE 1007-2

In addition to the foregoing, Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below.

**Local Rule 1007-2(a)(1)**

As set forth above, Capital is the owner of the Project and Management is the sole member of Capital.

**Local Rule 1007-2(a)(2)**

This case was not originally commenced under Chapter 7 or 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

**Local Rule 1007-2(a)(3)**

Upon information and belief, no committee or professionals were employed prior to the filing of the Order for relief.

**Rule 1007-2(a)(4)**

A list of the holders of the 20 largest general unsecured claims will be provided shortly.

**Local Rule 1007-2(a)(5)**

A list of the Debtors' 5 largest secured creditors will be filed with the Debtor's Schedules of Asset and Liabilities.

**Local Rule 1007-2(a)(6)**

No formal balance sheet currently exists for the Debtors.

**Local Rule 1007-2(a)(7)**

There are no publicly held securities of the Debtors.

**Local Rule 1007-2(a)(8)**

None of the Debtors' property is in possession of a receiver or custodian.

**Local Rule 1007-2(a)(9) and (10)**

The Debtors maintains offices at 86 Main Street, Irvington, New York which is also the location of the Debtor's books and records. The Debtor has no assets located outside the territorial limits of the United States.

**Local Rule 1007-2(a)(11)**

The following are lawsuits currently pending against the Debtor(s):

Legends Realty Group, LLC d/b/a William Raveis Legends Realty Group v. Joseph DeNardo, Sylvia DeNardo, DeNardo Capital Corp., DeNardo Captial II, LLC and DeNardo Captial Management, LLC, New York State Supreme Court, Westchester County, Index No. 61423/2019;

Silver Point Finance, LLC v. 34th Street Capital LLC, Denardo Capital II LLC, et. al., New York State Supreme Court, Queens County, Index No. 716506/2020; and

Silver Point Finance, LLC v. Denardo Capital II LLC, et. al., New York State Supreme Court, Westchester County, Index No. 62987/2020

**Local Rule 1007-2(a)(xiii)**

The Debtor's senior management consists of Declarant and Sylvia DeNardo.

**Local Rule 1007-2(b)(1)-(3)**

The Debtor's estimated payroll to non-insider, non-officer employees for the thirty (30) day period following the Chapter 11 petition is $0. The Debtor's estimated payroll to insider officers for the thirty (30) day period following the Chapter 11 petition is $0. No income is anticipated over the next thirty (30) days nor are any expenses anticipated to be paid. This information will be updated to the extent necessary.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: Irvington, New York
February 19, 2021

                                                    _/s/   Joseph DeNardo_
                                                    JOSEPH DENARDO