**HEARING DATE AND TIME: JUNE 10, 2021 AT 10:00 A.M. (ET)**
**OBJECTION DEADLINE DATE AND TIME: JUNE 3, 2021 AT 4:00 P.M. (ET)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

DeNardo Capital Management LLC, et al.

Debtors.

Chapter 11
Lead Case No. 21-22098 (SHL)

**RELATED DOC. NO.  37**

## DECLARATION OF MARK S. LICHTENSTEIN IN SUPPORT OF MOTION OF SILVER POINT FINANCE, LLC, AS AGENT, FOR RELIEF FROM THE AUTOMATIC STAY AS TO DEBTOR DENARDO CAPITAL MANAGEMENT LLC

Mark S. Lichtenstein declares under penalty of perjury as follows:

1.     I am an attorney duly admitted to practice law in the State of New York and before this court, and I am a partner in the firm of Akerman LLP ("Akerman"), attorneys for Silver Point Finance,LLC ("Agent"), as Administrative Agent and Collateral Agent for certain lenders, Specialty Credit Holdings, LLC and Zee Bridge Capital LLC (collectively, the "Lenders" and together with Agent, and their successors and assigns, the "Lender Parties").

2.     I respectfully submit this declaration in support of the Lender Parties' *Motion for Relief from the Automatic Stay as to Debtor Denardo Capital Management LLC* (the "Motion") [Doc. No. 37].

3.     Attached hereto as **Exhibit "A"** is a true and correct copy of the Mezzanine Loan Promissory Note dated December 28, 2018 in the original principal amount of $1,000,000.00 (the "Mezzanine Note").

4.     Attached hereto as **Exhibit "B"** is a true and correct copy of the Pledge and Security Agreement dated December 28, 2018 (the "Mezzanine Security Agreement");

5.      Attached hereto as **Exhibit "C"** is a true and correct copy of the Mezzanine Loan

and Security Agreement dated December 28, 2018 (the "Mezzanine Loan Agreement")

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        May 26, 2021


                           _/s/Mark S. Lichteinstein_
                           MARK S. LICHTENSTEIN

**<u>EXHIBIT A</u>**

**MEZZANINE NOTE**

## MEZZANINE LOAN PROMISSORY NOTE

**$1,000,000.00**                                                                 White Plains, New York
December 28, 2018

THIS MEZZANINE LOAN PROMISSORY NOTE (as the same may be amended, restated, replaced (whether by one or more replacement notes), supplemented, extended or otherwise modified from time to time, this "Note") is made as of December 28, 2018, by DENARDO CAPITAL MANAGEMENT LLC, a New York limited liability company, having an address at c/o Six Sigma LLC, 213 West 35th Street, New York, New York, 10001 ("Borrower") to SILVER POINT FINANCE, LLC, a Delaware limited liability company, having an address Two Greenwich Plaza, 1st Floor, Greewich, Connecticut 06830, as administrative agent and collateral agent on behalf of Lender (as hereinafter defined) (in such capacity, together with its successors and assigns, "Agent").

## RECITALS

FOR VALUE RECEIVED, Borrower hereby unconditionally promises to pay to the order of Agent on behalf of Lender at its address written above, or at such other place as the holder hereof may from time to time designate in writing, the maximum principal sum of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) (or so much thereof as is advanced pursuant to the Loan Agreement (hereinafter defined)), in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Interest Rate (as defined in the Loan Agreement), and to be paid in accordance with the terms of this Note and that certain Mezzanine Loan and Security Agreement, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "Loan Agreement"), by and among Borrower, ZEE BRIDGE CAPITAL LLC, a Delaware limited liability company ("Zee"), SPECIALTY CREDIT HOLDINGS, LLC, a Delaware limited liability company ("Specialty Credit", and together with Zee, each a "Lender" and collectively, "Lender"), and Agent.  All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

## ARTICLE I

## PAYMENT TERMS

Borrower agrees to pay the outstanding principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in Article II of the Loan Agreement, and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

## ARTICLE II

## DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable in accordance with the terms of the Loan Agreement, at the option of Lender if any payment

required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default.

## ARTICLE III

## LOAN DOCUMENTS

This Note is secured by the Pledge and Security Agreement and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Pledge and Security Agreement and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE IV

## SAVINGS CLAUSE

Notwithstanding anything to the contrary contained herein or in the Loan Agreement or any of the other Loan Documents, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender and (c) if through any contingency or event Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender.

## ARTICLE V

## NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by Borrower and Lender.

## ARTICLE VI

## WAIVERS

To the extent permitted by law, Borrower and all others who may become liable for the payment of all or any part of the Debt (collectively, "Obligor") do hereby, severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind, other than any notices otherwise expressly required under this Note, the Loan Agreement or any other Loan Document. No release of any security for the Debt or extension of time for

-2-

Promissory Note – Execution Copy
Mezzanine Loan - DeNardo

payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender and/or any Obligor shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, or any other Obligor, under this Note, the Loan Agreement or the other Loan Documents, except in accordance with and to the extent of the express terms of any such release, extension or agreement.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  If Borrower is a partnership, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership, and the term "Borrower," as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower", as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder.  If any Borrower is a limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the members comprising the limited liability company, and the term "Borrower", as used herein, shall include any alternate or successor limited liability company, but any predecessor limited liability company and their members shall not thereby be released from any liability.  Nothing in the foregoing three sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, corporation or limited liability company, as applicable, which may be set forth in the Loan Agreement or any other Loan Document.

## ARTICLE VII

## TRANSFER

Upon the transfer of this Note, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Project Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all respective rights hereby given to them with respect to any liabilities and the collateral not so transferred.

-3-

## ARTICLE VIII

### Intentionally Omitted

## ARTICLE IX

### GOVERNING LAW

This Note shall be governed in accordance with the terms and provisions of the Loan Agreement.

## ARTICLE X

### NOTICES

All notices or other written communications hereunder shall be delivered in accordance with the Loan Agreement.

## ARTICLE XI

### PORTFOLIO INTEREST EXEMPTION

It is intended that this Note be in registered form in compliance with Treasury Regulations Section 5f 103-1c. The transfer of Lender's interest in this Note shall be effected through book entry system maintained by Borrower. Borrower hereby agrees to maintain register indicating the owner and holder of this Note all subsequent transferees of such holders interests and all principal and interest due to each such holder as such interests exist from time to time. Immediately upon receipt of Lender's written request Maker shall comply with any such request to make change in Borrowers register to evidence any transfer of interest in this Note.

### [NO FURTHER TEXT ON THIS PAGE]

-4-

[SIGNATURE PAGE TO MEZZANINE PROMISSORY NOTE]

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

**BORROWER:**

DENARDO CAPITAL MANAGEMENT LLC,
a New York limited liability company

By: _____
Name: Sylvia DeNardo
Title:  Member

By: _____
Name: Joseph DeNardo
Title:  Managing Member

## EXHIBIT B

## MEZZANINE SECURITY AGREEMENT

PLEDGE AND SECURITY AGREEMENT

PLEDGE AND SECURITY AGREEMENT (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), dated as of December 28, 2018, made by DENARDO CAPITAL MANAGEMENT LLC, a New York limited liability company, having an address at 50 South Buckhout Street, Suite 307, Irvington, New York 10533 ("Pledgor"), in favor of SILVER POINT FINANCE, LLC, a Delaware limited liability company, having an address at Two Greenwich Plaza, 1st Floor, Greenwich, Connecticut 06830 (together with its successors and assigns, "Agent"), as administrative agent and collateral agent on behalf of ZEE BRIDGE CAPITAL LLC, a Delaware limited liability company, having an address at 450 Lexington Avenue, New York, New York ("Zee"), SPECIALTY CREDIT HOLDINGS, LLC, a Delaware limited liability company ("Specialty Credit", and together with Zee, each a "Lender" and collectively, "Lender").

RECITALS

WHEREAS, simultaneously with the execution and delivery of this Agreement, (i) 34TH STREET CAPITAL LLC ("LIC Borrower") and DENARDO CAPITAL II LLC, a New York limited liability company ("Mortgage Borrower") and ZEE BRIDGE CAPITAL, a Delaware limited liability company ("Zee"), SPECIALTY CREDIT HOLDINGS, LLC, a Delaware limited liability company ("Specialty Credit", and together with Zee, each a "Mortgage Lender" and collectively, "Mortgage Lender"), and SILVER POINT FINANCE, LLC, a Delaware limited liability company, having an address at Two Greenwich Plaza, 1st Floor, Greenwich, Connecticut 06830, as administrative agent and collateral agent on behalf of Mortgage Lender, have entered into that certain Acquisition Loan and Security Agreement, dated as of the date hereof, pursuant to which Mortgage Lender is making an acquisition loan to Mortgage Borrower and LIC Borrower in the original principal amount of $10,000,000.00 (the "Acquisition Loan"); (ii) Mortgage Borrower, and Mortgage Lender have entered into that certain Building Loan and Security Agreement, dated as of the date hereof, pursuant to which Mortgage Lender is making a building loan to Mortgage Borrower in the maximum principal amount of $8,000,000.00 (the "Building Loan", together with the Acquisition Loan, collectively, the "Mortgage Loan");

WHEREAS, Pledgor is the direct legal and beneficial owner of 100% of the issued and outstanding limited liability company interests in Mortgage Borrower;

WHEREAS, Pledgor has requested that Lender make a loan to it in the aggregate maximum principal amount of $1,000,000.00 (the "Loan") pursuant to that certain Mezzanine Loan and Security Agreement, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "Loan Agreement"), by and among Pledgor, Lender and Agent and evidenced by that certain Mezzanine Loan Promissory Note, dated as of the date hereof (as the same may be amended, restated, replaced (whether by one or more replacement notes), supplemented, renewed, extended or otherwise modified from time to time, the "Note"), made by Pledgor in favor of Agent; and

WHEREAS, it is a condition precedent to the obligation of Lender to make the Loan to Pledgor, as borrower under the Loan Agreement, that Pledgor shall have executed and delivered this Agreement to Agent.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Pledgor, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Pledgor hereby agrees with Agent, as follows:

1.      **Defined Terms.**  As used in this Agreement, the following terms have the meanings set forth in or incorporated by reference below:

"Acknowledgment and Consent" has the meaning ascribed to such term in Section 6(b).

"Acquisition Loan" has the meaning ascribed to such term in the Recitals.

"Agent" has the meaning ascribed to such term in the Recitals.

"Agreement" has the meaning ascribed to such term in the introductory paragraph.

"Article 8 Matter" has the meaning ascribed to such term in Section 7(b).

"Building Loan" has the meaning ascribed to such term in the Recitals.

"Code" means the Uniform Commercial Code from time to time in effect in the State of New York.

"Collateral" has the meaning ascribed to such term in Section 2.

"Company Power" has the meaning ascribed to such term in Section 3.

"Confirmation Statement and Instruction Agreement" has the meaning ascribed to such term in Section 6(b).

"Debt" has the meaning ascribed to such term in the Loan Agreement.

"Instruction to Register the Pledge" has the meaning ascribed to such term in Section 6(b).

"Lender" has the meaning ascribed to such term in the Recitals.

"Loan" has the meaning ascribed to such term in the Recitals.

"Loan Agreement" has the meaning ascribed to such term in the Recitals.

"Loan Documents" means the Note, the Loan Agreement, this Agreement, the UCC-1 Financing Statements and the other documents defined as "Loan Documents" in the Loan

2

Agreement (each as it may be amended, restated, replaced, supplemented, extended, consolidated or otherwise modified from time to time).

"Mortgage Borrower" has the meaning ascribed to such term in the Recitals.

"Mortgage Borrower Company Agreement" means the Limited Liability Company Operating Agreement of Mortgage Borrower, dated as of the date hereof, as the same may be amended, restated, replaced, supplemented or modified from time to time if and to the extent permitted under the Loan Documents.

"Mortgage Lender" has the meaning ascribed to such term in the Recitals.

"Mortgage Loan" has the meaning ascribed to such term in the Recitals.

"Note" has the meaning ascribed to such term in the Recitals.

"Pledged Company Interests" means the limited liability company interests of Pledgor in Mortgage Borrower listed on Schedule 1 hereto, together with all certificates evidencing ownership of such interests, and all claims, powers, privileges, benefits, remedies, voting rights, options or rights of any nature whatsoever which currently exist or may be issued or granted by Mortgage Borrower to Pledgor while this Agreement is in effect.

"Pledged Securities" means the Pledged Company Interests.

"Pledgor" has the meaning ascribed to such term in the introductory paragraph.

"Proceeds" means all "proceeds" (as such term is defined in Section 9-102(a)(64) of the Code in effect in the applicable State on the date hereof) of the Pledged Securities and, in any event, shall include, without limitation, all dividends or other income from the Pledged Securities, collections thereon or distributions with respect thereto.

"Securities Act" means, collectively, the Securities Act of 1933 and the rules and regulations promulgated thereunder, each as amended from time to time.

"Special Damages" has the meaning ascribed to such term in Section 17(k).

Terms used herein but not otherwise defined herein shall have the respective meanings ascribed to them in the Loan Agreement.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" and the word "include(s)" shall mean "includes(s)", without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or

3

burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

2.    **Pledge; Grant of Security Interest.**  Pledgor hereby pledges and grants to Agent, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Debt, a first priority security interest in all of Pledgor's right, title and interest in, to or under the following, whether now owned or hereafter acquired (collectively, the "Collateral"):

(i)    all Pledged Company Interests;

(ii)    all securities, additional equity interests, moneys or property representing dividends, distributions, cash or interest on any of the Pledged Securities, or representing a distribution in respect of the Pledged Securities, or resulting from a split-up, revision, reclassification or other like change of the Pledged Securities or otherwise received in respect of or otherwise in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Securities;

(iii)    any amounts payable under any policy of insurance by reason of loss or damage to the Pledged Securities or the Project;

(iv)    all "accounts", "general intangibles", "instruments" and "investment property" (in each case as defined in the Code) constituting or relating to the foregoing; and

(v)    all Proceeds of any of the foregoing (including any proceeds of insurance thereon, all "accounts", "general intangibles", "instruments" and "investment property", in each case as defined in the Code, constituting or relating to the foregoing).

3.    **Company Powers.**  Concurrently with the delivery to Agent of each certificate representing one or more shares of the Pledged Securities, Pledgor shall deliver to Agent an undated limited liability company power or assignment of interest, as applicable (each, a "Company Power"), covering each such certificate, duly executed in blank.

4.    **Representations and Warranties.**  Pledgor represents and warrants to Agent, as of the date hereof that:

(a)    no authorization by, consent of, notice to or filing with (except the filing of UCC financing statements in connection herewith) any other Person (including any member or creditor of Pledgor or Mortgage Borrower) that has not been obtained, is required (i) in connection with the execution and delivery of,  and performance and validity of its obligations under, this Agreement by Pledgor or the enforceability of this Agreement against Pledgor, including the pledge, assignment and transfer by Pledgor of any of the Collateral to Agent or the exercise of remedies by Agent hereunder (including the foreclosure of the Lien created hereunder and the subsequent assignment and transfer of any of the Collateral to Agent or the purchaser (or its nominee) at a foreclosure sale) or (ii) for the exercise by Agent the voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement, in each case, except as may be required by laws affecting (A) the offering

4

and/or sale of securities generally, (B) the exercise of remedies in respect of collateral generally, or (C) Agent or any of Agent's affiliates;

(b)     all of the Pledged Securities have been duly and validly issued and are fully paid and nonassessable;

(c)     the Pledged Securities, in each case, constitute all of the issued and outstanding membership limited liability company interests in Mortgage Borrower;

(d)     Pledgor is the record and beneficial owner of, and has good title to, the Pledged Securities, in each case free of any and all Liens or options in favor of, or claims of, any other Person, except the Liens created by this Agreement (and any UCC financing statements in connection herewith), and the Pledged Securities have not previously been assigned, sold, transferred, pledged or encumbered, except pursuant to this Agreement (and any UCC financing statements in favor of Agent in connection herewith);

(e)     upon the filing of the UCC-1 financing statements referred to in Section 12 with the New York Secretary of State and delivery to Agent of the membership certificates evidencing the Pledged Securities, the Liens granted pursuant to this Agreement will constitute a valid, perfected first priority Lien on the applicable Pledged Securities and related Proceeds under the laws of the State of New York, enforceable as such against all creditors of Pledgor and any Persons purporting to purchase any Pledged Securities and related Proceeds from Pledgor;

(f)     the principal place of business and chief executive office of Pledgor is, and at all times prior to the execution of this Agreement has been, located at 50 South Buckhout Street, Suite 307, Irvington, New York 10533;

(g)     the exact name of Pledgor is Denardo Capital Management LLC;

(h)     Pledgor is organized under the laws of the State of New York;

(i)     the Company Power(s) executed and delivered in connection with the execution and delivery of this Agreement have been duly executed and give Agent the authority they purport to confer;

(j)     the grant and perfection of the security interests in the Collateral in favor of Agent, in accordance with the terms herein, are not made in violation of the registration requirements of the Securities Act of 1933 and the rules and regulations promulgated thereunder (the "Securities Act"), any applicable provisions of other federal securities laws, state securities or "Blue Sky" law, foreign securities law, or applicable general corporation law or any other applicable law;

(k)     other than the membership certificates evidencing the Pledged Securities delivered to Agent in connection with the execution and delivery of this Agreement, there currently exist no membership certificates evidencing any of the Pledged Securities. However, to the extent that in the future there exist any such certificates, instruments or writings, Pledgor shall deliver all such certificates, instruments or writings to Agent;

5

(l)      Pledgor has, independently and without reliance upon Agent, and based upon such documents and information as Pledgor has deemed appropriate, made its own credit analysis and decision to enter into this Agreement; and

(m)      the Pledged Securities (i) are "securities" within the meaning of Sections 8-102(a)(15) and 8-103 of the Code, (ii) are "financial assets" (within the meaning of Section 8-102(a)(9) of the Code), (iii) are not credited to a "securities account" (within the meaning of Section 8-501(a) of the Code), (iv) are not dealt in or traded on a securities exchange or in a securities market, and (v) are not "investment company securities" (within the meaning of Section 8-103 of the Code).

5.      **Covenants.**  Pledgor covenants and agrees with Agent that, from and after the date of this Agreement until the Debt is paid in full (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive satisfaction of the Note):

(a)      **Acknowledgements of Pledgor.**  If Pledgor shall, as a result of its ownership of the Pledged Securities, become entitled to receive or shall receive any membership certificate (including any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any shares of the Pledged Securities, or otherwise in respect thereof, Pledgor shall accept the same as Agent's agent, hold the same in trust for Agent and immediately deliver the same forthwith to Agent in the exact form received, duly endorsed by Pledgor to Agent, if required, together with an undated limited liability company power covering any such membership certificate duly executed in blank, to be held by Agent hereunder as additional security for the Debt.  Any sums paid upon or in respect of the Pledged Securities upon the liquidation or dissolution of Mortgage Borrower shall be paid over to Agent to be applied by Agent to the Debt, and in case any distribution of capital shall be made on or in respect of the Pledged Securities or any property shall be distributed upon or with respect to the Pledged Securities pursuant to the recapitalization or reclassification of the capital of Mortgage Borrower or pursuant to the reorganization thereof, the property so distributed shall be promptly delivered to Agent to be held by it, subject to the terms hereof, as additional security for the Debt.  If any sums of money or property so paid or so distributed in respect of any of the Pledged Securities pursuant to the prior sentence shall be received by Pledgor, Pledgor shall, until such money or property is paid or delivered to Agent, hold such money or property in trust for Agent, segregated from other funds of Pledgor, as additional security for the Debt.

(b)      **Limitations on Issuance of Interests; Limitations on Transfer**.  Without the prior written consent of Agent, Pledgor shall not, directly or indirectly, do any of the following:  (i) vote to enable, or take any other action to permit, Mortgage Borrower to issue any membership interests or any other securities convertible into, or granting the right to purchase or exchange for any membership interests in Mortgage Borrower; (ii) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Collateral; or (iii) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Collateral, or any interest therein, except for the Lien provided for by this Agreement.

6

(c)      **Limitation on Liens.**  Pledgor will not create, incur or permit to exist, will defend the Pledged Securities and other Collateral against, and will take all such other action as is necessary to remove, any Lien or claim on or to the Pledged Securities or other Collateral, other than the Liens created by this Agreement (and any UCC financing statements in connection herewith), and will defend the right, title and interest of Agent in, to and under the Pledged Securities against the claims and demands of all Persons whomsoever.

(d)      **Further Identification of Pledged Securities.**  Pledgor will furnish to Agent from time to time statements and schedules further identifying and describing the Pledged Securities and such other reports in connection with the Pledged Securities as Agent may reasonably request, all in reasonable detail.

(e)      **Changes in Location, Name, etc.**  Pledgor will not, unless (i) it shall have given at least thirty (30) days' prior written notice to such effect to Agent and (ii) all action necessary or advisable, in Agent's opinion, to protect and perfect the Liens and security interests intended to be created hereunder with respect to the Pledged Securities shall have been taken, (A) change the location of its chief executive office or principal place of business from that specified in Section 4(f), or (B) change its name, identity or entity form, or (c) reorganize or reincorporate under the laws of another jurisdiction.

(f)      **Payment of Taxes**.  Pledgor shall pay taxes in accordance with the terms of Section 2.13 of the Loan Agreement.

(g)      **UCC Article 8**.  The Pledged Securities (i) will continue to be "securities" within the meaning of Sections 8-102(a)(15) and 8-103 of the Code, (ii) will continue to be "financial assets" (within the meaning of Section 8-102(a)(9) of the Code), (iii) will not be credited to a "securities account" (within the meaning of Section 8-501(a) of the Code), (iv) will not be dealt in or traded on a securities exchange or in a securities market, and (v) will not be "investment company securities" (within the meaning of Section 8-103 of the Code).  The Mortgage Borrower Company Agreement and the certificates evidencing the Pledged Securities each shall at all times state that the Pledged Securities are "securities" as such term is defined in Article 8 of the Code, from time to time in effect, in the State of New York.

(h)      **Further Assurances**.  At any time and from time to time, upon the request of Agent, and at the sole expense of Pledgor, Pledgor shall promptly and duly give, execute, deliver file and/or record such further instruments and documents and take such further actions as Agent may request for the purposes of obtaining, creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted including without limitation filing UCC financing or continuation statements.  Pledgor hereby authorizes Agent to file any such financing statement or continuation statement without the signature of or further action by Pledgor.  Any such financing statement may describe the collateral covered thereunder as "all assets of Pledgor, whether now owned or existing, or hereafter acquired or arising, and all proceeds and products thereof."  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, other instrument or chattel paper, such note, instrument or chattel paper shall be promptly delivered to Agent, duly endorsed in a manner satisfactory to Agent, to be held as Collateral pursuant to this Agreement.

7

6. **Certain Understandings of Parties; Registration of Pledge; Control of Collateral, Etc.**

(a)    Each of Pledgor and Agent acknowledges and agrees that the Pledged Securities do and will constitute "securities" within the meaning of Sections 8-102(a)(15) and 8-103 of the Code.  Pledgor covenants and agrees that it shall not take any action to have the Pledged Securities treated other than as securities within the meaning of Sections 8-102(a)(15) and 8-103 of the Code.

(b)    **Registration of Pledge; Control of Collateral.**   To better assure the perfection of the security interest of Agent in the Pledged Securities, concurrently with the execution and delivery of this Agreement, Pledgor shall (i) send written instructions in the form of Exhibit A hereto (such written instructions, the "Instruction to Register the Pledge") to Mortgage Borrower, (ii) shall cause Mortgage Borrower to execute and deliver to Agent a confirmation statement and instruction agreement in the form of Exhibit B hereto (the "Confirmation Statement and Instruction Agreement"), and (iii) cause Mortgage Borrower to execute and deliver to Agent an acknowledgment and consent in the form of Exhibit C attached hereto (the "Acknowledgment and Consent").  Notwithstanding anything in this Agreement to the contrary, none of the Instruction to Register the Pledge, the Confirmation Statement and Instruction Agreement or the Acknowledgement and Consent shall be construed as expanding the rights of Agent to give instructions with respect to the Collateral beyond any such rights set forth in this Agreement.

7. **Cash Dividends; Voting Rights.**

(a)    Notwithstanding any provision hereof to the contrary, unless and until an Event of Default shall have occurred and be continuing, except as provided to the contrary in the Loan Agreement, Pledgor shall be permitted to receive, retain and further distribute to Pledgor's Affiliates, constituent entities and/or other Persons all income, cash dividends, distributions, proceeds or other property received or paid in respect of the Pledged Securities.  Subject to Section 7(b) below (relating to Article 8 Matters) and unless and until an Event of Default shall have occurred and be continuing, Pledgor shall have the right to exercise all voting and other rights with respect to the Pledged Securities, provided that no vote shall be cast or right exercised or other action taken which would violate any provision of the Loan Agreement, the Note, this Agreement or any other Loan Documents; and, provided, further, that Pledgor shall give Agent not less than five (5) Business Days' written notice of the manner in which any Pledgor intends to exercise, or the reasons for refraining from exercising, any such right.

(b)    Solely with respect to Article 8 Matters, Pledgor hereby irrevocably grants and appoints Agent, from the date of this Agreement until the termination of this Agreement in accordance with its terms, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead to vote the Pledged Securities by Pledgor, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, in each case, solely with respect to Article 8 Matters.  The proxy granted and appointed in this Section 7(b) shall include the right to sign Pledgor's name to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Securities that applicable law may permit or require, to cause the Pledged Securities to be voted in accordance with the preceding sentence.  Pledgor hereby represents and warrants

8

that Pledgor has not granted proxies or powers of attorney with respect to an Article 8 Matter and the Pledged Securities other than pursuant to this Agreement or the other Loan Documents. Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Securities with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter or the Pledged Securities shall be void and of no effect. As used herein, "**Article 8 Matter**" means any action, decision, determination or election by Mortgage Borrower or its member(s) that the limited liability company interests or other equity interests, or any of them, issued by Mortgage Borrower be, or cease to be, a "security" as defined in and governed by Article 8 of the Code, and all other matters related to any such action, decision, determination or election. The proxies and powers granted by the Pledgor pursuant to this Agreement are coupled with an interest and are given to secure the performance of the Pledgor's obligations.

## 8.    Rights of Agent.

(a)    Following the occurrence and during the continuance of an Event of Default, Agent shall have the right to, subject to the rights of Mortgage Lender, to receive any and all income, cash dividends, distributions, proceeds or other property received or paid in respect of the Pledged Securities and make application thereof to the Debt, in such order as Agent, in its sole discretion, may elect. If an Event of Default shall occur and be continuing, then the Pledged Securities, at Agent's option, shall be registered in the name of Agent (if not already so registered), and, upon admission as a member of Mortgage Borrower, Agent or its nominee may thereafter, during the continuance of such Event of Default, exercise all voting and other rights, privileges and options pertaining to such Pledged Securities, including any and all rights of conversion, exchange and subscription pertaining to such Pledged Securities as if it were the absolute owner thereof (including the right to exchange at its discretion any and all of such Pledged Securities upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the organizational structure of Mortgage Borrower or upon the exercise by Pledgor or Agent of any right, privilege or option pertaining to such Pledged Securities, and in connection therewith, the right to deposit and deliver any and all of the Pledged Securities with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine), all without liability except, as described in clause (d) below, to account for property actually received by it, but Agent shall have no duty to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(b)    The rights of Agent under this Agreement shall not be conditioned or contingent upon the pursuit by Agent of any right or remedy against Pledgor or against any other Person which may be or become liable in respect of all or any part of the Debt or against any other security therefor, guarantee thereof or right of offset with respect thereto. Agent shall not be liable for any failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so, nor shall it be under any obligation to sell or otherwise dispose of any Collateral upon the request of Pledgor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.

(c)    Pledgor also authorizes Agent, at any time and from time to time following the occurrence and during the continuance of an Event of Default, to execute, in

9

connection with any sale provided for in <u>Section 9</u> or <u>Section 10</u> hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral to the extent necessary for Agent to exercise its rights under this Agreement.

(d)    The powers conferred on Agent under this <u>Section 8</u> are solely to protect Agent's interest in the Collateral and shall not impose any duty upon Agent to exercise any such powers.  Agent shall be accountable only for amounts or property that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors or employees shall be responsible to Pledgor for any act or failure to act hereunder, except for its or their gross negligence or willful misconduct.

(e)    If Pledgor fails to perform any of its obligations under this Agreement and such failure constitutes an Event of Default, then if the Agent performs, or causes performance of, such obligation in accordance with the terms of this Agreement, the out of pocket expenses of Agent incurred in connection with such performance (including out-of-pocket attorneys' fees and disbursements), together with interest at the Default Rate shall be reimbursed to Agent within twenty (20) days following written demand by Agent to Pledgor, and shall constitute obligations secured hereby.

9.    **Remedies.**  Following the occurrence and during the continuance of an Event of Default, Agent in addition to all other rights and remedies granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Debt:

(a)    all rights and remedies of a secured party under the Code (whether or not said Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if Agent was the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right);

(b)    Agent may make any compromise or settlement deemed desirable with respect to any of the Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Collateral;

(c)    Agent in its discretion may, in its name or in the name of Pledgor or otherwise, demand, sue for, collect, direct payment of or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so.

Without limiting the generality of the foregoing, following the occurrence and during the continuance of an Event of Default, Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind to or upon Pledgor, Mortgage Borrower or any other Person (all and each of which demands, presentments, protests, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give an option or options to purchase or otherwise dispose of and deliver the

10

Pledge and Security Agreement – Execution Copy
Mezzanine Loan - DeNardo

Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of Agent or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best in its sole discretion, for cash or on credit or for future delivery without assumption of any credit risk.

In furtherance of the foregoing, Agent shall have the right, without notice or publication, to adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be adjourned without further notice. Agent shall have the right upon any such public sale or sales, and, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of Pledgor, which right or equity of redemption is hereby waived or released. Agent shall apply any Proceeds from time to time held by it, including any net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all costs and expenses of any kind incurred by Agent in connection with the exercise of Agent's rights in accordance with this Agreement, including attorneys' fees and disbursements, to the payment in whole or in part of the Debt, in such order as Agent may elect in accordance with the Loan Agreement, and only after such application and after the payment by Agent of any other amount required by any applicable provision of law, including Section 9-615 of the Code, need Agent account for the surplus, if any, to Pledgor. Pledgor waives all claims, damages and demands it may acquire against Agent arising out of the exercise by Agent of any of its rights hereunder, except for any claims, damages and demands it may have against Agent arising from the willful misconduct or gross negligence of Agent, its affiliates, or any agents or employees of the foregoing. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition.

(d)   The rights, powers, privileges and remedies of Agent under this Agreement are cumulative and shall be in addition to all rights, powers, privileges and remedies available to Agent under the other Loan Documents or at law or in equity. All such rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of Agent hereunder.

(e)   Pledgor will reimburse Agent for all expenses incurred by Agent, including brokers', attorneys' and accountants' fees and expenses, in connection with the exercise of any Agent's remedies in accordance with the terms of this Agreement.

**10.   Private Sales.** Pledgor recognizes that Agent may be unable to effect a public sale of any or all of the Pledged Securities, by reason of certain prohibitions contained in the Securities Act or applicable state securities laws, and in such instance may be compelled to resort to one or more private sales thereof to a qualified group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to Agent than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner

11

solely by virtue of being a private sale. Agent shall be under no obligation to delay a sale of any of the Pledged Securities for the period of time necessary to permit Mortgage Borrower or Pledgor to register such securities for public sale under the Securities Act or applicable state securities laws, even if Mortgage Borrower or Pledgor would agree to do so.

(a)    Pledgor further shall cooperate with Agent to do or cause to be done all such other acts as may be necessary to make any sale or sales of all or any portion of the Pledged Securities pursuant to and in accordance with this Section 10 and Section 9 valid and binding and in compliance with any and all other requirements of applicable law. Pledgor agrees that a breach of any of Pledgor's covenants contained in this Section 10 will cause irreparable injury to Agent, that Agent have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 10 shall be specifically enforceable against Pledgor, and Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants.

(b)    Agent shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that are not customarily sold in a recognized market. Pledgor hereby waives any claims against Agent arising by reason of the fact that the price at which any of the Collateral may have been sold at any such private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Debt, even if Agent accepts the first offer received and does not offer any Collateral to more than one offeree, provided that Agent has acted in a commercially reasonable manner in conducting such private sale.

(c)    The Code states that Agent is able to purchase the Pledged Securities only if they are sold at a public sale. Agent has advised Pledgor that SEC staff personnel have issued various No-Action Letters describing procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the Code, yet not public for purposes of Section 4(2) of the Securities Act of 1933. The Code permits Pledgor to agree on the standards for determining whether Agent has complied with its obligations under Article 9. Pursuant to the Code, Pledgor specifically agrees (x) that it shall not raise any objection to Agent's purchase of all or any part of the Pledged Securities (through bidding on the obligations or otherwise) and (y) that a foreclosure sale conducted in conformity with the principles set forth in the No-Action Letters and pursuant to this Agreement shall be considered (i) a "public" sale for purposes of the Code; (ii) commercially reasonable, notwithstanding that Agent has not registered or sought to register all or any part of the Pledged Securities under the Securities Act, even if Pledgor or Mortgage Borrower agrees to pay all costs of the registration process; and (iii) commercially reasonable, notwithstanding that Agent purchases all or any part of the Pledged Securities at such sale, if the Agent was the high bidder at such sale and the price paid is commercially reasonable.

(d)    Pledgor agrees that Agent shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Pledged Securities sold by Agent in accordance with the terms of this Agreement and applicable law. Without limiting Agent's right to conduct a foreclosure sale in any manner which is considered commercially reasonable, Pledgor hereby agrees that any foreclosure sale conducted in accordance with the following

12

provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

      (i)      Agent conducts the foreclosure sale in the county of Queens and/or the County of Westchester and State of New York;

      (ii)      the foreclosure sale is conducted in accordance with the laws of the State of New York;

      (iii)      not less than ten (10) days in advance of the foreclosure sale, Agent notifies Pledgor in accordance with Section 17(e) hereof of the time and place of such foreclosure sale and/or any rescheduled foreclosure sale date in the event of a postponement;

      (iv)      the foreclosure sale is conducted by an auctioneer licensed in the State of New York and is conducted in front of the New York Supreme Court located in  Queens County and/or Westchester County on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. (Eastern Time);

      (v)      the notice of the date, time and location of the foreclosure sale is published in the New York Times or Wall Street Journal (or such other newspaper widely circulated in New York, New York) for seven (7) consecutive days prior to the date of the foreclosure sale; and

      (vi)      Agent sends notification of the foreclosure sale to all secured parties identified as a result of a search of the UCC financing statements in the filing offices located in the State of New York conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

      (e)      Agent shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Pledgor hereby waives any claims against Agent arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Debt, even if Agent accepts the first offer received and does not offer any Collateral to more than one offeree, provided that Agent has acted in a commercially reasonable manner in conducting such private sale.

      **11.**      **Limitation on Duties Regarding Collateral.**  Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the Code or otherwise, shall be to deal with it with the same degree of care and in the same manner as Agent deals with similar securities and property for its own account or for the Agent's account.  None of Agent or any of its respective directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Pledgor or otherwise.  Without limiting the

13

Pledge and Security Agreement – Execution Copy
Mezzanine Loan - DeNardo

generality of the foregoing, Agent shall be under no obligation to take any steps necessary to preserve rights in the Collateral against any other parties but may do so at their option.  All out of pocket expenses incurred by Agent in connection with the exercise of Agent's remedies and the custody, safekeeping and physical preservation of this Collateral in its process, in accordance with the terms of this Agreement and applicable law shall be for the sole account of the Pledgor, and shall constitute part of the Debt secured hereby.

**12.    Financing Statements; Membership Certificates and Company Powers on Date of this Agreement.**  On the date hereof, Pledgor (a) shall deliver to Agent the membership certificates with respect to the Pledged Securities owned by it as of the date hereof, together with the Company Powers with respect to such membership certificates, and (b) hereby authorizes Agent to file UCC-1 financing statements with respect to the Collateral.  Pledgor agrees to deliver any other document or instrument which Agent may request with respect to the Collateral for the purposes of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted.  Without limiting the generality of the foregoing, Pledgor hereby authorizes the filing of financing statements (and amendments of financing statements and continuation statements) that name the Pledgor as debtor and the Agent as secured party and that cover all personal property or all assets of the Pledgor.

**13.    Attorney-in-Fact.**  Without limiting any rights or powers granted by this Agreement to Agent is hereby appointed, which appointment as attorney-in-fact is irrevocable and coupled with an interest, the attorney-in-fact of Pledgor, for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which Agent may deem necessary or advisable to accomplish the purposes hereof including:

(a)    to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b)    to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (a) above;

(c)    to file any claims or take any action or institute any proceedings that the Agent may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Agent, with respect to any of the Collateral; and

(d)    to execute, in connection with any sale provided for in Section 9 or Section 10, any endorsement, assignments, or other instruments of conveyance or transfer with respect to the Collateral.

If so requested by Agent, Pledgor shall ratify and confirm any such sale or transfer by executing and delivering to Agent at the Pledgor's expense all proper and customary deeds, bills of sale, instruments of assignment, conveyance of transfer and releases as may be designated in any such request.

**14.    Termination.**  Upon satisfaction in full of the Debt, (i) Agent's rights, and Pledgor's obligations, under this Agreement shall terminate, (ii) Agent shall return all membership certificates representing or evidencing the Pledged Securities (together with all

14

Company Powers delivered to Agent), and (iii) Agent shall execute and deliver to Pledgor UCC-3 termination statements and any other agreements, documents and instruments reasonably necessary to terminate the lien created by this Agreement.

15.    **Exculpation**.  The provisions of Section 15.1 of the Loan Agreement are hereby incorporated by reference into this Agreement to the same extent and with the same force as if fully set forth herein.

16.    **Indemnity**.  Pledgor agrees that the terms and provisions of Section 16.12 of the Loan Agreement are hereby incorporated by reference into this Agreement to the same extent and with the same force as if fully set forth herein.

17.    **Miscellaneous**.

(a)    **Severability**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(b)    **Headings**.  The headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

(c)    **No Waiver; Cumulative Remedies**.  Agent shall not by any act (except by a written instrument pursuant to Section 17(d)), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or in any breach of any of the terms and conditions hereof.  No failure to exercise, nor any delay in exercising, on the part of Agent, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by Agent of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Agent would otherwise have on any future occasion.  The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights, remedies, powers or privileges provided by law.

(d)    **Waivers and Amendments; Successors and Assigns**.  None of the terms or provisions of this Agreement may be waived, amended, or otherwise modified except by a written instrument executed by the party against which enforcement of such waiver, amendment, or modification is sought.  This Agreement shall be binding upon and shall inure to the benefit of (i) Pledgor and its successors and assigns, provided that Pledgor shall not have any right to assign its rights hereunder except to the extent expressly permitted under the Loan Agreement and (ii) Agent and its successors and assigns.  The rights of Agent under this Agreement shall automatically be transferred to any transferee thereof and such transferee shall be entitled to all of the rights and remedies of the Agent under this Agreement.

(e)    **Notices.**  All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if (a) addressed to Agent or Pledgor, as applicable, at the address of Agent or Pledgor, as applicable, set forth in Section 16.6 of the Loan Agreement (or at such other address or to such other Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this <u>Section 17(e)</u>, and (b) given in accordance with the terms and provisions of Section 16.6 of the Loan Agreement.  Notices may be sent by a party hereto or on its behalf by its attorney.

(f)    **<u>Governing Law</u>.**

**(i)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY PLEDGOR AND ACCEPTED BY AGENT IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTES SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF PLEDGOR AND AGENT, HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTES, AND THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**(ii)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL, AND ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST AGENT ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL, BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW YORK, COUNTY OF QUEENS AND/OR COUNTY OF WESTCHESTER, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND EACH OF PLEDGOR AND AGENT, WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH OF PLEDGOR AND AGENT HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.**

16

(g)    **Agents.**  Agent may employ agents and attorneys-in-fact in connection herewith and shall not be responsible for their actions except for the gross negligence or willful misconduct of any such agents or attorneys-in-fact selected by it in good faith.

(h)    **Irrevocable Authorization and Instruction to the Mortgage Borrower.** Pledgor hereby authorizes and instructs Mortgage Borrower and any servicer of the Loan to comply with any instruction received by it from Agent in writing that (i) states that an Event of Default has occurred and is continuing and (ii) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from Pledgor, and Pledgor agrees that Mortgage Borrower and any servicer shall be fully protected in so complying.

(i)    **Counterparts.**  This Agreement may be executed in any number of counterparts and all the counterparts taken together shall be deemed to constitute one and the same instrument.

(j)    **WAIVER OF JURY TRIAL, DAMAGES, JURISDICTION. EACH OF PLEDGOR AND AGENT HEREBY AGREES TO WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ITS RIGHTS TO A JURY TRIAL ON ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY DEALINGS BETWEEN PLEDGOR AND AGENT IN CONNECTION WITH THIS AGREEMENT.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF PLEDGOR AND AGENT ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ITS ENTRY INTO THIS AGREEMENT, EACH OF PLEDGOR AND AGENT REPRESENTS AND WARRANTS TO THE OTHER THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH WAIVER IS KNOWINGLY AND VOLUNTARILY GIVEN FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED, EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, REPLACEMENTS, REAFFIRMATIONS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, OR ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**WITH RESPECT TO ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, EACH OF PLEDGOR AND AGENT, SHALL AND HEREBY DOES SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF NEW YORK (AND ANY APPELLATE COURTS TAKING APPEALS THEREFROM).  EACH OF PLEDGOR AND AGENT) HEREBY WAIVES AND AGREES NOT TO ASSERT, AS A DEFENSE IN ANY**

17

**ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, (A) THAT IT IS NOT SUBJECT TO SUCH JURISDICTION OR THAT SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN THOSE COURTS OR THAT THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS MAY NOT BE ENFORCED IN OR BY THOSE COURTS OR THAT IT IS EXEMPT OR IMMUNE FROM EXECUTION, (B) THAT THE ACTION, SUIT OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR (C) THAT THE VENUE OF THE ACTION, SUIT OR PROCEEDING IS IMPROPER.   IN THE EVENT ANY SUCH ACTION, SUIT, PROCEEDING OR LITIGATION IS COMMENCED, PLEDGOR AGREES THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER PLEDGOR OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH LITIGATION UPON PLEDGOR AT THE ADDRESS OF PLEDGOR AND TO THE ATTENTION OF SUCH PERSON AS SET FORTH IN THIS <u>SECTION 17</u>.**

(k)      No claim may be made by Pledgor against Agent, its affiliates, directors, officers, employees, or attorneys for any special, indirect or consequential damages ("<u>Special Damages</u>") in respect of any breach or wrongful conduct (whether the claim therefor is based on contract, tort or duty imposed by law) in connection with, arising out of, or in any way related to the transactions contemplated or relationship established by this Agreement, or any act, omission or event occurring in connection herewith or therewith; and to the fullest extent permitted by law Pledgor hereby waives, releases and agrees not to sue upon any such claim for Special Damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(l)      **Joint and Several Liability.**  If Pledgor consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

(m)      **Advice of Counsel**.  Each of Pledgor and Agent represents and warrants to the other that it is executing this Agreement and, specifically, the provisions of this <u>Section 17</u>, following consultation with counsel.

[Signatures commence on the Following Page]

18

[SIGNATURE PAGE TO MEZZANINE PLEDGE AND SECURITY AGREEMENT]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the date set forth above.

PLEDGOR:

**DENARDO CAPITAL MANAGEMENT LLC,**
A New York limited liability company,

By: _____
Name: Sylvia DeNardo
Title: Member

By: _____
Name: Joseph DeNardo
Title: Managing Member

SCHEDULE 1
To Pledge and Security Agreement

DESCRIPTION OF
PLEDGED COMPANY INTERESTS

| Issuer | Owner | Class of Limited Liability Company Interests | Percentage of Limited Liability Company Interests |
|---|---|---|---|
| DeNardo Capital II LLC | Pledgor | sole member | 100% |

EXHIBIT A

[Form of Instruction to Register Pledge]

December __, 2018

To:

        Attention:

        In accordance with the requirements of that certain Pledge and Security Agreement, dated as the date hereof (as amended, supplemented, modified and/or restated from time to time, the "Pledge Agreement"), made by DENARDO CAPITAL MANAGEMENT LLC, a New York limited liability company ("Pledgor"), in favor of Silver Point Finance, LLC, a Delaware limited liability company (together with its successors and assigns, "Agent") (defined terms used but not otherwise defined herein are as defined in the Pledge Agreement), you are hereby instructed to register the pledge of the following interests as follows:

        All of the limited liability company interests of Pledgor in DENARDO CAPITAL II LLC, a New York limited liability company (the "Issuer") as listed on Schedule 1 to the Pledge Agreement including without limitation all of the following property now owned or at any time hereafter acquired by Pledgor or in which Pledgor now has or at any time in the future may acquire any right, title or interest:

        (a)     all limited liability company interest of, or other equity interests in, the Issuer and any options, warrants, and other rights hereafter acquired by Pledgor in respect of such limited liability company interests or other equity interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of the Issuer or otherwise) (all such limited liability company interests and other equity interests, including those described on Schedule 1 to the Pledge Agreement, and all such options, warrants and other rights being hereinafter collectively referred to as the "Pledged Interests");

        (b)     all certificates, instruments, or other writings representing or evidencing the Pledged Interests, and all accounts and general intangibles arising out of, or in connection with, the Pledged Interests;

        (c)     any and all moneys or property due and to become due to Pledgor now or in the future in respect of the Pledged Interests, or to which Pledgor may now or in the future be entitled to in its capacity as a member of the Issuer, whether by way of a dividend, distribution, return of capital, or otherwise;

        (d)     all other claims which Pledgor now has or may in the future acquire in its capacity as a member of the Issuer against the Issuer and its property;

        (e)     all rights of Pledgor under the limited liability company agreement of the Issuer (and all other agreements, if any, to which Pledgor is a party from time to time which

relate to the ownership of the Pledged Interests), including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the Pledged Interests; and

(f)    to the extent not otherwise included, all Proceeds of any or all of the foregoing.

You are hereby further authorized and instructed to execute and deliver to Agent a Confirmation Statement and Instruction Agreement, substantially in the form of Exhibit B to the Pledge Agreement and, to the extent provided more fully therein, to comply with the instructions of Agent in respect of the Collateral without further consent of, or notice to, the undersigned.  Notwithstanding anything in this instruction letter, this instruction shall not be construed as expanding the rights of Agent to give instructions with respect to the Collateral beyond any such rights set forth in the Pledge Agreement.

(NO FURTHER TEXT ON THIS PAGE)

Very truly yours,

PLEDGOR

**DENARDO CAPITAL MANAGEMENT LLC,**
A New York limited liability company,


By: _____
Name: Sylvia DeNardo
Title:  Member


By: _____
Name: Joseph DeNardo
Title:  Managing Member

EXHIBIT B

[Form of Confirmation Statement and Instruction Agreement]

December __, 2018

To:    SILVER POINT FINANCE, LLC

Pursuant to the requirements of that certain Pledge and Security Agreement, dated the date hereof (as amended, supplemented, modified and/or restated from time to time, the "Pledge Agreement"), made by DENARDO CAPITAL MANAGEMENT LLC, a New York limited liability company ("Pledgor"), in favor of Silver Point Finance, LLC, a Delaware limited liability company (together with its successors and assigns, "Agent") (defined terms used but not otherwise defined herein are as defined in the Pledge Agreement), this Confirmation Statement and Instruction Agreement relates to those limited liability company interests (the "Pledged Interests"), as further described on Schedule I hereto, issued by DENARDO CAPITAL II LLC, a New York limited liability company (the "Issuer").

For purposes of better assuring the perfection of the security interest of Agent in the Pledged Interests, the Issuer acknowledges that, as of the date hereof,

(a)  the registered owner of 100% of the limited liability company interest in the Issuer is Pledgor;

(b)  by book-entry, the Issuer has registered the Pledged Interests in the name of Agent, and no other pledge is currently registered on the books and records of the Issuer with respect to the Pledged Interests; and

(c)  there are no liens of the Issuer on the Pledged Interests or any adverse claims thereto for which the Issuer has a duty under Section 8-403 of the Code.

Also for purposes of better assuring the perfection of the security interest of Agent in the Pledged Interests, the Issuer agrees that, until the Debt is paid in full (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive satisfaction of the Note), the Issuer shall:

(i)    comply with the written instructions of Agent, without any further consent from Pledgor or any other Person, in respect of the Collateral; and

(ii)    disregard any request made by Pledgor or any other person which contravenes the written instructions of Agent with respect to the Collateral.

Notwithstanding anything in this Confirmation Statement and Instruction Agreement, this Confirmation Statement and Instruction Agreement shall not be construed as expanding the rights of Agent to give instructions with respect to the Collateral beyond such rights set forth in the Pledge Agreement.

Very truly yours,

ISSUER:

**DENARDO CAPITAL II LLC**,
A New York limited liability company,

By:    DENARDO CAPITAL MANAGEMENT
LLC, A New York limited liability
company, Its Manager

By: _____
Name: Sylvia DeNardo
Title:  Member

By: _____
Name: Joseph DeNardo
Title:  Managing Member

PLEDGOR:

**DENARDO CAPITAL MANAGEMENT LLC,**
A New York limited liability company,


By: _____
Name: Sylvia DeNardo
Title:  Member


By: _____
Name: Joseph DeNardo
Title:  Managing Member

SCHEDULE I
TO CONFIRMATION STATEMENT AND INSTRUCTION AGREEMENT

Description of Pledged Interests

| Issuer | Owner | Percentage of Limited Liability Company Interests |
|---|---|---|
| DeNardo Capital II LLC | Pledgor | 100% |

EXHIBIT C

[Form of Acknowledgement and Consent]

DENARDO CAPITAL II LLC (the "Company") hereby acknowledges receipt of a copy of that certain Pledge and Security Agreement, dated as of the date hereof, (as the same may be amended, supplemented, modified and/or restated from time to time, the "Pledge Agreement"), made by DENARDO CAPITAL MANAGEMENT LLC in favor of Silver Point Finance, LLC, a Delaware limited liability company (together with its successors and assigns, "Agent") and consents to the security interest granted thereunder and agrees that Pledgor is bound thereby.  The Company agrees to notify Agent promptly in writing of the occurrence of any events described in Section 5(a) of the Pledge Agreement.

Dated:  as of December ___ 2018

_____,<br>
a _____

By: _____<br>
Name:<br>
Title:

## **EXHIBIT C**

### **MEZZANINE LOAN AGREEMENT**

MEZZANINE LOAN AND SECURITY AGREEMENT

Dated as of December 28, 2018

Between

DENARDO CAPITAL MANAGEMENT LLC, a New York limited liability company,
as Borrower

and

SILVER POINT FINANCE, LLC, a Delaware limited liability company,
as Administrative Agent and Collateral Agent on behalf of Lender

and

SPECIALTY CREDIT HOLDINGS, LLC, a Delaware limited liability company, as a Lender

and

ZEE BRIDGE CAPITAL LLC, a Delaware limited liability company, as a Lender

| | |
|---|---|
| Address: | 30, 40 and 42 South Broadway and 0-20, 22, 24, 26, 28 and 30 Marker Ridge, Irvington |
| County: | Westchester |
| Section: | 2.90 |
| Block: | 44 |
| Lot(s): | 21, 21.1, 21.2, 21.3, 21.4, 21.5, 21.6, 21.7, 21.8, 21.9, 21.10, 21.11, 21.12, 21.13, 21.14, 21.15, 21.16, 21.17, 21.18, 21.19, 21.20, 21.21, 21.22, 21.23, 21.24, 21.25, 21.26, 21.27, 21.29 |

Mezzanine Loan Amount: $1,000,000.00

## MEZZANINE LOAN AND SECURITY AGREEMENT

**THIS MEZZANINE LOAN AND SECURITY AGREEMENT** dated as of December 28, 2018 (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), is made by and between **DENARDO CAPITAL MANAGEMENT LLC**, a New York limited liability company ("Borrower"), **ZEE BRIDGE CAPITAL LLC**, a Delaware limited liability company, having an address at 450 Lexington Avenue, New York, New York 10017 ("Zee"), and **SPECIALTY CREDIT HOLDINGS, LLC**, a Delaware limited liability company ("Specialty Credit", and together with Zee and their respective successors and/or assigns, each a "Lender" and collectively, "Lender"), and **SILVER POINT FINANCE, LLC**, a Delaware limited liability company, having an address at Two Greenwich Plaza, 1st Floor, Greewich, Connecticut 06830, as Administrative Agent and Collateral Agent on behalf of Lender (in such capacity, together with its successors and assigns, "Agent").

## RECITALS:

WHEREAS, DENARDO CAPITAL II LLC, a New York limited liability company ("Mortgage Borrower") and 34th STREET CAPITAL LLC, a New York limited liability company ("34th Street" and together with Mortgage Borrower, individually and collectively, "Acquisition Loan Borrower") is obtaining the following loans from the Mortgage Lender (as defined below): (a) an acquisition loan in the proposed amount of $10,000,000.00 (the "Acquisition Loan"), pursuant to that certain Acquisition Loan and Security Agreement, dated as of the date hereof (the "Acquisition Loan Agreement") by and among Acquisition Loan Borrower, Mortgage Lender, and Mortgage Agent, and the other "Acquisition Loan Documents" referenced therein (collectively, the "Acquisition Loan Documents"), and (b) a building loan in the principal amount of $8,000,000.00 (the "Building Loan") pursuant to that certain Building Loan and Security Agreement, dated as of the date hereof, by and among Mortgage Borrower, Mortgage Lender and Mortgage Agent (together with all extensions, renewals, substitutions, restatements, modifications and amendments thereto, the "Building Loan Agreement"), and the other documents referenced as "Building Loan Documents" therein (collectively, the "Building Loan Documents", and together with the Acquisition Loan Documents, collectively, the "Mortgage Loan Documents");

WHEREAS, (a) the Acquisition Loan is evidenced by that certain Amended and Restated Acquisition Loan Promissory Note, dated as of the date hereof, made by Acquisition Loan Borrower in favor of Mortgage Agent on behalf of Mortgage Lender in the stated maximum principal amount of $10,000,000.00 (as amended, restated, replaced (whether by one or more replacement notes) or modified from time to time, the "Acquisition Loan Note"), and (b) the Building Loan is evidenced by that certain Building Loan Promissory Note, dated as of the date hereof, made by Mortgage Borrower in favor of Mortgage Agent on behalf of Mortgage Lender in the stated maximum principal amount of $8,000,000.00 (as amended, restated, replaced (whether by one or more replacement notes) or modified from time to time, the "Building Loan Note");

WHEREAS, (a) the Acquisition Loan is secured by, among other things, (1) that certain Amended and Restated Acquisition Loan Mortgage, Assignment of Leases and Rents and

Security Agreement, dated as of the date hereof, given by Mortgage Borrower to Mortgage Agent on behalf of Mortgage Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "Acquisition Loan Mortgage"), which grants to Mortgage Lender a first priority lien on the Property owned by Mortgage Borrower, and (2) the LIC Mortgage (as defined herein) given by 34th Street to Mortgage Agent which grants to Mortgage Lender a first priority lien on the Property owned by 34th Street, respectively; and (b) the Building Loan is secured by, among other things, that certain Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of the date hereof, given by Mortgage Borrower to Mortgage Agent on behalf of Mortgage Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "Building Loan Mortgage" and together with the Acquisition Loan Mortgage, the LIC Mortgage and the Building Loan Mortgage, collectively, the "Security Instruments"), which Building Loan Mortgage grants to Mortgage Lender a second-priority lien on the Property owned by Mortgage Borrower which is junior only to the lien of the Acquisition Loan Mortgage on said Property;

WHEREAS, Borrower desires to obtain a mezzanine loan in the maximum principal amount of ONE MILLION and NO/100 Dollars ($1,000,000.00) (the "Loan"), from Lender pursuant to this Agreement; and

WHEREAS, (a) the Loan is evidenced and/or secured by, among other things, (i) that certain Mezzanine Loan Promissory Note, dated as of the date hereof, in the stated maximum principal amount of ONE MILLION and NO/100 Dollars ($1,000,000.00), executed by Borrower in favor of Agent on behalf of Lender (as amended, restated, replaced (whether by one or more replacement notes) or modified from time to time, "Note"); and (b) that certain Pledge and Security Agreement, dated as of the date hereof, given by Borrower to Agent on behalf of Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "Pledge Agreement"), which grants to Lender a pledge of 100% of the direct equity interests in the Mortgage Borrower.

NOW, THEREFORE, in consideration of Lender making the Acquisition Loan and Building Loan, and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant, as applicable, as follows:

### ARTICLE I.  DEFINITIONS; PRINCIPLES OF CONSTRUCTION.

1.1 Definitions.  For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Account Collateral" means any and all funds, monies, cash and cash equivalents in the Collateral Accounts, from time to time.

"Acquisition Loan" has the meaning set forth in the recitals hereto.

"Acquisition Loan Agreement" has the meaning set forth in the recitals hereto.

"Acquisition Loan Amount" means $10,000,000.00.

"<u>Acquisition Loan Assignment of Leases</u>" means that certain Acquisition Loan Assignment of Leases and Rents, dated as of the Closing Date, made by Mortgage Borrower to Mortgage Agent, in connection with the Acquisition Loan, as the same may be amended, modified and/or restated from time to time.

"<u>Acquisition Loan Documents</u>" has the meaning set forth in the recitals hereto.

"<u>Acquisition Loan Mortgage</u>" has the meaning set forth in the recitals hereto.

"<u>Acquisition Loan Note</u>" has the meaning set forth in the recitals hereto.

"<u>Act</u>" has the meaning set forth on <u>Schedule IV</u> attached hereto.

"<u>Affiliate</u>" means, as to any Person, any other Person that, (i) directly or indirectly owns twenty percent (20%) or more of all Equity Interests in such Person, and/or (ii) is in Control of, is Controlled by or is under common Control with such Person, and/or (iii) is a director, partner, officer or employee of such Person or of an Affiliate of such Person, and/or (iv) is the spouse, issue or parent of such Person or an Affiliate of such Person.

"<u>Affiliate Agreement</u>" has the meaning set forth in <u>Section 6.6(r)</u>.

"<u>Affiliated Manager</u>" means any Manager that is an Affiliate of Borrower or any Guarantor.

"<u>Aggregate Debt Service</u>" means, with respect to any particular period of time, Debt Service plus all scheduled payments of interest under this Agreement and the Note.

"<u>Aggregate Loan Amount</u>" means the Loan Amount plus the Mortgage Loan Amount.

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>ALTA</u>" means American Land Title Association, or any successor thereto.

"<u>Alteration</u>" has the meaning set forth in <u>Section 10.2</u>.

"<u>Alternative Rate</u>" means, for any Interest Period in respect of an Alternative Rate Loan, the greater of (a) the sum of (i) the Alternative Rate Index plus (ii) the Alternative Rate Spread for such Interest Period and (b) the sum of (i) the Spread plus (ii) the LIBOR Floor.

"<u>Alternative Rate Index</u>" means the annual rate of interest published in The Wall Street Journal from time to time as the "prime rate" as of the date that is prior to (but most near) the date which is two (2) Business Days prior to the fifteenth (15th) day of the calendar month in which the applicable Interest Period commences.  If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest one-hundredth of one percent (0.01%).  If The Wall Street Journal ceases to publish the "Prime Rate," Agent, on behalf of Lender, shall reasonably select an equivalent publication that publishes such "prime rate," and if such "prime rate" is no longer generally published or is limited, regulated or administered by a governmental or quasi-

governmental body, then Agent shall select a reasonably comparable interest rate index. Agent's determination of the Alternative Rate Index shall be binding and conclusive on Borrower absent manifest error. The Alternative Rate Index may or may not be the lowest rate that Agent or Lender prices loans on the date which the Alternative Rate Index is determined by Agent as set forth above.

"Alternative Rate Loan" means the Loan or any portion thereof at any time during which the Interest Rate for the Loan or such portion thereof, as the case may be, is calculated with reference to the Alternative Rate in accordance with the provisions of Article II.

"Alternative Rate Spread" means the greater of (i) zero basis points and (ii) the difference (expressed as the number of basis points) between (a) the LIBOR Rate plus the Spread on the date the LIBOR Rate was last applicable to the Loan and (b) the Alternative Rate Index on the date that the LIBOR Rate was last applicable to the Loan.

"Annual Operating Budget" means an operating budget for the Property to be prepared by Mortgage Borrower for each Fiscal Year (or portion thereof) for Agent's written approval, and setting forth, in reasonable detail, Mortgage Borrower's good faith estimates, on a month-by-month basis, of all anticipated Operating Income, Operating Expenses, and Capital Expenditures for the Property for such Fiscal Year (or portion thereof).

"Appraisal" means an appraisal of the Property conducted by an Independent MAI appraiser selected by Agent, which Appraisal shall conform to all regulatory requirements and be satisfactory in form and substance to Agent.

"Approved Annual Operating Budget" has the meaning set forth in Section 11.7.

"Approved Bank" means Bank of America, N.A., Wells Fargo Bank, N.A., J.P. Morgan Chase Bank, N.A., Citibank, N.A. or another bank or other financial institution that has a minimum long term unsecured debt rating of at least "A" by S&P or "A2" by Moody's.

"Architect" means the architect to be engaged by Mortgage Borrower with respect to all or any portion of the Project and approved by Agent.

"Architect Agreement" means the architect agreement to be entered into by and between Mortgage Borrower and Architect, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement

"Architect Consent" means an Architect Consent and Agreement, the form of which is attached to the Assignment of Architect Agreement, to be executed and delivered by Architect in favor of Agent, in connection with the Loan, as the same may be modified, amended, restated or supplemented from time to time.

"Assignment of Architect Agreement" means an Assignment of Architect Agreement, in form and substance acceptable to Agent in its sole discretion, to be entered into upon the execution of the Architect Agreement, made by Mortgage Borrower in favor of Agent, as the same may be amended, modified and/or restated from time to time.

"Assignment of Construction Contract" means an Assignment of Construction Contract, in form and substance acceptable to Agent in its sole discretion, to be entered into upon the execution of the General Construction Contract, made by Mortgage Borrower in favor of Agent, as the same may be amended, modified and/or restated from time to time.

"Assignment of Management Agreement" means an Assignment of Management Agreement and Subordination of Management Fees, in form and substance acceptable to Agent in its sole discretion, to be entered into by Mortgage Borrower, Manager and Agent upon Mortgage Borrower's entering into a Management Agreement in accordance with Section 6.1.21(a) of this Agreement, in form and substance satisfactory to Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Permits" means an Assignment of Licenses, Permits, Approvals, Agreements, and Documents, entered into by Mortgage Borrower in favor of Agent, as the same may be amended, modified and/or restated from time to time.

"Assignment of Sales Agency Agreement" means an Assignment and Subordination of Sales Agency Agreement, in form and substance acceptable to Agent in its sole discretion, to be entered into by Mortgage Borrower, Sales Agent and Agent upon Mortgage Borrower's entering into a Sales Agency Agreement in accordance with Section 6.1.21(c) of this Agreement, in form and substance acceptable to Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Authorized Representative" means any Person(s) designated in writing by Borrower to Agent on the Closing Date as authorized to sign and deliver requisition letters pursuant to Section 4.4.2), as the list of such Persons may be updated and revised by Borrower by written notice to Agent from time to time.

"Bankruptcy Action" has the meaning set forth on Schedule IV attached hereto.

"Bankruptcy Code" means Title 11, U.S.C.A., as amended from time to time and any successor statute thereto.

"Bankruptcy Event" has the meaning set forth in Section 14.1(a)(ix).

"Blended Rate" means the weighted average annual interest rate payable under the Note and under the Mortgage Loan Note assuming an Event of Default does not then exist under either the Loan or the Mortgage Loan.

"Bona Fide Residential Sales Contract" has the meaning set forth in Section 6.2.24(i)(iv).

"Book Entry System" has the meaning set forth in Section 6.1.26.

"Borrower" has the meaning set forth in the introductory paragraph hereto.

"Borrower Group" means, collectively, the Borrower, Mortgage Borrower, 34th Street, any Affiliated Manager, any Guarantor or any Person Controlled by, Controlling or under common Control with Borrower, Mortgage Borrower, or Guarantor.

"<u>Borrower Party</u>" and "<u>Borrower Parties</u>" means, collectively, Borrower, Mortgage Borrower, each Guarantor and any of the respective members, managers, officers, directors or Affiliates of Borrower, Mortgage Borrower, or any Guarantor, whether direct or indirect.

"<u>Broker</u>" has the meaning set forth in <u>Section 5.1.34</u>.

"<u>Budget</u>" means the demolition, construction and development budget prepared by, or on behalf of, Mortgage Borrower, subject to Agent's written approval, for the construction and development of the Project (which may consist of a separate budget or separate budget components for each Mortgage Loan and the Loan), as the same may be adjusted due to approved changes or reallocations made in accordance with <u>Section 4.6</u> of the Building Loan Agreement or <u>Section 6.2.3</u> or the corresponding provisions of the Building Loan Agreement, and which, in any event (i) sets forth Borrower's best calculated estimates for budgeted construction categories of all items of direct and indirect Costs to be incurred or payable with respect to the foregoing (including monthly interest on the Loan and the Mortgage Loan), (ii) includes Line Items for all direct and foreseeable indirect Costs estimated to be incurred to construct the Project through receipt of all temporary certificates of occupancy for the entire Project (including the Hard Costs Contingency and the Soft Costs Contingency and reserves), (iii) specifies whether each such item constitutes a Hard Cost, a Soft Cost or a Project Cost, and (iv) specifies each direct and indirect Cost that is to be funded from proceeds of each of the Building Loan and the Loan.

"<u>Building Loan</u>" has the meaning set forth in the recitals hereto.

"<u>Building Loan Advance</u>" means an advance to or on behalf of Mortgage Borrower of certain Reserve Funds from the Construction Reserve Account made pursuant to the provisions and subject to the terms and condition of the Building Loan Agreement.

"<u>Building Loan Agreement</u>" has the meaning set forth in the recitals hereto.

"<u>Building Loan Amount</u>" means $8,000,000.00.

"<u>Building Loan Assignment of Leases</u>" means that certain Building Loan Assignment of Leases and Rents, dated as of the Closing Date, made by Mortgage Borrower to Agent, as security for the Building Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Building Loan Documents</u>" has the meaning set forth in the recitals hereto.

"<u>Building Loan Mortgage</u>" has the meaning set forth in the recitals hereto.

"<u>Building Loan Note</u>" has the meaning set forth in the recitals hereto.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which the New York Stock Exchange and/or commercial banks located in New York, New York are authorized and/or required by law to close. Unless otherwise provided, the term "day" or "days" when used herein shall mean calendar days. When used with respect to an Interest Determination

Date, Business Day means any day on which dealings in deposits in U.S. Dollars are transacted in the London interbank market.

"Capital Expenditures" means, for any period, the amount expended for items required to be capitalized under GAAP (including expenditures for building improvements, major repairs and tenant improvements).

"Cash" means the legal tender of the United States of America.

"Cash and Cash Equivalents" means any one or a combination of the following:  (i) Cash, and (ii) U.S. Government Obligations.

"Casualty" means the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"Casualty Amount" means Two Hundred Fifty Thousand Dollars ($250,000.00).

"Change Order" means any amendment, supplement or other modification in any respect to (i) the Plans and Specifications, (ii) the Construction Schedule, (iii) any Construction Contract, or (iv) any Major Trade Contract, in each case, which, without regard to any other such amendment and/or modification, which would (a) increase or decrease the Costs or any category thereof, (b) reduce (x) the gross square feet or leasable area of the Units (in the aggregate), (y) the number of Units in the Improvements, or (z) the general layout of the Improvements (or any component thereof); or (c) involve the use of materials, furniture, fixtures and equipment that will not be at least substantively equal or better in quality to the materials, furniture, fixtures and equipment originally specified in or required by the Plans and Specifications.

"Closing Date" means the date of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Collateral" has the meaning set forth in the Pledge Agreement.

"Collateral Accounts" means, collectively, the Construction Reserve Account, General Reserve Account, Interest Reserve Account, Tax Reserve Account, the Deficiency Account, and any other accounts now or hereafter established and pledged to Agent on behalf of Lender and maintained by Agent or Loan Servicer (as determined by Agent) pursuant to this Agreement, the Acquisition Loan Mortgage, the other Acquisition Loan Documents or any of the other Loan Documents (including pursuant to any other instruments, documents and agreements hereafter executed and delivered by Borrower in connection with the Loan).

"Common Charges" means all common charges, assessments and all other expenses incurred by Borrower as the owner of the Units pursuant to the Condominium Declaration.

"Completion" means, with respect to the Project or any portion thereof as more fully described in this Agreement, the stage at which the development, construction and equipping of

the Project (or any specified portion thereof, including, without limitation, with respect to the Initial Units and remaining Units) shall be one hundred percent (100%) complete substantially in accordance with the Plans and Specifications and all Legal Requirements (including, without limitation, DOF and DOL approvals regarding separate tax lots), including all Punchlist Items with respect thereto, and fully paid and a permanent certificate of occupancy has been issued. The terms "<u>Completed</u>" or "<u>Complete</u>" shall have correlative meanings.

"<u>Completion Guaranty</u>" means that certain Mezzanine Guaranty of Completion, dated as of the Closing Date, made by Guarantor in favor of Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Condominium</u>" shall mean the condominium formed in connection with the Project pursuant to the Condominium Act.

"<u>Condominium Act</u>" means Article 9-B of the New York Real Property Law (339-d et seq.) of the State of New York and all modifications, supplements and replacements thereof and all regulations with respect thereto, now or hereafter enacted or promulgated.

"<u>Condominium Board</u>" has the meaning set forth in <u>Section 6.2.25</u>.

"<u>Condominium Board Policy</u>" has the meaning set forth in <u>Section 7.1.7</u>.

"<u>Condominium Charges</u>" means the aggregate amount assessed or imposed against the Units owned by Mortgage Borrower in the Condominium for common charges and any special assessments and other similar amounts charged to Mortgage Borrower under the Condominium Documents or otherwise payable with respect to the Units then owned by Mortgage Borrower.

"<u>Condominium Conversion</u>" has the meaning set forth in <u>Section 6.2.24</u>.

"<u>Condominium Declaration</u>" means the declaration of condominium, together with all exhibits annexed thereto, including the by-laws and the floor plans, with respect to the Project to be recorded in the Register's Office pursuant to the Condominium Act, which has been approved by Agent in accordance with <u>Section 6.2.24</u>, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with this Agreement.

"<u>Condominium Documents</u>" means, collectively, an Offering Plan, the Condominium Declaration, by-laws, the Condominium Plans, and rules and regulations of a condominium association, and any and all other documentation related to the proper formation and operation of the condominium regime to be established at the Westchester Property under New York law, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with this Agreement.

"<u>Condominium Plans</u>" means the tax lot drawings of the Improvements to be recorded simultaneous with the Condominium Declaration.

"<u>Condominium-Related Documents</u>" means, collectively, the Condominium Documents and any and all other documentation related to the marketing and sale of Units at the Property,

including the Sales Agency Agreement and Unit Sales Contracts, including all agreements with respect to non-refundable and other purchase deposits related thereto, and other sales materials.

"Constituent Member" has the meaning set forth in Section 15.1(c).

"Constituent Equity Members" has the meaning set forth on Schedule IV attached hereto.

"Construction Commencement Date" means the date upon which the construction and development of the Project shall begin.

"Construction Consultant" means such Person that is experienced in Westchester County construction projects similar to the Project as may be designated and engaged by Agent in its sole discretion, from time to time, as construction consultant to advise, consult and render reports to Agent concerning the status of the development and construction of the Project who shall be paid by Borrower at its sole cost and expense; provided however, any and all costs and expenses of Construction Consultant not paid by Borrower when requested by Agent shall be added to the unpaid principal balance of the Building Loan on the first day of the immediately following month.

"Construction Contracts" means any contract between Borrower, an Affiliate of Borrower, or any Contractor and any other Person for the development, construction and equipping of the Project or any part thereof, and including, as the context shall require, the Architect Agreement, the Engineers Agreement, the General Construction Contract, each agreement with any other Design Professional, each Major Trade Contract, any other Trade Contract to which Borrower or an Affiliate of Borrower is a party, in each case, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time to time in accordance with the terms and conditions of this Agreement.

"Construction Documents" means, collectively, all Construction Contracts, the Plans and Specifications, the Budget, the Construction Permits and all Change Orders, and all other agreements, certificates or other documents to which Borrower or any Affiliate of Borrower is a party, or otherwise subject to, or is a beneficiary, in each case relating to the construction of the Project, in each case, as the same may be amended, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"Construction Permits" means, collectively, all authorizations, consents and approvals, licenses and permits given or issued by Governmental Authorities which are required for the construction of the Project in accordance with all Legal Requirements and the Plans and Specifications, and for the performance and observance of all obligations and agreements of Borrower contained herein or in the other Loan Documents relating to the development and construction of the Project, as the same may be amended, replaced, supplemented, assigned or otherwise modified from time to time in accordance with the terms of this Agreement and applicable Legal Requirements.

"Construction Phase" means the period commencing on the Construction Commencement Date and continuing until Completion.

"Construction Reserve Account" has the meaning defined in Section 13.3.

"Construction Schedule" means a schedule for the projected progress of the development and construction of the Project, setting forth a construction progress schedule reflecting, among other things, the anticipated dates of completion, which shall include a trade-by-trade breakdown of the estimated periods of commencement and completion of the specific work to be completed in connection with the Substantial Completion and Completion of the Project substantially in accordance with the Plans and Specifications and Legal Requirements, as the same may be amended, restated, replaced, supplemented, updated or otherwise modified from time to time in accordance with the terms of this Agreement or otherwise with the approval of Agent.

"Contingency" means, individually or collectively, as the context may require, the Hard Costs Contingency and the Soft Costs Contingency.

"Contractor" means any contractor, subcontractor, sub-subcontractor, supplier or provider of labor, materials, equipment and/or services in connection with the construction of the Project or any Design Professional.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.  The terms "Controlled", "Controlling" and "Common Control" shall have correlative meanings.

 "Cost Saving" has the meaning set forth in the Building Loan Agreement.

"Costs" means, collectively, all fees, costs and expenses of constructing the Project (including all Hard Costs, Project Costs and Soft Costs) through Completion whether or not set forth in the Budget, all as subject to Agent's approval.

"Costs of the Improvement" means those items defined as an "improvement" and/or a "cost of improvement" under Section 2 of the Lien Law.

"Cumulative Payments" means, the Aggregate Debt Service (specifically excluding any payments of interest at the Default Rate, Late Payment Charges, any payments of the Usage Fee, any payments in reduction of the Outstanding Principal Balance and any reimbursement of costs or expenses incurred by Agent and Lender required to be reimbursed by Borrower under the Loan Documents).

"Current Construction Permits" means, with respect to any phase or portion of the Project for which work is then being performed and/or for which Borrower is then requesting an Advance, all Construction Permits and approvals from all Governmental Authorities then required by law to commence and complete such phase or portion of the Project in accordance with the Plans and Specifications.

"DBRS" means DBRS, Inc., together with its successors.

"Debt" means the outstanding principal amount set forth in, and evidenced by, the this Agreement, the Mortgage Loan Agreements, and the Notes, together with all interest accrued and unpaid thereon and all fees, costs, expenses (including legal fees and costs) and other sums due to Agent and Lender in respect of the Loan under the Notes, this Agreement, the Mortgage Loan

Agreements, and the other Acquisition Loan Documents and Building Loan Documents, including, without limitation, the Deferred Origination Fee, any applicable Make Whole Fee, Usage Fee and all Reserve Funds.

"Debt Service" means, with respect to any particular period of time, scheduled payments of interest and principal under all Notes.

"Default" means the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"Default Rate" means a rate per annum equal to the lesser of (i) the Maximum Legal Rate and (ii) twenty-four percent (24%).

"Defects" has the meaning set forth in Section 4.1(v).

"Deficiency Account" has the meaning set forth in the Building Loan Agreement.

"Deficiency Collateral" has the meaning set forth in the Building Loan Agreement.

"Design Professionals" means, collectively, all architects, engineers, consultants, and similar professionals retained by or on behalf of Borrower in connection with the design of the Project (including the Architect), all of which shall be licensed professionals in the State (if so required by the Legal Requirements) and, if such Design Professional is retained after the Closing Date pursuant to a Material Agreement, shall be subject to approval by Agent prior to such engagement in connection with the Project.

"DOB" means the Westchester County Building Department.

"DOF" means the Westchester County Department of Finance.

"DOL" means the New York State Department of Law.

"DOL Comments" has the meaning set forth in Section 6.2.24(b).

"Dollars" or "$" shall mean lawful money of the United States of America.

"Draw Request" has the meaning set forth in the Building Loan Agreement.

"Eligible Account" means a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000.00 and subject to supervision or examination by federal and state

authority.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"Eligible Assignee"  (i) Agent or any Lender; or (ii) any Affiliate of Silver Point Capital, L.P.; or (iii) any commercial bank, savings bank, savings and loan association or similar financial institution which, with respect to immediately preceding clause (iii), (A) has total assets of Five Billion Dollars ($5,000,000,000) or more, (B) is "well capitalized" within the meaning of such term under the regulations promulgated under the auspices of the Federal Deposit Insurance Corporation Improvement Act of 1991, (C) in the sole judgment of the Agent, is engaged in the business of lending money and extending credit, and buying loans or participations in loans under credit facilities substantially similar to those extended under this Agreement, and (D) in the sole judgment of the Agent, is operationally and procedurally able to meet the obligations of a Lender hereunder to the same degree as a commercial bank; (iii) any insurance company in the business of writing insurance which (A) has total assets of Five Billion Dollars ($5,000,000,000) or more (B) is "best capitalized" within the meaning of such term under the applicable regulations of the National Association of Insurance Commissioners, and (C) meets the requirements set forth in sub clauses (C) and (D) of clause (ii) above; (iv) any other financial institution having total assets of Five Billion Dollars ($5,000,000,000) (including a mutual fund or other fund under management of any investment manager having under its management total assets of Five Billion Dollars ($5,000,000,000) or more) which meets the requirement set forth in sub clauses (C) and (D) of clause (ii) above; and (v) if an Event of Default has occurred, any entity approved by Agent; provided that each Eligible Assignee must (w) be organized under the Laws of the United States of America, any state thereof or the District of Columbia, or, if a commercial bank, be organized under the Laws of the United States of America, any state thereof or the District of Columbia, the Cayman Islands or any country which is a member of the Organization for Economic Cooperation and Development, or a political subdivision of such a country, (x) act under the Loan Documents through a branch, agency or funding office located in the United States of America, (y) be exempt from withholding of tax on interest and deliver the documents related thereto pursuant to the Internal Revenue Code as in effect from time to time and (z) not be the Borrower or an Affiliate of the Borrower.

"Eligible Institution" means (i) a depository institution or trust company insured by the Federal Deposit Insurance Corporation (A) the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" (or its equivalent) from each of the Rating Agencies (in the case of accounts in which funds are held for thirty (30) days or less) and (B) the long term unsecured debt obligations of which are rated at least "A-" (or its equivalent) from each of the Rating Agencies (in the case of accounts in which funds are held for more than thirty (30) days) or (ii) such other depository institution otherwise approved by Agent from time-to-time in its sole discretion.

"Engineers" means each individually and collectively, as the context may require, (i) the Mechanical Engineer and (ii) the Structural Engineer.

"Engineers Agreement" means each individually and collectively, as the context may require, (i) the Mechanical Engineer Agreement and (ii) the Structural Engineer Agreement.

"Engineers Consent" means collectively, that certain (i) Engineer Consent, to be executed and delivered by the Mechanical Engineer in favor of Agent, together with any additional consents and agreements required pursuant to the terms of this Agreement, which, in each case, shall be, in form and substance acceptable to Agent and the Mechanical Engineer and (ii) Engineer Consent, to be executed and delivered by Structural Engineer in favor of Agent, together with any additional consents and agreements required pursuant to the terms of this Agreement, which, in each case, shall be, in form and substance acceptable to Agent and the Structural Engineer.

"Environmental Indemnity" means that certain Mezzanine Environmental Indemnity Agreement, dated as of the Closing Date, made by Borrower and Guarantor(s) in favor of Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Environmental Law" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to the protection of human health or the environment.  The term "Environmental Laws" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues:  the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including, but not limited to, Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act as it relates to Hazardous Materials; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.  The term "Environmental Laws" also includes, but is not limited to, any present and future federal, state and local laws, statutes, ordinances, rules, regulations, permits or authorizations, as well as common law, that (a) condition transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property;  (b) require notification or disclosure of Releases of Hazardous Materials or other environmental condition of the Property to any Governmental Authority or other Person, whether or not in connection with transfer of title to or interest in property; (c) impose conditions or requirements concerning Hazardous Materials in connection with permits or other authorization for lawful activity; (d) relate to nuisance, trespass or other causes of action arising out of the presence of Hazardous Materials and related to the Property; or (e) relate to wrongful death, personal injury, or property or other damage in connection with the presence of Hazardous Materials and related to the Property.

"Environmental Reports" means that certain Phase I Environmental Site Assessment for the Property.

"Equipment" has the meaning set forth in the Security Instruments.

"Equity Interests" means (i) partnership interests (general or limited) in a partnership, (ii) membership interests in a limited liability company, (iii) shares or stock interests in a corporation, and (iv) the beneficial ownership interests in a trust.

"Equity Payment" means a payment by Borrower or Mortgage Borrower with respect to Costs which payment is not credited toward or derived from the Required Equity Investment and that is not made from Advances or Mortgage Advances.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and the rulings issued thereunder.

"Event of Default" has the meaning set forth in Section 14.1(a).

"Excluded Taxes" means, with respect to Agent and/or Lender ("Recipient") of any payment to be made on account of the Debt pursuant to this Agreement or any other Loan Document, (i) any taxes imposed on (or measured by) such Recipient's income and franchise or similar taxes imposed on it by the United States of America, or by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located, (ii) any branch profits taxes imposed by the United States of America or any similar tax imposed under the laws of any other jurisdiction in which Borrower is located, and (iii) any U.S. Federal Withholding Taxes imposed under FATCA.

"Excusable Delay" means any delay or number of delays, not exceeding sixty (60) days in the aggregate, due to conditions beyond the reasonable control of Borrower, including earthquakes, hurricanes, tidal waves, inclement weather or any act of God or operation of forces of nature, enemy action, an act of terrorism, civil commotion, fire, casualty, accidents, provided that with respect to any of the foregoing, Borrower shall have given written notice of such delay to Agent within ten (10) days of the date Borrower became aware of the occurrence of the event resulting in such delay.  Notwithstanding the foregoing, if Borrower is able subsequently to demonstrate to the satisfaction of Agent the existence and duration of an occurrence of delay that would have qualified as Excusable Delay but for Borrower's failure to timely notify Agent, such delay shall be deemed Excusable Delay for the period commencing on the date which is ten (10) days prior to the date on which Borrower notifies Agent of such occurrence, and continuing thereafter in accordance with the terms of this definition.

"Extended Maturity Date" has the meaning set forth in Section 2.4(b) hereof.

"Extension Fee" means an amount equal to one percent (1.00%) of the then Outstanding Principal Balance which, if consented to by Agent may be added to the Outstanding Principal Balance.

"Extension Option" has the meaning set forth in Section 2.4(b).

"Extension Period" means the period of twelve (12) months following the Initial Maturity Date.

"FATCA" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System as constituted from time to time.

"Financial Information" has the meaning set forth in Section 12.2(b).

"Fiscal Year" means each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan or the portion of any such twelve (12) month period falling within the term of the Loan in the event that such a 12-month period occurs partially before or after, and partially during, the term of the Loan.

"Fitch" means Fitch, Inc., together with its successors.

"GAAP" means the generally accepted accounting principles as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession, to the extent such principles are applicable to the facts and circumstances on the date of determination.

"General Construction Contract" means the guaranteed maximum price general construction contract or general contractor agreement to be entered into between Mortgage Borrower and General Contractor and approved by Agent in accordance with the terms hereof, providing for construction of the Project together with any guaranty of the General Contractor's obligations under the Contractor's obligations under such contract, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"General Contractor" means a general contractor to be engaged by Mortgage Borrower with respect to all or any portion of the Project and approved by Agent

"General Contractor Consent" means the General Contractor Consent and Agreement, the form of which is attached to the Assignment of Construction Contract, to be executed and delivered by the General Contractor in favor of Agent and delivered in connection with the Loan, as the same may be amended, modified and/or restated from time to time in accordance with the terms and conditions of this Agreement.

"General Reserve Account" has the meaning defined in Section 13.4.

"Governmental Authority" means any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"Gross Sales Proceeds" means, as to any Unit, the gross proceeds from the sale of such Unit, payable to the Borrower (including in the case of Units, purchaser upgrades and options (if applicable), any fees, expenses or transfer taxes of Borrower paid to Borrower by the purchaser of such Unit, and any mortgage recording tax reimbursement paid by such purchaser to Borrower, and including any customary closing prorations paid by such purchaser (such as real estate taxes in respect of accrual periods from and after the closing of such Unit, any payments made for any additional services provided to or in connection with such Unit, any payments for storage units, if applicable, and any forfeited deposits under any sales contracts.

"Guarantees" means, collectively, the Mezzanine Completion Guaranty and the Personal Guaranty.

"Guarantor" means, individually, collectively, jointly and severally, Joseph DeNardo and Sylvia DeNardo, each, an individual.

"Hard Costs" means, collectively, all costs and expenses constituting Costs of the Improvement set forth in the Budget which are denominated in the Budget as "Hard Costs".

"Hard Costs Contingency" means the contingency line item set forth in the Budget, and available for Hard Costs pursuant to this Loan Agreement and the Mortgage Loan Agreement, subject to compliance at all times with the Lien Law.

"Hazardous Materials" means any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including, but not limited to, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, mold, radioactive materials, flammables and explosives, but excluding substances of kinds and in amounts ordinarily and customarily used for construction or demolition of buildings or ordinarily and customarily used or stored in properties similar to the Property for the purposes of cleaning, maintenance, operations, vehicular parking or residential use and otherwise in compliance with all Environmental Laws.

"Impositions" means all taxes or payments-in-lieu of taxes (including all ad valorem, sales (including those imposed on lease rentals), use, gross rental receipts, value added, intangible transaction or similar taxes), governmental assessments (including all assessments for public improvements or benefits, whether or not commenced or completed prior to the Closing Date and whether or not commenced or completed during the Term), business improvement district charges and assessments, water, sewer, maintenance, vault or other similar charges, excises, levies or fees, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Property and/or any Rents (including all interest and penalties thereon), which at any time prior to, during or in respect of the term hereof may be assessed or imposed by any Governmental Authority on or in respect of or be a Lien upon (i) the Property, or any other collateral delivered or pledged to Agent on behalf of Lender in connection with the Loan, or any part thereof, or any Rents therefrom or any estate, right, title or interest therein, or (ii) any occupancy, operation, use or possession of, or sales

from, or activity conducted on, or in connection with the Property or the leasing or use of all or any part thereof, but, in each case, excluding (a) all income, franchise, single business or other taxes imposed on Borrower or Mortgage Borrower for the privilege of doing business in the jurisdiction in which the Property is located, (b) all permit, license and similar fees payable in connection with the construction of the Project and (c) sales, occupancy or similar taxes to the extent actually paid by Tenants or which cannot become a Lien on the Property.

"Improvements" has the meaning set forth in the Security Instruments.

"Indebtedness" has the meaning set forth on Schedule IV attached hereto.

"Indemnification Date" has the meaning set forth in Section 16.12(b).

"Indemnified Parties" has the meaning set forth in Section 16.12(b).

"Indemnified Taxes" shall mean any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority.

"Independent" means, when used with respect to any Person, a Person who (i) does not have any direct financial interest or any material indirect financial interest in Borrower or in any Affiliate of Borrower, (ii) is not connected with Borrower, Mortgage Borrower or any Affiliate of Borrower or Mortgage Borrower, as an officer, employee, promoter, underwriter, trustee, partner, member, manager, creditor, director, supplier, customer or person performing similar functions, and (iii) is not a member of the immediate family of a Person defined in clauses (i) or (ii) above.

"Independent Accountant" means any so-called "big four" accounting firm or another firm of nationally recognized, certified public accountants which is Independent and which is selected by Borrower, paid by Borrower at its sole cost and expense and acceptable to Agent.

"Independent Architect" means an architect, engineer or construction consultant selected by Mortgage Borrower which is Independent and paid by Borrower at its sole cost and expense, licensed to practice in the State and has at least five (5) years of architectural experience and which is acceptable to Agent.

"Independent Director" or "Independent Manager" means, if any as may be required by Agent, a natural person who (A) has prior experience as an independent director, independent manager or independent member with at least three (3) years of employment experience and who is provided by CT Corporation, Corporation Service Company, National Registered Agents, Inc. (or its affiliate NRAI Entity Services, LLC), Wilmington Trust Company, Stewart Management Company, Lord Securities Corporation or, if none of those companies is then providing professional independent directors, independent managers or independent members, another nationally-recognized company approved by Agent, in each case, that is not an Affiliate of the Borrower and that provides professional independent directors, independent managers, independent members and other corporate services in the ordinary course of its business, and (B) is duly appointed as an independent director, independent manager or independent member of (1) the board of directors or board of managers of the applicable corporation or (2) the applicable

- 18 -

limited liability company and for the five (5)-year period prior to his or her appointment as such independent director, independent manager or independent member has not been and during the continuation of his or her serving as such independent director, independent manager or independent member will not be, any of the following:  (i) a member (other than a Special Member of Borrower), manager (other than an Independent Director or Independent Manager of Borrower), director, trustee, officer, employee, attorney, or counsel of any of Borrower or their respective Affiliates; (ii) a creditor, customer, supplier, service provider (including provider of professional services) or other Person who derives any of its purchases or revenues from its activities with Borrower or any of their respective Affiliates (other than a member, manager, director, trustee, officer, employee, attorney or counsel of a nationally-recognized company that routinely provides professional independent directors, independent managers and independent members and other corporate services to Borrower or any of their respective Affiliates in the ordinary course of business); (iii) a direct or indirect legal or beneficial owner in Borrower or Mortgage Borrower or any of their respective Affiliates; (iv) a member of the immediate family of any member, manager, employee, attorney, customer, supplier or other Person referred to above; and (v) a Person Controlling or under the common Control of anyone listed in clauses (i) through (iv) above.  A natural person who otherwise satisfies the foregoing definition but does not satisfy the requirements of clause (i) by reason of being the independent director, independent manager or independent member of a "single purpose entity" affiliated with Borrower shall be qualified to serve as an Independent Director or Independent Manager hereunder, provided that, the fees that such individual earns from serving as an independent director, independent manager or independent member of affiliates of Borrower in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.  For purposes of this paragraph, a "single purpose entity" is an entity, whose organizational documents contain restrictions on its activities and impose requirements intended to preserve such entity's separateness that are substantially similar to the Single Purpose Entity definition in this Agreement.  The Independent Director or Independent Manager for each of Borrower and Mortgage Borrower shall at all times be separate persons.

"Initial Maturity Date" means December 31, 2019.

"Initial Units" means, the first six (6) Units to be fully constructed and completed in accordance with all Legal Requirements and obtaining any and all approvals from any Governmental Authorities, no later than the Outside Completion Date, it being expressly understood and agreed that the specified Initial Units and location thereof shall be subject to Agent's approval.

"Insurance Premiums" has the meaning set forth in Section 7.1.2.

"Insurance Requirements" means, collectively, (i) the requirements of Section 7.1 together with all material terms of any of the Policies required thereunder, and (ii) all material regulations and then-current standards applicable to or affecting the Property (excluding Units acquired by purchasers that are not Affiliates of Borrower) or any part thereof or any use or condition thereof, which may, at any time, be recommended by the Board of Fire Underwriters,

if any, having jurisdiction over the Property, or such other body then exercising similar functions over the Property.

"Intangibles" has the meaning set forth in the Security Instruments.

"Intercreditor Agreement" means any applicable intercreditor agreement between Agent, Lender and Mortgage Lender, as the same may be amended, restated, extended, supplemented or otherwise modified from time to time.

"Interest Determination Date" means, with respect to each Interest Period, the date which is two (2) London Business Days prior to the fifteenth (15th) day of the calendar month in which such Interest Period commences; provided, however, that with respect to the initial Interest Period, the Interest Determination Date shall be the Closing Date.

"Interest Period" means, with respect to each Payment Date, the period commencing on and including the first day of the preceding calendar month and ending on and including the last day of the preceding calendar month; provided, however, that no Interest Period shall end later than the Maturity Date (other than for purposes of calculating interest at the Default Rate).

"Interest Rate" means, with respect to each Interest Period, an interest rate per annum equal to the greater of (a) the LIBOR Floor and (b) the LIBOR Rate plus the Spread, except with respect to any portion of the Loan which is an Alternative Rate Loan, in which case, the interest rate for such Alternative Rate Loan for each Interest Period during which such Alternative Rate Loan is outstanding shall be the Alternative Rate.

"Interest Reserve Account" has the meaning set forth in Section 13.1.

"Knowledge" means, when used in relation to Borrower, (i) the actual knowledge of Guarantor or (ii) to the extent that any such individual(s) are no longer associated with Borrower and future representations, warranties and certifications required to be made by Borrower under the Loan Documents are at issue, then the actual knowledge (after engaging in reasonably due inquiry) of any individual having the title of President, Executive Vice President or Treasurer (or similar variants thereof) of Borrower.

"Labor Agreements" has the meaning set forth in Section 5.1.33.

"Land" means that certain real property located at 30, 40 and 42 South Broadway and 0-20, 22, 24, 26, 28 and 30 Marker Ridge, Irvington, New York, as more particularly described on Exhibit A, attached hereto and made a part hereof.

"Late Payment Charge" has the meaning set forth in Section 2.9.3.

"Lease" means any lease, sublease or sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect), pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property (including any lease, sublease or sub-sublease, letting, license, concession or other agreement affecting a Unit or any portion thereof as may be approved by Agent in writing), and every modification, amendment or other agreement relating to such lease, sublease,

sub-sublease, or other agreement entered into in connection with such lease, sublease, sub-sublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"Legal Requirements" means, collectively, all present and future laws, statutes, codes, ordinances, consents, approvals, certifications, orders, judgments, decrees, injunctions, rules, regulations and requirements of every Governmental Authority (including Environmental Laws, the Rules and Regulations of the DOL, the General Business Law and all covenants, restrictions and conditions now or hereafter of record) which may be, and to the extent the same are, applicable to (i) Borrower or Mortgage Borrower, (ii) all or any portion of the Property, including the Improvements and/or the Equipment thereon, (iii) the performance and completion of the obligations and agreements of Borrower or Mortgage Borrower contained herein or in the other Acquisition Loan Documents, including the development and construction of the Project, (iv) the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of all or any portion of the Property, including building and zoning codes and any required variances, and ordinances and laws relating to handicapped accessibility, and (v) each Operating Permit.

"Lender" has the meaning set forth in the introductory paragraph hereto, and each and every successive lender under the Loan that is a direct or indirect successor or assign to Lender in such capacity.

"LIBOR" means, with respect to each Interest Determination Date and each Interest Period in respect of any LIBOR Loan, the rate determined by Agent to be (a) the per annum rate for deposits in U.S. dollars for a period equal to the applicable Interest Period, which appears on Reuters Screen LIBOR01 Page (or the successor thereto) as the London Interbank Offering Rate as of 11:00 a.m., London time, on the applicable Interest Determination Date (rounded upwards, if necessary, to the nearest 1/1000 of 1%); (b) if the rate described in clause (a) does not appear on Reuters Screen LIBOR01 Page (or the successor thereto), the arithmetic mean (rounded upwards, if necessary, to the nearest 1/1000 of 1%) of the offered quotations of rates obtained by Agent from the Reference Banks for deposits in U.S. dollars for a period equal to the applicable Interest Period to prime banks in the London interbank market as of approximately 11:00 a.m., London time, on the applicable Interest Determination Date and in an amount that is representative for a single transaction in the relevant market at the relevant time; or (c) if fewer than two (2) Reference Banks provide Agent with such quotations, the rate per annum which Agent determines to be the arithmetic mean (rounded upwards, if necessary, to the nearest 1/1000 of 1%) of the offered quotations of rates which major banks in New York, New York selected by Agent are quoting at approximately 11:00 a.m., New York time, on the Interest Determination Date for loans in U.S. dollars to leading European banks for a period equal to the applicable Interest Period in amounts of not less than U.S. $1,000,000.00. Agent's good faith determination of LIBOR in accordance with the foregoing shall be binding and conclusive on Borrower absent manifest error. LIBOR may or may not be the lowest rate based upon the market for U.S. Dollar deposits in the London Interbank Eurodollar Market at which Agent and/or Lender prices loans on the applicable Interest Determination Date.

"LIBOR Loan" means the Loan or any portion thereof at any time during which the Interest Rate for the Loan or such portion thereof, as the case may be, is calculated with reference to the LIBOR Rate in accordance with the provisions of Article II.

"LIBOR Rate" means, with respect to each Interest Period, the quotient of (i) LIBOR applicable to such Interest Period, divided by (ii) a percentage equal to one hundred percent (100%) minus the Reserve Requirements (if any) applicable to such Interest Period; provided that the LIBOR Rate shall never be below 2.40% per annum (the "LIBOR Floor").

"Licenses" has the meaning set forth in Section 5.1.21.

"LIC Improvements" means any and all current and future Improvements on the LIC Land.

"LIC Land" means that certain real property located at 37-08 34th Street, Queens, New York as more particularly described in the LIC Mortgage.

"LIC Mortgage" means that certain Collateral Second Mortgage, Security Agreement and Assignment of Leases and Rents, dated March 2, 2018, by and among 34th Street and Titan Capital ID, LLC, in the principal amount of $16,000,000.00, as further assigned to Agent as of the Closing Date, as further modified and amended by that certain Modification and Extension Agreement, dated as of the Closing Date, by and among 34th Street and Mortgage Agent which reduced the principal amount secured thereby to $10,000,000.00.

"LIC Proceeds" means any and all proceeds derived from the sale of the LIC Property subject to a final, executed closing statement approved by Mortgage Agent.

"LIC Property" means, collectively, the LIC Land and any improvements now or hereafter erected thereon, together with all other property, interests, rights and estates pertaining to the LIC Land and such improvements and described in the LIC Mortgage.

"Lien" means any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance or charge on or affecting Borrower, Mortgage Borrower, the Property, the Collateral, any portion thereof or any interest therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances against the Property, the Collateral or any portion thereof or Borrower or Mortgage Borrower or any direct or indirect interest in Borrower.

"Lien Law" means the Lien Law of the State as in effect from time to time.

"Line Item" means a line item of cost or expense set forth in the Budget, as the same may be adjusted pursuant to this Agreement.

"Line Item Category" means each of the categories of Line Items set forth in the Budget.

"Loan" has the meaning set forth in the recitals hereto.

"Loan Amount" means $1,000,000.00.

"Loan Documents" means, collectively, this Agreement, the Note, the Pledge Agreement, the Guaranties, the Environmental Indemnity, together with all other agreements, certificates or other documents now or hereafter evidencing, guaranteeing, securing or otherwise executed by Borrower or any Guarantor and delivered to Lender in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time..

"Loan Servicer" means, Grandbridge Real Estate Capital, LLC.

"London Business Day" means any day other than a Saturday, Sunday or any other day on which commercial banks in London, England are closed for interbank or foreign exchange transactions.

"Major Trade Contract" means (i) each Trade Contract, having a contract or purchase price, as the case may be, whether initially or thereafter by virtue of any Change Order or Change Orders, equal to or in excess of one hundred fifty thousand and 00/100 Dollars ($150,000.00), and (ii) Trade Contracts for the foundation, superstructure, window-wall, HVAC, electrical, plumbing, elevator, fire alarm, kitchen cabinets (i.e., cabinets, countertops and backsplash), exterior and interior framing, demolition, supportive excavation, site utility contractor, and sprinkler systems of the Improvements; provided that, for purposes of this definition, multiple Trade Contracts with a single Trade Contractor, or an Affiliate thereof, as the case may be, shall be deemed to be one Trade Contract.

"Major Trade Contractor" means any Trade Contractor under a Major Trade Contract.

"Major Trade Contractor Consent" means a Major Trade Contractor Consent and Agreement executed and delivered by a Major Trade Contractor in favor of Agent, in connection with the Loan, substantially in the form attached as Exhibit B to the Assignment of Permits, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"Make Whole Amount" shall mean if the Debt is indefeasibly paid in full (but not in part except only in connection with the receipt of the Required Release Price on or prior to expiration of the Make Whole Period, the present value of the aggregate amount of interest that would have accrued on the Mezzanine Loan at the Interest Rate from the Closing Date through and including the last day of the Make Whole Period computed on the basis of actual days elapsed over a year of 360 days using a discount rate equal to the Treasury Rate as of the date of such repayment or prepayment (or acceleration, as the case may be) plus 100 basis points.

"Make Whole Fee" shall mean, upon the prepayment or repayment of the Debt, if the aggregate sum of the Cumulative Payments at the time of such prepayment or repayment is less than the applicable Make Whole Amount, the amount that is equal to (x) such Make Whole Amount minus (y) the present value of the aggregate sum of the Cumulative Payments as of the date of such prepayment or repayment; provided that, if the Make Whole Fee is not paid when due, may be added to the Outstanding Principal Balance upon Agent's consent.

"Make Whole Period" means the period of time from the Closing Date through 11:59 pm (EST) on the nine (9) month anniversary of the Closing Date.

"Management Agreement" means any property management agreement to be entered into by Mortgage Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Management Fee" means all compensation paid or payable to Manager pursuant to the terms of the Management Agreement. "Management Fee" does not include reimbursement to Manager for expenses incurred at the Property for the Property, but does include reimbursements for Manager's overhead, for employees of Manager who have duties that are not exclusive to the Property, and for other items which are allocated among more than one property which is owned or managed by Manager or its affiliates. "Management Fee" also includes any of the following paid or payable to Manager or its Affiliates: marketing fees, system expense reimbursements, payments for use of names, marks and systems in which Manager or any Affiliate has any interest, and other royalties.

"Manager" means any Qualified Manager engaged by Mortgage Borrower with respect to the property management of all or any portion of the Property in accordance with Section 6.1.21(a).

"Manager Replacement Event" has the meaning set forth in Section 6.1.21(a)(ii).

"Material Action" shall mean (i) a Bankruptcy Action or (ii) any other action which, pursuant to the terms of the organizational documents of Borrower or of any other SPE Entity requires the affirmative vote of 100% of the board of directors, board of managers or members of such Person.

"Material Adverse Effect" means, as determined by Agent, any event or condition after the Closing Date (including, without limitation, (1) any default by Guarantor or any Affiliate thereof under any other Indebtedness, (2) the bankruptcy of any Affiliate of Guarantor, or (3) any illegal acts of Guarantor (except minor misdemeanors)) that has a material adverse effect on (i) the Project or the Collateral taken as a whole, (ii) the business, profits, operations or financial condition of Borrower, Mortgage Borrower, Guarantor or any Affiliate thereof, (iii) the value of the Collateral (other than collateral having a *de minimis* value) securing the Loan pursuant to the Loan Documents, (iv) the ability of Borrower to achieve Substantial Completion substantially in accordance with the Plans and Specifications on or prior to the Outside Construction Completion Date, subject to extension by reason of Excusable Delay, (v) the ability of Borrower to repay the principal and interest of the Loan as it becomes due or to perform and satisfy when due or required any of Borrower's other material obligations under the Loan Documents or any of the other Loan Documents pursuant to the terms thereof, (vi) the ability of Mortgage Borrower to repay the principal and interest of the Mortgage Loan as it becomes due or to perform and satisfy when due or required any of the Mortgage Borrower's material obligations under the Mortgage Loan Documents or (vii) the validity or enforceability of any of the Loan Documents, or the rights and remedies of Lender thereunder.

"Material Agreement" means any agreement to which Borrower or Mortgage Borrower is a party (other than the Leases, the Loan Documents, the Mortgage Loan Documents to which Borrower or Mortgage Borrower is a party) which (i) is between Borrower or Mortgage Borrower, on the one hand, and any Affiliate of Borrower or Mortgage Borrower, on the other hand, that relates to the Property, (ii) has a term greater than one (1) year, unless such agreement may be terminated by Borrower or Mortgage Borrower upon thirty (30) days' notice or less, or (iii) provides for annual payments thereunder by Borrower or Mortgage Borrower in excess of $25,000.00.

"Material Alteration" means any Alteration following the Substantial Completion of the Project which, when aggregated with all related Alterations (other than decorative work such as painting, wall papering and carpeting and the replacement of fixtures, furnishings and equipment to the extent being of a routine and recurring nature and performed in the ordinary course of business) constituting a single project, involves an estimated cost exceeding $25,000.00 with respect to such Alteration or related Alterations (including the Alteration in question) then being undertaken at the Property by or at the direction of Borrower or Mortgage Borrower.

"Maturity Date" means the Initial Maturity Date or such earlier date on which the final payment of the outstanding principal amount of the Loan becomes due and payable as herein provided, whether by acceleration, or otherwise; provided, however, that if Borrower exercises the Extension Option, in accordance with the terms of this Agreement, during the Extension Period, the term "Maturity Date" shall mean the Extended Maturity Date or such earlier date on which the final payment of the outstanding principal amount of the Loan becomes due and payable as herein provided, whether by acceleration, or otherwise.

"Maximum Legal Rate" means the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"Mechanical Engineer" means the mechanical engineer to be engaged by (or on behalf of) Borrower with respect to the design and construction of the Project, together with any successor or additional mechanical engineer engaged by (or on behalf of) Borrower in accordance with Section 6.2.12.

"Mechanical Engineer's Agreement" means an agreement for mechanical engineering services which Borrower may enter into with any Mechanical Engineer in accordance with Section 6.2.12, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"Minimum Release Price" means, with respect to any particular Unit the sum of $1,350,000.00.

"Monthly Tax Reserve Amount" has the meaning set forth in Section 13.2.

"Moody's" means Moody's Investors Service, Inc., together with its successors.

"<u>Morningstar</u>" means Morningstar, Inc., together with its successors.

"<u>Mortgage Borrower</u>" has the meaning set forth in the recitals hereto.

"<u>Mortgage Completion Guaranty</u>" means the "Completion Guaranty" as such term is defined in the Mortgage Loan Agreements.

"<u>Mortgage Debt</u>" means the outstanding principal amount set forth in, and evidenced by, the Mortgage Loan Documents, together with all interest accrued and unpaid thereon and all other sums due to Agent and the Lender in respect of the Mortgage Loan under the Mortgage Loan Agreements, the Mortgage Loan Notes and the other Mortgage Loan Documents.

"<u>Mortgage Lender</u>" has the meaning set forth in the recitals hereto, together with its successors and assigns in such capacity.

"<u>Mortgage Loan</u>" means the Acquisition Loan and Building Loan.

"<u>Mortgage Advances</u>" means "Advances" as such term is defined in the Mortgage Loan Agreements.

"<u>Mortgage Loan Agreements</u>" means the Acquisition Loan Agreement and Building Loan Agreement.

"<u>Mortgage Loan Amount</u>" means the Acquisition Loan Amount plus the Building Loan Amount.

"<u>Mortgage Loan Documents</u>" has the meaning set forth in the recitals hereto.

"<u>Mortgage Loan Event of Default</u>" means an "Event of Default" as defined in the Mortgage Loan Agreements.

"<u>Mortgage Loan Notes</u>" means, collectively, the Building Loan Note and the Acquisition Loan Note.

"<u>Mortgage Reserve Funds</u>" means the "Reserve Funds" as defined in the Mortgage Loan Agreements.

"<u>Net Sales Proceeds</u>" means, as to any particular Unit, the Gross Sales Proceeds of such Unit, *minus* the sum of customary and reasonable out-of-pocket closing costs and expenses to be incurred by Borrower in connection with the sale of a Unit as approved by Agent in writing, including transfer taxes, reasonable legal fees of Borrower and sales commissions, which in the aggregate shall be subject to Agent's review and adjustment and shall not exceed eight percent (8%) of the Gross Sales Proceeds from such Unit.

"<u>No Action Letter</u>" has the meaning set forth in <u>Section 6.2.24(p)</u>.

"<u>Non-Substantive Plan Amendment</u>" has the meaning set forth in <u>Section 6.2.24(c)</u>.

"<u>Non-U.S. Entity</u>" has the meaning set forth in <u>Section 2.13(b)</u>.

"Notes" means, collectively, the Building Loan Note, the Acquisition Loan Note and any other promissory notes executed and delivered by Borrower after the Closing Date pursuant to the requirements of the Loan Documents, evidencing the obligation of Borrower to repay the Loan. "Note" means any one of the foregoing.

"Obligations" means Borrower's obligations for the payment of the Debt and the performance of all other obligations of Borrower contained in this Agreement and the other Loan Documents and in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document.

"OFAC List" means the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and accessible through the internet website http://www.treasury.gov/ofac/downloads/t11sdn.pdf.

"Offering Plan" has the meaning set forth in Section 6.2.24(b).

"Officer's Certificate" means a certificate executed by an authorized signatory of Borrower that is familiar with the financial condition of Borrower or Mortgage Borrower and the operation of the Property.

"Off-Site Materials" has the meaning assigned to such term in the definition of Stored Materials.

"Operating Expenses" means, for any period, and without duplication, the total of all expenditures, computed in accordance with GAAP, of whatever kind during such period relating to the operation, maintenance and/or management of the Property that are incurred on a regular monthly or other periodic basis and included in the Approved Annual Operating Budget, (including utilities, ordinary repairs and maintenance, insurance, license fees, Impositions and Common Charges, advertising expenses, management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments, and other similar costs), but excluding (a) non-cash charges such as depreciation and amortization, (b) Debt Service and Mortgage Loan Debt Service, (c) Capital Expenditures, (d) tenant improvements and leasing commissions, (e) any Reserve Funds required under the Loan Documents, (f) costs of restoration following a Casualty or Taking, (g) any payment or expense for which Borrower or Mortgage Borrower was or is to be reimbursed from proceeds of the Loan or the Mortgage Loan (respectively), by insurance, or by any third party, and (h) federal, state or local income taxes.

"Operating Income" means, for any period, and without duplication, all Revenues received or paid to or for the account or benefit of Mortgage Borrower resulting from or attributable to the ownership or operation of the Property, determined in accordance with GAAP, but excluding (a) income and proceeds from the sale or other disposition of goods, capital assets and other items not in the ordinary course of the Property operation; (b) any insurance proceeds paid by reason of a Casualty (except for proceeds of business interruption or other loss of income or insurance as set forth in the definition of Revenues); (c) any proceeds received in connection with a Taking; (d) payment of Rents from Tenants more than one (1) month in advance or

deposits paid in advance for the use of the Property until such time as such payments or deposits become due; (e) Lease termination or modification payments; (f) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority; (g) Loan proceeds and disbursements to Borrower from the Reserve Funds or to Mortgage Borrower from the Mortgage Reserve Funds, if any; (h) gross receipts received by lessees, licensees or concessionaires of the Property; (i) sales of furniture, fixtures and equipment; (j) refunds of amounts not included in Operating Expenses at any time and uncollectible accounts; and (k) Revenues from any other events not related to the ordinary course of operation of the Property.

"Operating Permits" means, collectively, all authorizations, consents and approvals given by and licenses and permits issued by Governmental Authorities which are required for the ownership, use and occupancy of the Property in accordance with all Legal Requirements (other than Operating Permits) and for the performance and observance of all obligations and agreements of Mortgage Borrower contained herein or in the other Loan Documents that relate to the ownership, use and occupancy of the Property, including the ownership, use and occupancy of the Project following Substantial Completion of the same.

"Origination Fee" means a fee deemed fully earned by and payable to Agent on behalf of Lender in the amount equal to three percent (3.00%) of the original Loan Amount and payable, as follows: (i) two percent (2.00%) of the original Loan Amount shall be paid to Lender on the Closing Date; and (ii) one percent (1.00%) of the original Loan Amount shall be deferred by Agent (the "Deferred Origination Fee") and paid upon the earlier to occur of (a) the Maturity Date (subject to any Extension Option being granted); (b) acceleration of the Debt (whether such acceleration is voluntary and/or involuntary); or (c) a prepayment and/or repayment of the unpaid principal amount of the Loan in accordance with Section2.10 hereof, it being expressly understood and agreed that   at all relevant times until received by Agent, the Deferred Origination Fee shall be secured by the Loan Documents and shall not be subject to any Interest Rate charge unless if the Deferred Origination Fee is not paid when due, it will be added to the unpaid principal balance of the Loan.

"Other Design Professionals" means all architects (other than Architect), engineers (other than Engineers) and design professionals engaged by Mortgage Borrower and/or Mortgage Borrower's agent to work on the Improvements.

"Other Design Professionals Agreement(s)" means any agreements between Mortgage Borrower and each Other Design Professional for the design of the Project or otherwise relating to the Improvements.

"Outside Construction Completion Date" means, (a) with respect to the Initial Units described in Schedule V, the nine (9) month anniversary of the Closing Date whereupon the Initial Units shall have achieved Substantial Completion; and (b) thereafter, with respect to the remaining Units, such date(s) as may be established by Agent and Borrower, from time to time, by amending Schedule V.

"Outstanding Principal Balance" means, as of any date of determination by Agent, the unpaid principal balance of the Loan.

"<u>Participant Register</u>" has the meaning set forth in <u>Section 12.1(b)</u>.

"<u>Payment Date</u>" means the first (1st) day of each calendar month during the term of the Loan, <u>provided</u> <u>that</u>, if such day is not a Business Day, then "Payment Date" means the immediately preceding Business Day.

"<u>Permitted Debt</u>" means, collectively: (i) (a) as to Borrower, the Note and the other obligations, indebtedness and liabilities specifically provided for in any Loan Document and secured by this Agreement, the Pledge Agreement and/or the other Loan Documents, and (b) as to Mortgage Borrower, collectively, the Mortgage Loan Notes and the other obligations, indebtedness and liabilities specifically provided for in any Mortgage Loan Documents and secured by the Mortgage Loan Agreements, the Security Instruments and/or the other Mortgage Loan Documents; (ii)   during the Construction Phase, amounts incurred pursuant to the Construction Contracts and any other contracts or agreements entered into between Borrower and any Design Professionals; and (iii) unsecured trade payables payable by or on behalf of Borrower for or in respect of the operation of the Property in the ordinary course of business that are (x) not secured by Liens on the Property, (y) in an amount not to exceed one percent (1%) of the aggregate outstanding principal of the Loan and Mortgage Loan, and (z) not evidenced by a note, but in all events are paid within sixty (60) days following the date on which each such amount is incurred.

"<u>Permitted Encumbrances</u>" means, collectively, (i) as to the Collateral, the Liens and security interests created by the Pledge Agreement and the other Loan Documents and (ii) as to the Property, collectively: (a) the Liens and security interests created by the Mortgage Loan Documents, (b) all other Liens and other matters disclosed in the Title Policy, (c) the Liens, if any, for Impositions not yet due or payable, (d) any Liens which have been fully bonded to the satisfaction of Agent, e) any Liens which are being contested in accordance with the terms of with Section 8.3, (f) financing leases for equipment in the ordinary course, provided that the aggregate rental payments under all such leases do not exceed the amounts reflected in the Budget or any Approved Annual Operating Budget for such applicable budget period, (g) such governmental, public utility and private easements, covenants, conditions and restrictions which are customary and necessary for the provision of utilities or access to the Property or any Unit, (h) any documents or instruments recorded against the Property (or any portion thereof), provided that such documents and instruments have been approved by Agent as set forth in this Agreement to the extent Agent's approval is required pursuant to the express terms of this Agreement, (i) each Lease and each Sales Contract entered into in accordance with the terms of this Agreement, (j) such other title and survey exceptions as Agent has approved or may approve in writing in its sole discretion, and (k) the Condominium Documents.

"<u>Permitted Transfer</u>" has the meaning set forth in <u>Section 9.3</u>.

"<u>Person</u>" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Personal Guaranty" means that certain Unconditional Guaranty, dated as of the Closing Date, made by Guarantors in favor of Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Personal Property" has the meaning set forth in the granting clause of the Security Instruments.

"Plans and Specifications" means the plans and specifications for the construction of the Project prepared or to be prepared by Architect, the Engineers and the Other Design Professionals, including any architectural, structural, foundation and elevator plans and specifications prepared by Architect and any other mechanical, electrical, plumbing and fire protection plans and specifications prepared by any Person retained or to be retained by Mortgage Borrower, Architect or General Contractor as approved in writing by Agent and Construction Consultant, in each case, which have been submitted to the DOB for plan review and have been reviewed and approved by the DOB's examiner, as the same may be amended by Change Orders applicable thereto, provided that such Change Orders have been approved pursuant to Section 6.2.7; the Plans and Specifications shall include a description of the materials, a sprinkler and shop drawing, and equipment and fixtures necessary for the construction of the Project.

"Pledge Agreement" has the meaning set forth in the recitals hereto.

"Pledged Company Interests" has the meaning set forth in the Pledge Agreement.

"Policies" or "Policy" has the meaning set forth in Section 7.1.2.

"Prepayment Date" has the meaning set forth in Section 2.10(a).

"Prepayment Notice" has the meaning set forth in Section 2.10(a).

"Proceeds" has the meaning set forth in Section 7.2.2.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States or America.

"Project" means the construction and development of the Westchester Improvements and related improvements and amenities for a residential condominium project to be built on the Westchester Land in accordance with the Plans and Specifications, all Legal Requirements and all other applicable requirements of the Loan Documents, which will consist of, among other things, the Units.

"Project Costs" means, all Costs set forth in the Budget which are denominated as "Project Costs" and which are to be funded from the Loan and/or the Construction Reserve Account, all as determined by Agent.

"Property" means, collectively, the Land and the Improvements now or hereafter erected thereon, together with all other property, interests, rights and estates pertaining to the Land and the Improvements and described as the "Real Property" in the Security Instruments.

"Protective Advances" means the payment by Agent on behalf of any Lender, and/or Lender, of Impositions, Insurance Premiums, Liens, cure payments in the nature of protective advances made on behalf of Borrower or Mortgage Borrower and any other advances or payments by Agent on behalf of any Lender, and/or Lender, made for the purpose of avoiding deterioration or harm to the Property, or diminution in value of the Property or any other collateral for the Loan or the Mortgage Loan, all as determined by Agent.

"Punchlist Items" means, collectively, minor or insubstantial details of construction, decoration, mechanical adjustment or installation the non-completion of which does not prevent the use and occupancy of the Improvements for their intended purposes.

"Qualified Leasing Agent" means a reputable and experienced leasing organization (which may be an Affiliate of Borrower) possessing experience in leasing properties in Westchester County similar in size and scope to the Property and the Project and approved by Agent in Agent's sole discretion.

"Qualified Manager" means a reputable and experienced construction management organization (which may be an Affiliate of Borrower) controlled by individuals with at least ten (10) years' experience in the construction, operation and management of properties and projects in Westchester County similar in size and scope to the Property and the Project and approved by Agent in Agent's sole discretion.

"Qualified Sales Agent" means a reputable and experienced sales organization (which may be an Affiliate of Borrower) possessing experience in selling properties in Westchester County similar in size and scope to the Property and the Project and approved by Agent.

"Rating Agencies" means each of S&P, Moody's, Fitch, DBRS or Morningstar or any other nationally-recognized statistical rating agency.

"Recipient" has the meaning set forth in the definition of "Excluded Taxes" in this Section 1.1.

"Register" has the meaning set forth in Section 12.1(b).

"Register's Office" means the Office of the Westchester County Clerk.

"Regulatory Change" has the meaning set forth in Section 2.12.

"Removal Effective Date" has the meaning set forth in Section 17.4(a).

"Rents" means all rents, percentage rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, all other amounts

payable as rent under any Lease or other agreement relating to the Property (including utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, other required pass-throughs or reimbursements paid by Tenants under Leases of any nature, and interest on reserve funds, if any), business interruption or other loss of income or rental insurance proceeds, and other income or consideration of whatever form or nature, in each case received by or paid to or for the account of or benefit of Mortgage Borrower from any and all sources arising from or attributable to the Property, but, in each case, excluding (i) all deposits under any Sales Contract entered into in accordance with the terms of this Agreement  or the Mortgage Loan Agreements until such deposits are required to be remitted to Agent pursuant to the terms of this Agreement  or the Mortgage Loan Agreements and (ii) all deposits paid by any Tenant under any Lease until the landlord is no longer required to return such deposit under the terms of the applicable Lease or applicable Legal Requirements to the applicable Tenant, and (iii) proceeds from the sale of any Unit.

"Required Equity Investment" means $4,000,000.00.

"Required Lenders" – Means, Lenders holding at least sixty-six and two-thirds percent (66 2/3%) of the aggregate Outstanding Principal Balance.

"Required Release Price" means, with respect to each Unit, an amount equal to the greater of: (x) the Minimum Release Price for such Unit, or (y) 100% of the Net Sales Proceeds derived from the sale of such Unit.

"Reserve Funds" means, collectively, any and all funds held in any Collateral Accounts from time to time.

"Reserve Requirements" means with respect to any Interest Period, the maximum rate of all reserve requirements imposed upon or affecting Agent or any Lender or the London Interbank Eurodollar Market (including all basic, marginal, emergency, supplemental, special or other reserves and taking into account any transitional adjustments or other schedule changes in reserve requirements during such Interest Period) which are imposed under Regulation D on Eurocurrency liabilities (or against any other category of liabilities which includes deposits by reference to which LIBOR is determined or against, any category of extensions of credit or other assets which includes loans by a non-United States office of a depository institution to United States residents or loans which charge interest at a rate determined by reference to such deposits) during such Interest Period and which are applicable to member banks of the Federal Reserve System with deposits exceeding one billion dollars ($1,000,000,000.00), but without benefit or credit of proration, exemptions or offsets that might otherwise be available from time to time under Regulation D. The determination of the Reserve Requirements shall be based on the assumption that each Lender funded one hundred percent (100%) of its portion of the Loan in the interbank Eurodollar market.  In the event of any change in the rate of such Reserve Requirements under Regulation D during the applicable Interest Period, or any variation in such requirements based upon amounts or kinds of assets or liabilities, or other factors, including the imposition of Reserve Requirements of Agent or Lender, Agent may use any reasonable averaging and/or attribution methods which it deems appropriate and practical for determining

the rate of such Reserve Requirements which shall be used in the computation of the Reserve Requirements.  Agent's computation of same shall be final absent manifest error.

"Restoration" has the meaning set forth in Section 7.2.4(a).

"Restricted Party" means, collectively (i) Borrower, Mortgage Borrower and Guarantor and (ii) any shareholder, partner, member, non-member manager, direct or indirect legal or beneficial owner of Borrower, Mortgage Borrower or any non-member manager, but excluding from clause (ii) any other members or shareholders which are not Affiliates of such entities.

"Revenues" means all rents (including percentage rents), rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents (including payments by reason of the rejection of a Lease in a Bankruptcy Action), all income and proceeds from judgments, settlements and other resolutions of disputes with respect to matters which would be includable in this definition of "Revenues" if received in the ordinary course of the Property operation, royalties (including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, fees, charges for services rendered, all other amounts payable as rent under any Lease or other agreement relating to the Property (including utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits), other required pass-throughs or reimbursements paid by tenants under Leases of any nature, and interest on Reserve Funds, if any), business interruption or other loss of income or rental insurance proceeds, and other income or consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgage Borrower, Manager or any of their respective agents or employees from any and all sources arising from or attributable to the Property.

"Sales Agency Agreement" means any sales agency agreement hereafter entered into by Mortgage Borrower with a Qualified Sales Agent with respect to the marketing and sale of Units and approved by Agent pursuant to Section 6.1.20, as each of the same may be amended, modified or supplemented from time to time in accordance with the terms and conditions of this Agreement.

"Sales Agent" means a Qualified Sales Agent, acceptable to Agent, selected by Mortgage Borrower to perform the duties of the sales and marketing agent under a Sales Agency Agreement.

"Sales Agent Replacement Event" has the meaning set forth in Section 6.1.20(a).

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc., together with its successors.

"Secondary Market Transaction" has the meaning set forth in Section 12.1(a).

"Section 22 Affidavit" means that certain Mortgage Borrower's affidavit required under Section 22 of the Lien Law to be filed with the Building Loan Agreement.

"Security Instruments" has the meaning set forth in the recitals hereto.

"Single Purpose Entity" has the meaning set forth on Schedule IV attached hereto.

"Soft Costs" means, collectively, all costs and expenses set forth in the Budget which are denominated as "Soft Costs"; it being agreed that only Soft Costs constituting Costs of the Improvement and as set forth in the Section 22 Affidavit shall be paid from Building Loan Advances under the Building Loan Agreement.

"Soft Costs Contingency" means the contingency line item set forth in the Budget, and available for Costs, pursuant to the Building Loan Agreement and the Mortgage Loan Agreement, subject to compliance at all times with the Lien Law.

"Special Member" has the meaning set forth on Schedule IV attached hereto.

"SPE Entity" means Borrower and Mortgage Borrower, each of which is required by this Agreement to be, as long as any portion of the Loan is outstanding, a Single Purpose Entity.

"Spread" means ten percent (10%) per annum during the Initial Term and eleven percent (11%) per annum during the Extension Period.

"State" means the State of New York.

"Stored Materials" means materials purchased by Mortgage Borrower at or prior to the date of a Draw Request for use in the Project, but either (i) stored at the Property or a bonded warehouse, and not yet installed or incorporated into the Project ("Unincorporated Materials") or (ii) not yet delivered to the Property nor stored in bonded warehouse ("Off-Site Materials"). Stored Materials shall cease to be Stored Materials only when the same are installed or incorporated into the Project.

"Structural Engineer" means the structural engineer to be engaged by (or on behalf of) Mortgage Borrower with respect to the design and construction of the Project, together with any successor or additional Structural Engineer engaged by (or on behalf of) Mortgage Borrower in accordance with Section 6.2.12.

"Structural Engineer's Agreement" means an agreement for structural engineering services which Mortgage Borrower may enter into with any structural engineer in accordance with Section 6.2.12, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"Substantial Completion" means the occurrence of each of the following:

(i)    with respect to the Project as a whole, the substantial completion of the construction of the Project (subject only to Punch List Items), in each case, lien-free (except for the Liens and security interests created by the Mortgage Loan Documents and other Permitted Encumbrances), substantially in accordance with the Plans and Specifications, all Legal Requirements (including, without limitation, approval from the DOF and the DOL), all Permitted Encumbrances, the Condominium-Related Documents, this Agreement, and the Mortgage Loan Documents, with all utilities necessary to service the Property connected and in operation, such completion to be evidenced to the satisfaction of Agent and the Construction Consultant and the

delivery to Agent of temporary certificates of occupancy for the Improvements and evidence that all other Governmental Approvals and Operating Permits have been issued and all other Legal Requirements have been satisfied so as to allow the Improvements to be used and operated in accordance with the Loan Documents; and

(ii) with respect to any portion of the Project, including, without limitation, the Initial Units and any remaining Units, the substantial completion of such portion of the Project (subject only to Punch List Items), in each case, lien-free (except for the Liens and security interests created by the Loan Documents and other Permitted Encumbrances), substantially in accordance with the Plans and Specifications, all Legal Requirements (including, without limitation, approval from the DOF and the DOL), all Permitted Encumbrances, the Condominium-Related Documents and this Agreement, with all utilities necessary to service the Property connected and in operation, such completion to be evidenced to the satisfaction of Agent and the Construction Consultant and the delivery to Agent of temporary certificates of occupancy for the Improvements and evidence that all other Governmental Approvals and Operating Permits have been issued and all other Legal Requirements have been satisfied so as to allow the Improvements to be used and operated in accordance with the Mortgage Loan Documents.

"Survey" means a survey of the Property prepared by a surveyor licensed in the State and reasonably satisfactory to Agent and Title Company, and containing a certification of such surveyor satisfactory to Agent.

"Taking" means a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"Tax Reserve Account" means an account for the retention of Reserve Funds in respect of Impositions and the Tax Reserve Amount.

"Tax Reserve Amount" has the meaning set forth in Section 13.2.

"Tenant" means any Person leasing, subleasing or otherwise occupying any portion of the Property pursuant to a Lease in accordance with this Agreement.

"Term" has the meaning set forth in Section 2.4(a).

"Title Company" means Royal Abstract of New York LLC, as agent for First American Title Insurance Company, or any successor title company or companies licensed to issue title insurance in the State and approved by Agent in its sole discretion.

"Title Continuation" has the meaning set forth in the Mortgage Loan Documents.

"Title Policy" means an ALTA mortgagee title insurance policy in a form acceptable to Agent issued by Title Company with respect to the Property and insuring the lien of the Security Instruments.

"<u>Trade Contract</u>" means any agreement, contract or purchase order between Mortgage Borrower, an Affiliate of Mortgage Borrower or General Contractor, on the one hand, and any Trade Contractor, on the other hand, pursuant to which such Trade Contractor agrees to provide labor, materials, equipment and/or services in connection with the construction of the Project, in each case, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.  The term "Trade Contract" shall not include the Architect Agreement, the Engineers Agreement, the General Construction Contract or any other agreement, contract or purchase order pertaining solely to professional services to be provided by any other Design Professional.

"<u>Trade Contractor</u>" means any Person that is a contractor, subcontractor, sub-subcontractor, supplier or provider of labor, materials, equipment and/or services in connection with the construction of the Project.

"<u>Tranches</u>" has the meaning set forth in <u>Section 12.2(a)</u>.

"<u>Transfer</u>" means any sale, conveyance, transfer, lease, assignment, grant, mortgage, option, encumbrance, hypothecation, pledge, in each case, directly or indirectly, voluntarily or involuntarily, in whole or in part, by operation of law or otherwise (and with respect to an entity shall include the merger of such entity with or into any other entity) of (i) any interest or estate in the Property, other than Permitted Encumbrances or (ii) any Equity Interests in any Restricted Party.

"<u>Treasury Rate</u>" – Means, as of the date of any repayment and/or prepayment of the Loan, the yield to maturity as of such date of the United States Treasury securities with a constant maturity (as complied and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two (2) Business Days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such date to the last day of the Make Whole Period; <u>provided</u>, <u>however</u>, that if the period from such date to the last day of the Make Whole Period is less than one year, the weekly average yield on actually traded United States Treasury Securities adjusted to a constant maturity of one year will be used.

"<u>UCC</u>" or "<u>Uniform Commercial Code</u>" means the Uniform Commercial Code as in effect in the State.

"<u>Unincorporated Materials</u>" has the meaning assigned to such term in the definition of Stored Materials.

"<u>Unit</u>" means each individual condominium unit (including any appurtenant interest in the common elements or limited common elements) created by the submission of the Improvements to the provisions of the Condominium Act in accordance with the Condominium Documents, which Units are to be used for residential purposes in accordance with the terms of the Condominium Documents and in compliance with Legal Requirements and marketed for sale in accordance with the terms of the Offering Plan and the Loan Documents plus any corresponding parking space for such Unit, all as more particularly described in the Condominium Documents.

"Unit Sales Contract" has the meaning set forth in Section 6.2.24(b).

"Unit Sales Escrow Agent" has the meaning set forth in Section 6.2.24(g).

"United States" means the United States of America, including the States and the District of Columbia, but excluding its territories and possessions.

"Updated Information" has the meaning set forth in Section 12.2(b).

"U.S. Government Obligations" means any direct obligations of, or obligations guaranteed as to principal and interest by, the United States Government or any agency or instrumentality thereof, provided that such obligations are backed by the full faith and credit of the United States.  Any such obligation must be limited to instruments that have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change.  If any such obligation is rated by S&P, it shall not have an "r" highlighter affixed to its rating.  Interest must be fixed or tied to a single interest rate index *plus* a single fixed spread (if any), and move proportionately with said index.  In no event shall any such obligation have a maturity in excess of 365 days.

"Usage Fee" means, in addition to any other amounts payable by Borrower (including, without limitation, Aggregate Debt Service), a monthly fee equal to $1/12^{th}$ of 0.474% of the original Aggregate Loan Amount which shall be due and payable on the Closing Date and thereafter on each Payment Date, it being expressly understood and agreed if the Usage Fee is not paid when due, the unpaid amount shall be added to the Outstanding Principal Balance.

"Withholding Taxes" has the meaning set forth in Section 6.1.26.

1.2 Principles of Construction.

All references to Schedules, Sections and Exhibits are to Schedules, Sections and Exhibits in or attached to this Agreement unless otherwise specified.  Those Schedules identified as being Schedules attached to the Building Loan Agreement are, to the extent necessary, incorporated herein by reference.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP.  Unless otherwise specified herein or therein, all terms defined in this Agreement shall have the definitions given them in this Agreement when used in any other Loan Document or in any certificate or other document made or delivered pursuant thereto.  All uses of the word "include" or "including" shall mean "include or including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified or unless the context shall indicate otherwise, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.  The words "Borrower shall", "Borrower shall cause" or "Borrower shall not permit" (or words of similar meaning) shall mean (if applicable) "Borrower shall and shall cause Mortgage Borrower to" or "Borrower shall not permit and shall not allow Mortgage Borrower to permit", as the case may be, to so act or not to so act, as applicable. Terms used herein which are defined by cross-reference to the Mortgage Loan Agreements (a) shall have the meaning set forth

in the Mortgage Loan Agreements as of the Closing Date, notwithstanding any subsequent amendment of the Mortgage Loan Agreements to such terms, unless Lender shall have consented to such amendment in accordance with the terms of this Agreement, and (b) shall be effective notwithstanding the termination of the Mortgage Loan Agreements by payment in full of the Mortgage Loan or otherwise.

## ARTICLE II.   GENERAL TERMS.

2.1 <u>Loan Amounts and Disbursements to Borrower.</u>

2.1.1        <u>Loan Amounts</u>.

(a)        <u>Loan</u>.  Subject to the conditions and upon the terms herein provided, and subject specifically to the restrictions set forth in the remainder of this <u>Section 2.1.1</u>, Lender hereby agrees to make the Loan to Borrower.  The Loan shall be evidenced by, among other things, this Agreement and the Note and shall in no event exceed the Loan Amount.  The Loan shall be repaid with interest, costs and charges as more particularly set forth in this Agreement, the Note, and the other Loan Documents.  Principal amounts of the Loan which are repaid for any reason may not be re-borrowed.

(b)        <u>Maximum Aggregate Loan Amount</u>.   Except as otherwise expressly stated herein, notwithstanding anything contained in any other Loan Document to the contrary, the aggregate principal amount of the Loan and the Mortgage Loan shall not under any circumstances exceed the Aggregate Loan Amount; provided that additional amounts may be added to the Outstanding Principal Balance and the unpaid principal balance of the Mortgage Loan in accordance with the applicable Loan Documents and Mortgage Loan Documents.

2.1.2        <u>Loan Advances</u>.  Lender shall advance the entire principal amount of the Loan on the Closing Date.

2.1.3        <u>The Loan Documents</u>.  The Loan shall be evidenced by, among other things, this Agreement and the Note, and secured by the Pledge Agreement and the other applicable Loan Documents.

2.1.4        <u>Use of Proceeds</u>.  Borrower shall use the proceeds of the Loan only for the purposes and in the manner set forth in this Agreement or any filed amendment thereto in accordance with this Agreement.  The portion of the Budget labeled "Loan" sets forth, by category and line items, the purposes and amounts for which Advances made by Lender under this Agreement are to be used.  Borrower will receive the Loan Amount in a single advance to be made hereunder, and will hold the right to receive the same, as a trust fund for such purposes as approved by Agent in writing, including, without limitation, the purpose of paying the Costs of the Improvement, and Borrower will apply the same first to such payment before using any part thereof for any other purpose.

2.2 *Intentionally Omitted*.

2.3 <u>Disbursements After Substantial Completion of Initial Units</u>. Notwithstanding anything to the contrary in the Loan Documents and the Mortgage Loan Documents, Agent and

Lender shall not be obligated to disburse or make any advances of proceeds from the Loan or the Mortgage Loan after Substantial Completion of the Initial Units and any such future advance or disbursement from the Construction Reserve Account shall be solely at the discretion of Agent and Lender.

      2.4 <u>Term and Extension Option.</u>

          (a)    The term of the Loan (the "<u>Term</u>") shall commence on the Closing Date and terminate and expire on the Maturity Date.  The Debt, shall be payable by Borrower in full on the Maturity Date.

          (b)    Borrower shall have an option (the "<u>Extension Option</u>") to extend the initial Term of the Loan beyond the Initial Maturity Date for one (1) additional twelve (12) month term (the Initial Maturity Date, as extended pursuant to this <u>Section 2.4</u>, the "<u>Extended Maturity Date</u>") upon satisfaction of each of the following conditions:

          (i)    Borrower shall have given Agent written notice of Borrower's exercise of the Extension Option by no later than sixty (60) days prior to the Initial Maturity Date but not earlier than ninety (90) days prior to the Initial Maturity Date;

          (ii)    on or before the Initial Maturity Date, Borrower shall have paid or caused to be paid to Agent the non-refundable Extension Fee with respect to the Extension Option (or Agent shall have agreed in writing to add the unpaid Extension Fee (or any part thereof) to the Outstanding Principal Balance;

          (iii)    no Event of Default shall be continuing on the Initial Maturity Date;

          (iv)    Agent shall have received an updated title report dated as of the Initial Maturity Date confirming no encumbrances other than Permitted Encumbrances;

          (v)    the Mortgage Loan shall be concurrently extended to the extent the same remain outstanding, it being understood that a written notice of Borrower's exercise of the Extension Option described in <u>Section 2.4(b)(i)</u> shall also constitute notice of Borrower's exercise of the "Extension Option" as such term is defined in the Mortgage Loan Agreements;

          (vi)    *intentionally omitted*;

          (vii)    Agent's completion of a credit check of the Borrower Parties reasonably satisfactory to Agent, which reveals no material adverse changes to credit that would impact such party's ability to perform its obligations set forth in this Agreement and/or the Loan Documents;

          (viii)    Borrower shall have (A) paid all out-of-pocket fees, costs and expenses incurred by Agent and Lender in connection with the exercise by Borrower of the Extension Option, including legal fees and costs; and (B) deposited with Agent or

Loan Servicer (as determined by Agent) any other funds into the Collateral Accounts as required by Agent pursuant to the provisions of <u>Article XIII</u>;

(ix)    Mortgage Borrower shall have achieved Substantial Completion of the Project (or such portion thereof (including, without limitation, the Initial Units)) as determined by Agent in its sole discretion);

(x)    Mortgage Borrower shall have filed for, and delivered evidence thereof to Lender, a temporary certificate of occupancy for the Project to be issued by the DOB;

(xi)    Mortgage Borrower shall have entered into Bona Fide Residential Sales Contracts for no less than four (4) of the Initial Units where the gross purchase price under all Bona Fide Residential Sales Contracts;

(xii)    No Material Adverse Effect is continuing;

(xiii)    The LIC Property has been sold and the LIC Proceeds have been received by Agent in accordance with the terms of the Mortgage Loan Documents and the Loan Documents, and the LIC Proceeds have been deposited into the General Reserve Account; and

(xiv)    The loan-to-value as determined by Agent in its sole discretion is not less than 65.00% based on the then unpaid principal balance of the Loan and Mortgage Loan and all remaining collateral with respect to the Loan and Mortgage Loan.

2.5  <u>Interest on the Loan Prior to Maturity.</u>

(a)    The Loan shall bear interest prior to the Maturity Date at a rate per annum equal to the Interest Rate for the applicable Interest Period.

(b)    Interest on the Loan shall be payable prior to the Maturity Date, as follows: (i) interest shall be prepaid through January 30, 2019; and (ii) commencing on March 1, 2019 and continuing on each Payment Date thereafter through and including the Maturity Date, and (iii) on any prepayment on a date other than a Payment Date (solely on the principal amount prepaid).

(c)    On each Payment Date, pursuant to <u>Section 13.1</u> hereof, Borrower hereby expressly authorizes that any funds in the Interest Reserve Account may be utilized to make payments of any interest then due and payable.  To the extent that funds in the Interest Reserve Account are insufficient to pay the interest then due and payable on any Payment Date, Borrower shall be obligated to make such payment of interest in accordance with <u>Section 2.6</u> hereof.

2.6  <u>General Provisions as to Payments.</u>

(a)    Subject to <u>Section 2.5(c)</u>, on each Payment Date through the Maturity Date, Borrower shall pay to Agent or Loan Servicer (as determined by Agent), accrued and unpaid interest at the Interest Rate on the Note.

(b)    Borrower shall make each payment of principal of, and interest on, the Loan and of any unpaid, then due and owing fees, costs and expenses (including, without limitation, legal fees) hereunder, not later than 1:00 p.m. (New York time) on the date when due, in immediately available funds in lawful money of the United States of America, delivered to Agent or Loan Servicer by wire transfer to such accounts at such banks as Agent may designate from time to time.

(c)    All amounts due hereunder shall be payable, without any counterclaim, defense, protest, setoff or deduction whatsoever.

(d)    Borrower shall pay to Agent or Loan Servicer (as determined by Agent) on the Maturity Date (a) the Debt and (b) any and all other amounts then due and owing under this Agreement, the Note and the other Loan Documents.

(e)    Borrower expressly acknowledges, consents and agrees that any payments of interest, fees, costs and expenses (including, without limitation, legal fees) hereunder which are not paid when due, may be added to the Outstanding Principal Balance on the first day of the immediately following month.

(f)    On each Payment Date, Borrower shall pay the monthly Usage Fee utilizing funds in the Interest Reserve Account; provided however, if funds in the Interest Reserve Account are insufficient to pay the monthly Usage Fee on any Payment Date, Borrower shall be obligated to make such payment.

2.7    <u>Funding Losses</u>.   If, without the prior written approval of Agent (a) Borrower makes any payment of principal with respect to the Loan on any day other than a Payment Date or (b) Borrower fails to, subject to <u>Section 2.10(a)</u>, prepay any portion of the Loan after Borrower has given irrevocable notice thereof to Agent in accordance with the terms of this Agreement, then, in any such event, Borrower shall reimburse Agent and/or Lender, within ten (10) days after written demand therefor, for any resulting actual loss or expense incurred by Agent and/or Lender.

2.8    <u>Calculation of Interest and Fees</u>.   All interest and fees shall be calculated on the basis of a year of three hundred sixty (360) days and paid for the actual number of days elapsed in the Interest Period or other period for which the calculation is being made.

2.9 <u>Default Interest; Late Payment Charge and Usury Savings</u>.

2.9.1      <u>Default Interest</u>.   Upon the occurrence and during the continuance of an Event of Default, interest on the Outstanding Principal Balance and, to the extent permitted by law, overdue interest and other amounts due in respect of the Loan shall accrue interest at the Default Rate calculated from the earliest date of the underlying Default as determined by Agent (which determination shall be final absent manifest error), without regard to any grace or cure periods contained herein and, in each case, continuing until (y) the date Agent is in actual receipt

and collection of the Debt or that portion thereof that is then due in connection with the Loan, or (z) if Agent has not declared the entirety of principal, interest and other amounts outstanding under the Loan due and payable as a result of such Event of Default, the date the Event of Default has been cured, as determined and confirmed by Agent in writing.  This Section 2.9 shall not be construed as an agreement or privilege to extend the date of the payment of the Loan nor as a waiver of any other right or remedy accruing to Agent by reason of the occurrence of any Event of Default, and Agent retains its rights hereunder to accelerate and to continue to demand payment of the Loan upon the occurrence and during the continuance of any Event of Default at any time as determined by Agent in its sole discretion.

2.9.2     Application of Payments.  Any repayments of the Debt or the Mortgage Debt, may be applied by Agent in any manner, to the Loan and/or the Mortgage Loan, and in any order determined by Agent in its sole discretion.

2.9.3     Late Payment Charge.  If any principal, interest or other recurring monthly payments due under the Loan Documents is not paid when due, Borrower shall pay to Agent, within five (5) days of written demand by Agent to Borrower, a late payment charge (a "Late Payment Charge") in amount equal to the lesser of (i) five percent (5%) of such unpaid sum or (ii) the maximum amount permitted by applicable law.  Borrower shall pay the applicable Late Payment Charge in order to defray the expense incurred by Agent and Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment and such Late Payment Charge shall be in addition to and not in lieu of any interest that accrues at the Default Rate as a result of an Event of Default.  Late Payment Charges shall be secured by this Agreement, the Pledge Agreement and the other applicable Loan Documents to the extent permitted by applicable law.  Any Late Payment Charges which are not paid when due shall be added to the Outstanding Principal Balance.

2.9.4     Usury Savings.  This Agreement and the Note are subject to the express condition that, at no time shall interest be charged, or Borrower be required or obligated to pay interest, on the Outstanding Principal Balance of the Loan at a rate which could subject Agent and/or Lender to civil or criminal liability as a result of such interest rate being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the Outstanding Principal Balance at a rate in excess of the Maximum Legal Rate, then the Interest Rate or the Default Rate for such Note shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due under such Note.  All sums paid or agreed to be paid to Agent and/or Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the  Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for as long as the Loan is outstanding.

2.10     Mandatory and Voluntary Prepayments.

(a)     Voluntary Prepayments.  Subject to payment of the Make Whole Fee as provided below, Borrower may voluntarily prepay the Loan in whole (but not in part except only

in connection with the payment of the LIC Proceeds or payment of the Required Release Price pursuant to Section 2.10(b) hereof), without any additional penalty or premium, upon at least ten (10) Business Days' prior written notice to Agent, which notice (each, a "Prepayment Notice") shall specify the Business Day upon which such prepayment in full (or in part with respect to payment of the Required Release Price) shall be made (each such date upon which the prepayment amount is received by Agent, a "Prepayment Date"). The Prepayment Notice may be revoked by Borrower by written notice to Agent up until and including the Prepayment Date and such revocation notice may identify a new Prepayment Date that is no more than five (5) Business Days from the original Prepayment Date, provided that, Borrower pays all actual costs and expenses incurred by Agent and/or Lender on account of such revocation. Together with such principal prepayment, Borrower shall pay:  (A) all accrued and unpaid interest to and including the applicable Prepayment Date, and (B) all other sums then due and payable by Borrower under the Loan Documents with respect to the portion of the Loan being prepaid, including, without limitation, such pro rata portion of the Deferred Origination Fee based on the principal amount being repaid or prepaid and the applicable Make Whole Fee (if any).  Any amounts prepaid by Borrower pursuant to this Section 2.10(a) shall be applied by Agent in any manner and in any order determined by Agent in its discretion. Provided no Event of Default is continuing, repayments of the principal amount of the Loan or of the Debt shall be applied in such amounts as determined by Agent in its sole discretion as follows: (i) first, to pay the Make Whole Fee (if any); (ii) second, to pay such pro rata portion of the Deferred Origination Fee based upon the amount of principal being voluntarily prepaid or repaid; (iii) third, to pay Agent's and Lender's unpaid fees, costs and expenses (including legal fees and costs) due and owing as of the Prepayment Date (provided that Borrower may consent in writing that such unpaid amounts under this clause (iii) be added to the then unpaid principal balance of the Loan, and/or any Mortgage Loan in such amounts as determined by Agent in its sole discretion); (iv) fourth, to accrued and unpaid interest then due and owing to Agent; (v) fifth, to outstanding principal under the Building Loan Note; and (vi) sixth, if the and Building Loan Note has been paid in full, to the outstanding principal under the Acquisition Loan Note.

(b)      Mandatory Prepayments from Unit Sales.

(i)      Unit Sales.  At the closing of the sale of each Unit at the Property, and subject to Agent's approval of a final closing statement (or HUD-1) for each Unit being sold, Borrower shall pay to Agent or Loan Servicer (as determined by Agent) an amount equal to (A) the Required Release Price for such Unit as provided in Section 2.15 (which amount shall be applied by Agent in any manner and in any order determined by Agent in its discretion, subject to Section 2.15(b)(iii) below), and (B) all other sums then due and payable to Agent and Lender, under the Loan Documents with respect to the amount of the Loan being repaid pursuant to such sale of Units including, without limitation, all accrued and unpaid interest to and including the applicable Prepayment Date, such pro rata portion of the Deferred Origination Fee based on the principal amount being repaid or prepaid and the applicable Make Whole Fee.  In addition, if Borrower is entitled to retain any escrow deposit or receive any other monies from the purchaser of a Unit who defaults under its Unit Sales Contract, the Unit Sales Escrow Agent shall be unequivocally authorized upon Agent's written demand therefor, to immediately remit to Agent the entire amount of all such escrow deposits and other monies, without further investigation or direction by Borrower and without offset or any claim, whereupon all

such funds shall be applied by Agent as a partial prepayment against the Debt in any manner as determined by Agent.  If, notwithstanding the preceding sentence, Borrower directly receives any such monies, Borrower shall hold such funds in trust for Agent, and Borrower shall immediately remit any such funds to Agent without offset or any claims to be applied in accordance with the immediately preceding sentence.

(ii)    *Intentionally Omitted.*

(iii)    Provided no Event of Default is continuing, mandatory prepayments of principal amounts on the Loan pursuant to this Section 2.10(b)(i) and (ii) shall be applied in such amounts as determined by Agent in its sole discretion as follows: (i) first, to pay the Make Whole Fee (if any); (ii) second, to pay such pro rata portion of the Deferred Origination Fee based upon the amount of principal being voluntarily prepaid or repaid; (iii) third, to pay Agent's and Lender's unpaid fees, costs and expenses (including legal fees and costs) due and owing as of the Prepayment Date (provided that Borrower may consent in writing that such unpaid amounts under this clause (iii) be added to the then unpaid principal balance of the Loan, the Acquisition Loan and/or Building Loan in such amounts as determined by Agent in its sole discretion);(iv) fourth, to fund the Interest Reserve Account; (v) fifth, to fund the Construction Reserve Account in accordance with the Budget (it being expressly understood and agreed that the Budget shall specifically take into account and include budgeted line items for such portions of LIC Proceeds or Required Release Price being deposited into the Construction Reserve Account); (vi) sixth, to outstanding principal under the Building Loan Note; and (cii) seventh, if Building Loan Note has been paid in full, to the outstanding principal under the Acquisition Loan Note.  Borrower expressly acknowledges, consents and agrees that Agent reserves the right to change the allocations, amounts and order of priority with respect to any matters in this Section 2.10(b)(i), (ii) and (iii).

(c)    Prepayments after Event of Default.  If, following the occurrence and during the continuance of an Event of Default, Borrower, a purchaser at foreclosure or any other Person tenders payment of all or any part of the Outstanding Principal Balance, or if all or any portion of the Outstanding Principal Balance is recovered by Agent after such Event of Default (excluding therefrom mandatory prepayments of the Loan made from application of the LIC Proceeds, the Required Release Prices or Proceeds as provided herein), Borrower, such purchaser at foreclosure or such other Person (as the case may be) shall pay (A) interest at the Default Rate on the Outstanding Principal Balance through the last day of the Interest Period within which such tender or recovery occurs, and (B) all other sums then due and payable under the Loan Documents (including Late Payment Charge and the Make Whole Fee). Notwithstanding anything to the contrary contained herein or in any other Loan Document, any prepayment of the Debt made concurrently with the occurrence of an Event of Default or while an Event of Default is continuing shall be applied to the Debt in such order and priority as may be determined by Agent in its sole discretion.

(d)    No Right to Re-borrow.  The Loan is not a "revolving" loan and, therefore, Borrower may not borrow, repay and re-borrow hereunder.

(e)    Make Whole Fee.  Borrower expressly acknowledges, consents and agrees that the Make Whole Fee is a reasonable cost and charge payable by the Borrower in exchange for any repayment or prepayment of the Debt in accordance with the terms hereof. Further, Borrower may consent in writing that all or any portion of the Make Whole Fee then due under this Agreement may be deferred and added to the Outstanding Principal Balance.

2.11    LIBOR Unascertainable.  If Agent determines that adequate and reasonable means do not exist for ascertaining LIBOR or that a contingency has occurred which affects the London Interbank Eurodollar Market at which Agent and/or Lender prices loans (which determination by Agent shall be conclusive and binding on Borrower in the absence of manifest error), then Agent shall forthwith give notice thereof to Borrower, whereupon Agent's obligation to maintain interest based on LIBOR shall be suspended and the Interest Rate applicable to the Note shall be based on the Alternative Rate.  Computation of the Interest Rate based on the Alternative Rate for the Note shall continue until Agent determines that the circumstances giving rise to Agent's substitution of the Alternative Rate Index for LIBOR no longer exist.

2.12    Illegality.  If, after the Closing Date, any applicable law, rule or regulation is adopted, or any change is made in any existing applicable law, rule or regulation or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent or any Lender with any request or directive (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency issued after the Closing Date (a "Regulatory Change") shall make it unlawful for Lender to make, maintain or fund its LIBOR Loans at the LIBOR Rate, and Agent shall forthwith give written notice thereof to the Borrower, whereupon (a) the obligation of Lender to make LIBOR Loans shall be suspended, and (b) each outstanding LIBOR Loan made by Lender shall be converted into an Alternative Rate Loan on the first day of the immediately succeeding Interest Period or within such earlier period as required by applicable law.  If, pursuant to the terms of this Section 2.14, the Note is bearing interest at the Alternative Rate and the Regulatory Change which resulted in the Note bearing interest at the Alternative Rate shall no longer exist or be effective or applicable to Agent and Lender, Agent shall give written notice thereof to Borrower, and the Note shall bear interest at the LIBOR Rate commencing on the first day of the next succeeding Interest Period.  Agent shall promptly notify Borrower in writing of each such determination made pursuant to the terms of this Section 2.12.

2.13    Indemnified Taxes.

(a)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, Indemnified Taxes, excluding (i) Indemnified Taxes measured by Lender's net income, and franchise taxes imposed on it, by the jurisdiction under the laws of which Lender is resident or organized, or any political subdivision thereof and (ii) taxes measured by Lender's overall net income, and franchise taxes imposed on them, by the jurisdiction of Lender's applicable lending office or any political subdivision thereof or in which Lender is a resident or engaged in business.  If any non-excluded Indemnified Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all non-excluded

- 45 -

Indemnified Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder.  Whenever any non-excluded Indemnified Tax is payable pursuant to Applicable Law by Borrower, Borrower shall send to Agent, an original official receipt showing payment of such non-excluded Indemnified Tax or other evidence of payment satisfactory to Agent.  Borrower hereby indemnifies Agent and Lender for any incremental taxes, interest or penalties that may become payable by Agent and/or Lender which may result from any failure by Borrower to pay any such non-excluded Indemnified Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Agent the required receipts or other required documentary evidence.

(b)     In the event that Agent or Lender or any successor and/or assign thereof is not incorporated under the laws of the United States of America or a state thereof (a "Non-U.S. Entity") Agent and Lender agrees that, prior to the first date on which any payment is due such entity hereunder, Agent  will deliver to Borrower two duly completed copies of United States Internal Revenue Service Form W-8BEN or W-8ECI or successor applicable form, as the case may be, certifying in each case that such entity is entitled to receive payments under the Note, without deduction or withholding of any United States federal income taxes.  Each entity required to deliver to Borrower a Form W-8BEN or W-8ECI pursuant to the preceding sentence further undertakes to deliver to Borrower two further copies of such forms, or successor applicable forms, or other manner of certification, as the case may be, on or before the date that any such form expires (which, in the case of the Form W-8ECI, is the last day of each U.S. taxable year of the Non-U.S. Entity) or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it to Borrower, and such other extensions or renewals thereof as may reasonably be requested by Borrower, certifying in the case of a Form W-8BEN or W-8ECI that such entity is entitled to receive payments under the Note without deduction or withholding of any United States federal income taxes, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders all such forms inapplicable or which would prevent such entity from duly completing and delivering any such form with respect to it and such entity advises Borrower that it is not capable of receiving payments without any deduction or withholding of United States federal income tax.

2.14     Release on Payment in Full.  Notwithstanding anything in the Loan Documents to the contrary, the Loan shall not be repaid in full prior to indefeasible payment in full of the Building Loan.  If Borrower shall pay or cause to be indefeasibly paid, the principal of and interest on the Note in full at maturity or as otherwise permitted in accordance with the terms of the Loan Documents and all other Debt (including, without limitation, the Make Whole Fee (if any) payable to Agent under the Loan Documents by Borrower or secured by the Pledge Agreement or by the other Loan Documents (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive the indefeasible satisfaction of the Note in full, then, at Borrower' sole cost and expense (including, without limitation, payment of any recording fees, Agent's and Lender's legal fees and related charges and costs): (a) Agent shall release the Lien of this Agreement and the other applicable Loan Documents upon the Account Collateral, and (b) Agent shall deliver appropriate UCC-3 termination statements to release of record the Pledge Agreement and the Collateral and all related UCC financing statements, and (c) all the other Loan Documents shall be discharged (unless such Loan Document by its terms is expressly

intended to survive repayment of the Loan).  and (d) Agent shall deliver a pay-off letter in customary form), all of the foregoing being at the sole cost, preparation and expense of Borrower.    Concurrently with such release and satisfaction or assignment of the Loan Documents, Agent will return to Borrower the original Note (and all original insurance policies, if any, relating to the Property which may be held by Agent) (and to the extent any originals are lost, mislaid or destroyed, such affidavits of lost instruments), any amounts held in escrow pursuant to this Agreement or any of the other Loan Documents, or otherwise, and any part of the Collateral, the Account Collateral that may be in its possession or maintained by Loan Servicer and, on the written request and at the expense of Borrower, will execute and deliver such appropriate UCC-3 termination statements prepared by Borrower and as may reasonably be requested by Borrower to evidence such release and satisfaction and any such termination statements, when duly filed, shall conclusively evidence the release and satisfaction of the Pledge Agreement and the other applicable Loan Documents and shall return the Mortgage Borrower's membership certificate and power to Borrower..

2.15    Release of Units.    As long as the Mortgage Loan remains outstanding, sales and/or releases of Units shall be completed in accordance with the terms and conditions set forth in Section 2.15 of the Mortgage Loan Agreements.  If the Mortgage Loan is no longer outstanding, then provided that no Event of Default has occurred and is continuing under this Agreement and the Offering Plan has been approved by Agent as set forth in Section 6.2.24, Borrower shall have the right to cause Mortgage Borrower to effectuate a sale and transfer of any Unit upon satisfaction of each of the following conditions with respect to such Unit:

(a)    Borrower shall have fully complied with the provisions of subsections (a) through (h) of Section 6.2.24;

(b)    the Condominium Declaration has become effective;

(c)    Agent shall have received, with respect to a proposed sale of a Unit, a copy of the executed Bona Fide Residential Sales Contract with respect to such Unit;

(d)    Agent shall have received and approved not less than five (5) Business Days' prior written notice of the proposed release, accompanied by a pro forma settlement statement (or HUD-1) signed by Mortgage Borrower and the purchaser of such Unit and reflecting the Gross Sales Proceeds, the Net Sales Proceeds and the Required Release Price with respect to such Unit;

(e)    contemporaneous with such release there shall be a sale of such Unit, pursuant to the applicable Bona Fide Residential Sales Contract;

(f)    the Unit to be partially released will constitute one or more tax lots separate and distinct from the tax lot or lots applicable to the remaining portion of the Property retained by Mortgage Borrower;

(g)    Agent or Loan Servicer shall have received in cash or by wire transfer of immediately available funds or by certified or bank check payable to Agent the Required Release Price, which Required Release Price shall be applied by Agent in accordance with Section 2.10;

- 47 -

(h)     in connection with the sale and release of such Unit, the costs and expenses of Agent and Lender, including, all fees, costs and disbursements of Agent's and Lender's counsel, shall be paid by Borrower on demand or Borrower shall have agreed in writing that such amounts due and owing to Agent and Lender shall be added to the unpaid principal balance of the Loan;

(i)     The aggregate loan-to-value of the Loan and Mortgage Loan is not greater than it was as of the day immediately preceding the date of any such proposed release, all as determined by Agent; and

(j)     in connection with the sale and release of such Unit, a release fee equal to $2,500.00 shall be paid to Agent.

So long as any portion of the Debt remains outstanding, Borrower shall not be entitled to receive any portion of the Required Release Price.

### ARTICLE III.     *INTENTIONALLY OMITTED.*

### ARTICLE IV.     *INTENTIONALLY OMITTED.*

### ARTICLE V.     REPRESENTATIONS AND WARRANTIES.

5.1 <u>Borrower General Representations</u>.  Borrower represents and warrants to Agent and Lender, as of the Closing Date and as of the date of any disbursement of funds from the Construction Reserve Account, that:

5.1.1          <u>Organization</u>.  Borrower is a limited liability company formed under the laws of the State, has been duly organized and is validly existing and in good standing pursuant to the laws of the State, with requisite power and authority to own its properties and to transact the businesses in which it is now engaged.  Borrower has duly qualified to do business and is in good standing in the State.  Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its property and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership of the Collateral and the Management of the Mortgage Borrower and activities related thereto.  As of the Closing Date, the organizational and ownership structure of Borrower and Mortgage Borrower is accurately depicted by the schematic diagram attached hereto as <u>Schedule I</u> up to the highest level of ownership depicted thereon.  Borrower shall not change its name, identity, jurisdiction of organization, or entity form, unless it shall have given Agent thirty (30) days prior written notice of any such change and shall have taken all steps requested by Agent to grant, perfect, protect and/or preserve the security interest granted hereunder to Agent.

5.1.2          <u>Proceedings</u>.  Borrower has taken all necessary action to authorize the execution and delivery of this Agreement by Borrower and performance of Borrower's obligations under this Agreement and the other Loan Documents.  This Agreement and the other Loan Documents have been duly executed and delivered by, or on behalf of, Borrower and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws generally affecting rights of creditors and the enforcement of debtors' obligations,

21-22098-shl    Doc 43    Filed 05/26/21    Entered 05/26/21 16:27:23    Main Document
Pg 87 of 184

and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

         5.1.3      <u>No Conflicts</u>.  The execution, delivery and performance by Borrower of this Agreement and the other Loan Documents to which it is a party will not result (a) in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement or other agreement or instrument to which Borrower or Mortgage Borrower is a party or to which any of Borrower's property or assets is subject (unless consents from all applicable parties thereto have been obtained), or (b) in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

         5.1.4      <u>Litigation</u>.  Except as set forth on <u>Schedule II</u>, as of the Closing Date there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or threatened in writing against or affecting Borrower, Mortgage Borrower, any Guarantor or all or any portion of the Property.  The actions, suits or proceedings identified or disclosed , if any, in each case, if determined adversely to Borrower, Mortgage Borrower or the Property, as the case may be, would not reasonably be expected to have a Material Adverse Effect.  Notwithstanding anything to the contrary in the Loan Documents, any litigation involving all or any portion of the Property, Borrower and/or Guarantor, including, without limitation, the foreclosure action described in Schedule II with respect to the Westchester Property, shall be dismissed and discharged without prejudice and any *lis pendens* filed in connection therewith shall be discharged prior to the Closing Date.

         5.1.5      <u>Agreements</u>.  Neither Borrower, nor Mortgage Borrower is a party to any agreement or instrument or subject to any restriction which is reasonably likely to materially and adversely affect Borrower or Mortgage Borrower or Borrower's or Mortgage Borrower's business, properties or assets, operations or financial condition.  Borrower has received no written notice that Borrower is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower, Mortgage Borrower or the Collateral is bound and which would have a Material Adverse Effect.  Neither Borrower, nor Mortgage Borrower has any financial obligation (contingent or otherwise) under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower or Mortgage Borrower is a party or by which Borrower, Mortgage Borrower or the Collateral is otherwise bound, other than (a) obligations incurred in the ordinary course of (i) Mortgage Borrower owning, leasing, developing (including developing for condominium ownership), constructing, managing, maintaining, marketing, designing, selling and operating the Property, and (ii) in the case of Borrower, owning the Collateral and managing the Mortgage Borrower, and (b) obligations under the Loan Documents to which Borrower is a party, the, the Mortgage Loan Documents, the Permitted Encumbrances and the Permitted Debt.  Schedule II attached to the

- 49 -

Project Loan Agreement contains a true, complete and accurate list of all Material Agreements in effect as of the Closing Date. .   True, complete and correct copies of all Material Agreements listed on such <u>Schedule III</u> have been delivered to Agent and Borrower has delivered true, complete and correct copies of all Material Agreements to Agent made subsequent to the Closing Date.

        5.1.6        <u>Collateral</u>.  Borrower is the record and beneficial owner and has good title to, the Collateral, free and clear of all Liens whatsoever, and Mortgage Borrower has insurable fee simple title to the Property, free and clear of all Liens whatsoever, in each case, other than the Liens created by the Loan Documents, the Mortgage Loan Documents and other Permitted Encumbrances. The Pledge Agreement, together with the UCC-1 financing statements relating to the Collateral when properly filed in the appropriate records, will create a valid, perfected first priority security interests in and to, such portion of the Collateral for which a Lien can be perfected by filing a UCC-1 financing statement. The Pledge Agreement, together with Borrower's delivery to Lender of the membership certificates, evidencing the Pledged Company Interests, together with powers executed in blank, as required under the Pledge Agreement, creates a first priority valid and perfected security interest in the Pledged Company Interests.

        5.1.7        <u>No Bankruptcy Filing</u>.  Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and no Person is contemplating the filing of any such petition against Borrower or Mortgage Borrower.

        5.1.8        <u>Full and Accurate Disclosure</u>.  No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any knowingly untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no fact which has not been disclosed to Agent or its counsel which would have a Material Adverse Effect.

        5.1.9        <u>All Property</u>.  The "Property" as defined in the Security Instruments constitutes all of the real property, personal property, equipment and fixtures currently owned or leased by Mortgage Borrower.

        5.1.10        <u>No Plan Assets</u>.

        (a)        Borrower does not maintain a Plan which is subject to Title IV of ERISA; and

        (b)        Borrower is not a Plan that is subject to Title I of ERISA, none of the assets of Borrower constitutes or will constitute Plan assets of one or more such Plans within the meaning of 29 C.F.R. Section 2510.3 101 and Borrower is not a governmental plan within the meaning of Section 3(32) of ERISA and transactions by or with Borrower are not subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

        5.1.11        <u>Compliance</u>.  Borrower, Mortgage Borrower and the Property and, upon the completion of the Project, the use of the Property shall comply in all material

respects with all applicable Legal Requirements, including building and zoning ordinances and codes. Borrower is not in default or in violation in any material respect of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Borrower or Mortgage Borrower any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Collateral or the Property or any part thereof or any monies paid in performance of Borrower's or Mortgage Borrower's obligations under any of the Loan Documents or the Mortgage Loan Documents.

5.1.12    Financial Information.  All financial data including the statements of cash flow and income and operating expense, that have been delivered by or on behalf of Borrower to Agent in respect of the Property (a) are true, complete and correct in all material respects as of the respective dates thereof and (b) fairly represent the financial condition of the Property as of the date of such reports.  Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and likely to have a Material Adverse Effect.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements which has not been disclosed in writing to Agent.

5.1.13    Condemnation.  No Taking has been commenced or is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

5.1.14    Federal Reserve Regulations.  None of the proceeds of the Loan will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U, Regulation X or Regulation T or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry "margin stock" or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of Regulation U or Regulation X. Borrower does not own any "margin stock."

5.1.15    Not a Foreign Person.  Borrower is not a foreign person within the meaning of § 1445(f)(3) of the Code.

5.1.16    Separate Lots.  The Property is comprised of one parcel or several parcels which constitutes a separate tax lot or separate tax lots and does not constitute or include a portion of any other tax lot not a part of the Property.

5.1.17    Assessments.  There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property or any portion thereof.

5.1.18    Enforceability.  The Loan Documents are not subject to any existing rights of rescission, set off, counterclaims, claims or defenses by Borrower, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and Borrower has not asserted any rights of rescission, set off, counterclaims, claims or defenses with respect thereto.

5.1.19    <u>No Prior Assignment</u>.    There are no prior sales, transfers or assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding following the funding of the Loan, other than those granted to Mortgage Lender concurrently with the execution and delivery of the Mortgage Loan Documents.

5.1.20    <u>Insurance</u>.    Borrower or Mortgage Borrower has obtained and has delivered to Agent full and accurate copies of all certificates or Policies reflecting the insurance coverages, amounts and other requirements required to be maintained pursuant to this Agreement.    Neither Borrower nor Mortgage Borrower has not, and no Person has, done by act or omission anything which reasonably would be expected to impair the coverage of any such Policy.

5.1.21    <u>Permits; Licenses</u>.    All Current Construction Permits and other certifications, permits, licenses and approvals required in connection with the current development and operation of the Property (collectively, the "<u>Licenses</u>") have been obtained and are in full force and effect, and true, correct and complete copies of same have been delivered to Agent.

5.1.22    <u>Flood Zone</u>.    No portion of the Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if so located, any flood insurance required under <u>Section 7.1</u> is in full force and effect.

5.1.23    <u>Boundaries</u>.    All of the Improvements lie wholly within the boundaries and building restriction lines of the Property, and, as of the Closing Date, no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those which are insured against by the Title Policy or constitute Permitted Encumbrances.

5.1.24    <u>Leases</u>.    As of the Closing Date, the Property is not subject to any Leases.    No Person has any possessory interest in the Property or right to occupy the same except under and pursuant to the Leases.    As of the Closing Date and as of each date on which this representation is deemed remade and except as otherwise disclosed in writing to Agent by Borrower, the then current Leases are in full force and effect and there are no material defaults (beyond applicable notice and cure periods) thereunder by either party and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute material defaults thereunder.    No Leases for any Units have been entered into by Borrower without Agent's prior written consent, which consent may be withheld in Agent's sole discretion.    No Rents have been paid more than one (1) month in advance of its due date, unless Borrower has deposited such advance rent with Agent or Loan Servicer (as determined by Agent) as additional security for the obligations of Borrower.

5.1.25    <u>Filing and Recording Taxes</u>.    All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution,

delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid or delivered to the Title Company for payment on the Closing Date.

        5.1.26        <u>Single Purpose Entity/Separateness</u>.  Until the Loan has been paid in full, Borrower hereby represents, warrants and covenants that each SPE Entity is, shall be, and shall continue to be, a Single Purpose Entity.

        5.1.27        <u>Management Agreement; Leasing Agency Agreement; and Sales Agency Agreement</u>.

        (a)        <u>Management Agreement</u>.  As of the Closing Date, no Management Agreement is in force or effect with respect to the Property.  Any Management Agreement will be subject to the requirements set forth in <u>Section 6.1.21(a)</u>.

        (b)        <u>Sales Agency Agreement</u>.  As of the Closing Date, no Sales Agency Agreement is in force or effect with respect to the Property.  Any Sales Agency Agreement will be subject to the requirements set forth in <u>Section 6.1.21(c)</u>.

        5.1.28        <u>Illegal Activity</u>.  No portion of the Collateral or the Property has been or will be purchased by Borrower or Mortgage Borrower with proceeds of any illegal activity.

        5.1.29        <u>No Change in Facts or Circumstances; Disclosure</u>.  All financial statements (and rent rolls, if any) submitted by Borrower to Agent in connection with the Loan are accurate, complete and correct in all material respects as of the respective dates thereof.  All other material written information, reports, certificates and other documents submitted by Borrower to Agent in connection with the Loan are accurate, complete and correct in all material respects as of the respective dates thereof.  There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects the Mortgage Borrower or the Property or the business operations or the financial condition of Borrower or Mortgage Borrower, in each case, other than as has been disclosed to Agent.  Borrower has disclosed to Agent all material facts known to Borrower and has not failed to disclose any material fact known to Borrower that is likely to cause any representation or warranty made herein to be materially misleading.

        5.1.30        <u>Tax Filings</u>.  Borrower has filed or caused to be filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments shown to be due and payable by Borrower on such returns, other than any taxes, fees or other charges the amount or validity of which is being contested in good faith by appropriate proceedings and satisfactory evidence thereof has been provided to Agent in connection therewith.

        5.1.31        <u>Solvency/Fraudulent Conveyance</u>.  Borrower (a) has not entered into the transaction contemplated by this Agreement or any Loan Document with the actual intent to hinder, delay, or defraud any creditor or any other Person, and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  As of

the date this representation is made or deemed remade, Borrower's assets do not and will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

        5.1.32     <u>Investment Company Act</u>. Borrower is not (a) an investment company or a company Controlled by an investment company, within the meaning of the Investment Company Act of 1940, as amended; (b) a holding company or a subsidiary company of a holding company or an affiliate of either a holding company or a subsidiary company within the mean of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

        5.1.33     <u>Labor</u>. No organized work stoppage or labor strike is pending or threatened in writing by employees and other laborers at the Property. None of Borrower, Mortgage Borrower nor General Contractor (a) is involved in or threatened in writing with any labor dispute, grievance or litigation relating to labor matters involving any employees and other laborers at the Property, including violation of any federal, state or local labor, safety or employment laws (domestic or foreign) and/or charges of unfair labor practices or discrimination complaints; (b) has engaged in any unfair labor practices within the meaning of the National Labor Relations Act or the Railway Labor Act at the Property; or (c) is a party to, or bound by, any collective bargaining agreement or union contract with respect to employees and other laborers at the Property except as disclosed by Borrower to Agent in advance and in writing and as approved in advance by Agent (collectively, the "<u>Labor Agreements</u>").

        5.1.34     <u>Brokers</u>. No financial advisors, brokers, underwriters, placement agents, agents or finders have been dealt with by Borrower in connection with the Loan other than Ideal Corporate Funding, Inc. (together with any affiliates, "<u>Broker</u>"), who will be paid in full by Borrower utilizing proceeds from the Loan on the Closing Date. From and after the Closing Date, Broker shall not be entitled to any further fees, commission or payments in connection with the Property, the Loan and the Mortgage Loan unless a separate agreement is entered into between Broker and Borrower on terms and conditions acceptable to Agent. Further, until the Loan and Mortgage Loan are paid in full, Borrower shall be obligated to pay any and all brokers and co-brokers market rate commissions pursuant to commission agreements acceptable to Agent in connection with any sale or other monetization of the Units.

        5.1.35     <u>No Other Indebtedness</u>. Borrower has not borrowed or received debt financing or other Indebtedness that has not been heretofore repaid in full, other than the Permitted Debt.

        5.1.36     <u>Taxpayer Identification Numbers</u>.

Borrower's Federal taxpayer identification number is 83-2850404.

5.1.37        <u>Principal Place of Business</u>.  Borrower's principal place of business and is 50 South Buckhout Street, Suite 307, Irvington, New York 10533, or as updated and disclosed by Borrower to Agent in advance and in writing.

5.1.38        <u>Compliance with Anti-Terrorism, Embargo and Anti-Money Laundering Laws</u>.  Borrower hereby represents, warrants, covenants and agrees as follows:

(a)        none of the Borrower Group or, to the Knowledge of Borrower, any Person who owns any equity interest in or Controls any of the foregoing currently is identified on the OFAC List or otherwise qualifies as a Prohibited Person, and Borrower has implemented procedures to ensure that no Person who now or hereafter owns any equity interest in Borrower is a Prohibited Person or Controlled by a Prohibited Person, in each case, <u>provided</u> <u>that</u> no representation is made as to any holders of shares traded in a public market;

(b)        none of the Borrower Group or, to the Knowledge of Borrower, any Person who owns any equity interest in or Controls any of the foregoing is in violation of any Legal Requirements relating to anti-money laundering or anti-terrorism, including Legal Requirements related to transacting business with Prohibited Persons or the requirements of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law 107 56, and the related regulations issued thereunder, including temporary regulations, all as amended from time to time, in each case, <u>provided</u> <u>that</u> no representation is made as to any holders of shares traded in a public market; and

(c)        if Mortgage Borrower enters into any Lease at the Property in accordance with the terms of this Agreement, Borrower will cause Mortgage Borrower (or Manager on Borrower's behalf) will implement commercially reasonable procedures to ensure that no Tenant at the Property is a Prohibited Person or owned or Controlled by a Prohibited Person, in each case, <u>provided</u> <u>that</u> no representation is made as to any holders of shares traded in a public market.

5.1.39        <u>Purchase Options</u>.  Neither the Property nor any part thereof is or will be subject to any purchase options or other similar rights in favor of third parties.

5.1.40        <u>Business Purposes</u>.  This Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

5.2 <u>Construction and Project Representations</u>.

5.2.1        <u>Construction Documents</u>.

(a)        Mortgage Borrower has all necessary power and authority to enter into and perform its respective obligations under the Construction Documents to which Mortgage Borrower is a party, and all other agreements and instruments to be executed by Mortgage Borrower in connection with the construction and the development of the Project.

(b)        The Construction Documents to which Mortgage Borrower will be a party will be, duly executed and delivered by Mortgage Borrower.

(c)    The Construction Documents to which Mortgage Borrower will be a party will constitute, when executed and delivered, a legal, valid and binding obligation of Mortgage Borrower, enforceable against Mortgage Borrower in accordance with its terms, subject only to applicable bankruptcy, insolvency and similar laws generally affecting rights of creditors and the enforcement of debtors' obligations, and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

5.2.2    No Violation.  The construction of the Project and the execution, delivery and performance by Mortgage Borrower of its obligations under, and the consummation of the transactions contemplated by, each of the Construction Documents to which Mortgage Borrower is, or will be, a party, and all other agreements and instruments to be executed by Mortgage Borrower in connection therewith do not and will not (a) violate any Legal Requirement applicable to Mortgage Borrower in any material respect, (b) result in a breach of any of the terms, conditions or provisions of, or constitute a default under the organizational documents of Mortgage Borrower, or result in a material breach of the terms, conditions or provisions of any mortgage, indenture, agreement, permit, franchise, license, note or instrument to which Mortgage Borrower is a party or by which it or any of its properties is bound, or (c) result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Mortgage Borrower (except as contemplated by this Agreement and by the other Loan Documents, the Mortgage Loan Documents and the Permitted Encumbrances).

5.2.3    Consents.  All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, or other actions in respect of or by, any Governmental Authorities that are required in connection with the execution, delivery and performance by Mortgage Borrower of the Construction Documents and all other agreements and instruments to be executed by Mortgage Borrower in connection therewith and the construction and operation of the Project have been obtained or will be obtained when required for the then applicable stage of construction of the Project and are or will be in full force and effect.

5.2.4    Plans and Specifications.  The Plans and Specifications applicable up to and including the current stage construction as set forth in the Construction Schedule have been approved, to the extent required by applicable Legal Requirements, by all applicable Governmental Authorities.  The anticipated use of the Project complies with all restrictive covenants affecting the Property and all Legal Requirements, including all applicable zoning ordinances and regulations and Environmental Laws.

5.2.5    Availability of Utilities and Access.  All utility services and facilities necessary for the construction of the Project and, upon completion of construction, the operation, use and occupancy of the Project for its intended purposes are or will be available at the boundaries of the Land, including water supply, storm and sanitary sewer facilities, gas and electric and telephone facilities and means of access between the Land and public ways.

5.2.6    No Liens.  Except for the Permitted Encumbrances, neither Borrower nor Mortgage Borrower has made, assumed or been assigned any contract or arrangement of any kind, the performance of which by the other party thereto would give rise to a Lien (other than Permitted Encumbrances) against all or any portion of the Property.

5.2.7       Compliance with Building Codes and Zoning Laws.  The current land use, zoning law, regulations and declarations covering the Property permit on an as-of-right basis, the construction of the Project to be completed substantially in accordance with the Plans and Specifications, the current zoning law and declarations covering the Property permit the Project to be operated and used as contemplated by this Agreement and the other Loan Documents, and no additional variance, conditional use permit, special use permit or other similar approval is required for such construction, use and occupancy of the Project that has not been or will not, if and when required, be obtained.  Upon completion of construction of the Project substantially in accordance with the Plans and Specifications, the Property and the use thereof will be in all material respects in compliance with all Current Construction Permits then required and Operating Permits then required, as the case may be, and all other applicable Legal Requirements, and such compliance is not dependent on any land, improvements or facilities that are not a part of the Property.  There are no pending threatened in writing actions, suits or proceedings to revoke, attach, invalidate, rescind or modify the zoning applicable to the Property or any part thereof or any of the Current Construction Permits, as currently existing.

5.2.8       Condominium Act. The current Condominium Act, assuming all condominium approvals set forth in Section 6.2.24 are duly issued, permit the Condominium Conversion to be completed with respect to the Westchester Property.

5.2.9       Project Documents. As of the Closing Date, neither Mortgage Borrower, nor an Affiliate thereof, has entered into any Trade Contract, the General Construction Contract, the Architect Agreement, the Sale Agency Agreement, the Management Agreement, or any other Construction Document.

5.2.10       Budget.  As of the Closing Date and as of each date on which this representation is deemed remade, the Budget (as the same may be amended from time to time in accordance with this Agreement and the Mortgage Loan Agreements) accurately reflects Borrower's best good faith estimate of all anticipated Hard Costs, Soft Costs, Project Costs and any other costs and expenses reasonably anticipated to be incurred in connection with the construction and development of the Project.

5.2.11       Loan Proceeds and Adequacy.  The sum of (a) the Mortgage Loan Amount to be advanced by Mortgage Lender pursuant to the Building Loan Agreement, and the Acquisition Loan Agreement and (b) the Loan Amount to be advanced by Agent pursuant to this Agreement, and (c) the Required Equity Investment are sufficient to pay (i) all Costs necessary for Completion of the Project substantially in accordance with the Budget and the Plans and Specifications and (ii) Aggregate Debt Service on the Loan and Mortgage Loan.

5.2.12       Architect's Agreement; Engineer's Agreement; Other Design Professionals Agreement.

(a)       (i) upon execution thereof, the Architect's Agreement shall be in full force and effect; (ii) both Mortgage Borrower and Architect are in compliance in all material respects with their respective obligations under the Architect's Agreement; and (iii) the work to be performed by the Architect under the Architect's Agreement is the architectural services required to design the Improvements to be built in accordance with the Plans and Specifications

and all architectural services required to complete the Improvements in accordance with the Plans and Specifications is provided for under the Architect's Agreement;

(b)    (i) Each Engineers Agreement is in full force and effect; (ii) both Mortgage Borrower and the Engineers thereunder are in compliance in all material respects with their respective obligations under such Engineers Agreements; (iii) the work to be performed by the Engineers under the Engineers Agreement is the engineering services other than architectural services required to design the Improvements to be built substantially in accordance with the Plans and Specifications and all engineering services (excluding architectural services) required to complete the Improvements substantially in accordance with the Plans and Specifications as provided for under the Engineers Agreements; and (iv) all work on the Improvements shall be completed in accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any defects.

(c)    (i) upon execution thereof, each Other Design Professionals Agreement is in full force and effect; (ii) both Mortgage Borrower and the Other Design Professionals thereunder are in compliance in all material respects with their respective obligations under such Other Design Professionals Agreements; (iii) the work to be performed by the Other Design Professionals under the Other Design Professionals Agreements is the design services other than architectural and engineering services required to design the Improvements to be built substantially in accordance with the Plans and Specifications and all design services (excluding architectural and engineering  services) required to complete the Improvements substantially in accordance with the Plans and Specifications as provided for under the Other Design Professional's Agreements; and (iv) all work on the Improvements shall be completed in accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any defects.

(d)    Borrower shall cause Mortgage Borrower from time to time, upon request by Agent, cause Architect, the Engineers and the Other Design Professionals to provide Agent with reports in regard to the status of construction of the Improvements, in such form and detail as requested by Agent.

5.3  Survival of Representations.  Borrower agrees that (i) all of the representations and warranties of Borrower set forth in Section 5.1 and Section 5.2 and elsewhere in this Agreement and in the other Loan Documents shall be deemed given and made as of the Closing Date and (ii) unless such representations and warranties were expressly made as of and applicable only to a specified date such representations shall survive for as long as any amount remains owing by Borrower to Agent and Lender under this Agreement or any of the other Loan Documents, unless a longer survival period is expressly stated in an Loan Document with respect to a specific representation or warranty, in which case, the same shall survive for such longer period.  All representations and warranties made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Agent and Lender notwithstanding any investigation heretofore or hereafter made by Agent and/or Lender or on its behalf.

## ARTICLE VI.        BORROWER COVENANTS.

6.1 <u>Affirmative Covenants</u>.  From the Closing Date and until payment in full of the Loan, Borrower hereby covenants and agrees with Agent and Lender as follows:

6.1.1        <u>Performance by Borrower and Mortgage Borrower</u>.  Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by Borrower in accordance with the applicable terms thereof.

6.1.2        Borrower shall cause Mortgage Borrower to comply with all obligations with which Mortgage Borrower has covenanted to comply under the Mortgage Loan Agreements and all other Mortgage Loan Documents (including those certain affirmative and negative covenants set forth in the Mortgage Loan Agreements) whether the Mortgage Loan has been repaid or the Mortgage Loan Documents have otherwise terminated, unless otherwise consented to in writing by Lender, provided, however, that, from and after such time as the Mortgage Loan has been indefeasibly repaid in full or the Mortgage Loan Documents have otherwise been terminated, Mortgage Borrower shall not be required to provide any notices or documents to, or obtain any consents or approvals from, Mortgage Lender.

6.1.3        <u>Existence; Compliance with Legal Requirements</u>.  Subject to Borrower's good faith right of contest in accordance with <u>Section 8.3</u>, Borrower shall at all times comply and cause Mortgage Borrower and the Property to be in compliance in all material respects with all Legal Requirements applicable to Mortgage Borrower and Borrower and the Property and the uses permitted upon the Property.  Borrower shall or cause Mortgage Borrower to do or cause to be done all things reasonable and necessary to preserve, renew and keep in full force and effect its existence, and all rights, licenses, permits and franchises to the extent necessary for Borrower or Mortgage Borrower to comply in all material respects with all Legal Requirements applicable to Borrower, Mortgage Borrower and the Property.  Borrower shall not commit, and shall not knowingly permit any other Person in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  Borrower hereby covenants and agrees not to commit, knowingly permit or suffer to exist any act or omission affording such right of forfeiture.

6.1.4        <u>Litigation</u>.  Borrower shall give prompt written notice to Agent of any litigation, investigation or governmental proceedings pending or threatened in writing against (a) Borrower, Mortgage Borrower or the Property which, if determined adversely to such Person or the Property would have a Material Adverse Effect, or (b) any Guarantor which, if determined adversely to such Guarantor, would have a Material Adverse Effect.

6.1.5        <u>Single Purpose Entity</u>.  Each SPE Entity has been, since the date of its formation, and shall at all times remain a Single Purpose Entity.  No SPE Entity shall remove or replace any Independent Director or Independent Manager except for Cause, and in any event not without providing at least five (5) Business Days' advance written notice thereof to Agent, in each case, unless such removal or replacement occurs as a result of the death or incapacity of such Independent Director or Independent Manager, or the termination of such individual's employment with the applicable service provider, in which case Borrower shall

provide written notice of the removal and replacement of such Independent Director or Independent Manager promptly following such removal and replacement.

6.1.6      Consents.   If Borrower or any other SPE Entity is a limited liability company the members of such Person may not take any Material Action unless all of the members, including the Independent Director or Independent Manager, shall have participated in such vote.   Borrower's and each other SPE Entity's operating agreements shall expressly state that, for as long as the Loan is outstanding, neither Borrower nor any other SPE Entity shall be permitted to (y) dissolve, liquidate, consolidate, merge or sell all or substantially all of Borrower's or any other SPE Entity's assets other than in connection with the repayment (or prepayment) of the Loan or (z) engage in any other business activity in violation of the Single Purpose Entity requirements set forth in this Agreement, and such restrictions shall not be modified or violated for as long as the Loan is outstanding.

6.1.7      Access to Property.   Borrower shall or shall cause Mortgage Borrower to  permit agents, representatives and employees of Agent and Construction Consultant to inspect the Property or any part thereof, at Borrower's expense, during normal business hours on Business Days upon reasonable advance notice, subject to the rights of Tenants and owners of Units (other than Mortgage Borrower and its Affiliates) and provided that such inspections do not unreasonably interfere with the construction of the Project or the operation of the Property and such agents, representatives and employees of Agent and Construction Consultant comply with all safety and other reasonable rules and requirements instituted by Mortgage Borrower or General Contractor with respect to the Project and the Property or the then existing Tenants at the Property.

6.1.8      Notices of Events of Default.   In addition to all other notices required to be given by Borrower hereunder, Borrower shall give notice to Agent promptly upon Borrower obtaining actual knowledge of the occurrence of any Event of Default.

6.1.9      Cooperate in Legal Proceedings.   Borrower shall cooperate fully with Agent with respect to any proceedings before any court, board or other Governmental Authority which may affect the rights of Agent and/or Lender hereunder or under any of the other Loan Documents and, in connection therewith, permit Agent, at its election, to participate in any such proceedings on behalf of itself and/or Lender which may have a Material Adverse Effect.

6.1.10      Perform Loan Obligations.   Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all out-of-pocket costs, fees and expenses to the extent required, under the Loan Documents executed and delivered by, or applicable to, Borrower.

6.1.11      Insurance.

(a)      Borrower shall cooperate with Agent in obtaining for Agent the benefits of any Proceeds lawfully or equitably payable in connection with the Property, and Agent and Lender shall be reimbursed for any out-of-pocket expenses incurred by Agent and/or Lender in connection therewith (including attorneys' fees and disbursements) out of such Proceeds.

       (b)     Borrower shall comply in all material respects with all Insurance Requirements and shall not bring or keep or knowingly permit to be brought or kept any article upon any of the Property or cause or knowingly permit any condition to exist thereon which would be prohibited by any Insurance Requirement, or would invalidate insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Property pursuant to Section 7.1.

       6.1.12       <u>Further Assurances; Substitute Notes</u>.

       (a)     Borrower shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Agent all documents, and take all actions, required by Agent from time to time to confirm the rights created or now or hereafter intended to be created under this Agreement and the other Loan Documents and any security interest created or purported to be created thereunder, to protect and further the validity, priority and enforceability of this Agreement and the other Loan Documents, to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents, or otherwise carry out the purposes of the Loan Documents and the transactions contemplated thereunder.  Borrower agrees that it shall, promptly after written notice from Agent, cooperate with Agent in connection with any request by Agent to sever any Note into two (2) or more separate substitute notes in an aggregate principal amount up to the aggregate principal amount of the Note being severed and to reapportion the among such separate substitute notes, and Borrower hereby agrees to execute and deliver to Agent, promptly after written demand therefor from Agent, new substitute notes substantially in the same form as the existing Note to replace the Note and amendments to or replacements of existing Loan Documents substantially in the same form as such existing Loan Documents to reflect such severance (including if required by Agent, an amendment to the Pledge Agreement).  Upon receipt of such substitute Note, Agent shall mark the replaced Note with a legend indicating they have been substituted and replaced by such substitute Note and, upon release of the Lien of the Pledge Agreement, shall return (or cause the Agent to return, as the case may be) the same to Borrower.  Borrower hereby further agrees, promptly after written demand therefor from Agent, to cause such Opinions of Counsel with respect to such substitute notes, amendments and/or replacements (consistent with the scope and substance of those Opinions of Counsel as delivered in connection with the closing of the Loan) to be delivered to Agent, and Borrower shall be responsible for all out-of-pocket fees and expenses incurred in connection therewith.  Any such combination of substitute notes may have different principal amounts and interest rates (as long as the weighted average of the interest rates on such substitute Note is equal to the Spread plus the LIBOR Rate); <u>provided</u>, <u>however</u>, that (i) the maturity date of any such substitute note shall be the same as the scheduled Maturity Date of the Note immediately prior to the issuance of such substitute notes, (ii) there shall be no other changes in the terms of the Loan in a manner which is adverse to Borrower, and (iii) such substitute notes shall not increase Borrower's obligations or decrease its rights under the Loan Documents. Notwithstanding anything to the contrary contained in this Section, nothing in this Section shall increase (other than with respect to ministerial and other *de minimis* matters) Borrower's or any Guarantor's obligations or materially decrease (other than with respect to ministerial and other *de minimis* matters) their rights under the Loan Documents.

(b)     In addition, Borrower shall, at Borrower's sole cost and expense:

(i)     execute and deliver, from time to time, such further instruments (including any financing statements under the UCC) as may be requested by Agent to confirm the lien of the Pledge Agreement on the Collateral;

(ii)     execute and deliver to Agent such documents, instruments, certificates, assignments and other writings, and do such other acts reasonably necessary to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, in each case as Agent may require; and

(iii)     do and execute all and such further lawful and reasonable acts, conveyances and assurances for the carrying out of the terms and conditions of this Agreement and the other Loan Documents, as Agent shall require from time to time.

(c)     If any Note is mutilated, destroyed, lost or stolen, upon Agent's furnishing to Borrower a lost note affidavit to such effect from Agent, Borrower shall deliver to Agent, in substitution therefor, a new promissory note containing the same terms and conditions as the mutilated, destroyed, lost or stolen Note with a notation thereon (i) of the unpaid principal and accrued and unpaid interest, and (ii) stating that such promissory note is a duplicate original of the mutilated, destroyed, lost or stolen Note, intended to replace the mutilated, destroyed, lost or stolen Note.

6.1.13     Intentionally Omitted.

6.1.14     Business and Operations.

(a)     Borrower will continue to engage in the businesses presently conducted by it or contemplated to be conducted by it in accordance with the terms of this Agreement as and to the extent the same are necessary for the Mortgage Borrower's ownership, leasing, development, construction, maintenance, management and operation of the Property.  Borrower will and will cause Mortgage Borrower to qualify to do business and will remain in good standing under the laws of each applicable jurisdiction as and to the extent the same are required for the ownership, leasing, development, construction, maintenance, management and operation of the Property.

(b)     Borrower shall, and shall cause Mortgage Borrower to (i) perform and/or observe in all material respects all of the covenants and agreements required to be performed and observed by Mortgage Borrower under the Management Agreement and do all things reasonably necessary to preserve and to keep unimpaired Mortgage Borrower's material rights thereunder; (ii) notify Agent of any "event of default" by Manager under any Management Agreement prior to delivery of any notice of such event of default to Manager; (iii) deliver to Agent a copy of each financial statement, capital expenditures plan, property improvement plan and any other material notice, report and estimate received by Mortgage Borrower under the Management Agreement; and (iv) enforce in a commercially reasonable manner the performance and observance of all of the covenants and agreements required to be performed and/or observed by the Manager under the Management Agreement

(c)    Borrower shall, and shall cause Mortgage Borrower to (i) perform and/or observe in all material respects all of the covenants and agreements required to be performed and observed by Mortgage Borrower under the Sales Agency Agreement and do all things reasonably necessary to preserve and to keep unimpaired Mortgage Borrower's material rights thereunder; (ii) notify Agent of any "event of default" by Sales Agent under the Sales Agency Agreement prior to delivery of any notice of such event of default to Sale Agent; (iii) deliver to Agent a copy of each financial statement, capital expenditures plan, property improvement plan and any other material notice, report and estimate received by Mortgage Borrower under the Sales Agency Agreement; and (iv) enforce in a commercially reasonable manner the performance and observance of all of the covenants and agreements required to be performed and/or observed by Sales Agent under the Sales Agency Agreement.

6.1.15    <u>Title to the Collateral and the Property</u>.    Borrower will warrant and defend title to the Collateral and the validity and priority of the Lien of the Pledge Agreement on the Collateral, and will cause Mortgage Borrower to warrant and defend (a) its title to the Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances), and (b) the validity and priority of the Lien of the Security Instruments, the Acquisition Loan Assignment of Leases and the Building Loan Assignment of Leases on the Property, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever.    Borrower shall reimburse Agent and/or Lender for any and all losses, damages or out-of-pocket fees, costs or expenses (including attorneys' fees and court costs) incurred by Agent and/or Lender  if an interest in the Property, other than as permitted hereunder, is claimed by any Person.

6.1.16    <u>Costs of Enforcement</u>.    If (a) this Agreement or the Pledge Agreement is foreclosed upon in whole or in part or this Agreement or any Loan Document is put into the hands of an attorney for collection, suit, action or foreclosure, (b) a foreclosure occurs with respect to any security agreement prior to or subsequent to this Agreement in which proceeding Agent and/or Lender is made a party, or a pledge prior to or subsequent to the Pledge Agreement in which proceeding Agent and/or Lender is made a party, or (c) the bankruptcy, insolvency, rehabilitation or other similar proceeding occurs with respect to Borrower or an assignment by Borrower for the benefit of its creditors, then, in each case, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all out-of-pocket fees, costs of collection and defense, including attorneys' fees and costs, actually incurred by Agent and/or Lender in connection therewith and in connection with any appellate proceeding or post judgment action involved therein.

6.1.17    <u>Estoppel Statement</u>.

(a)    Borrower shall, from time to time, upon ten (10) days' prior written request from Agent, execute, acknowledge and deliver to Agent, an Officer's Certificate, stating that this Agreement and the other Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that this Agreement and the other Loan Documents are in full force and effect as modified and listing such modifications), stating the principal amount outstanding under the Loan and the Mortgage Loan, accrued and unpaid interest thereon and containing such other information with respect to Borrower, Mortgage Borrower, the Property, the Loan and the Mortgage Loan as Agent may request.    The estoppel certificate shall also state

- 63 -

either that no Event of Default or Mortgage Loan Event of Default exists or, if any Event of Default or Mortgage Loan Event of Default shall exist, specifying such Event of Default or Mortgage Loan Event of Default, as applicable and the steps being taken to cure such Event of Default or Mortgage Loan Event of Default, as applicable.

(b)     Upon prior written request from Agent, Borrower shall request, and use commercially reasonable efforts to obtain, estoppel certificates from each Tenant leasing space at the Property in form and substance acceptable to Agent.

6.1.18     <u>No Joint Assessment</u>.     Borrower shall not cause or permit Mortgage Borrower to suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

6.1.19     <u>No Further Encumbrances</u>.     Borrower shall do, or cause to be done, all things necessary to keep and protect the Collateral unencumbered from any Liens. Borrower shall cause Mortgage Borrower to do, or cause to be done, all things necessary to keep and protect the Property and all portions thereof unencumbered from any Liens, easements or agreements granting rights in or restricting the use or development of the Property, except for Permitted Encumbrances.

6.1.20     <u>Leases</u>.

(a)     Without the prior written consent of Agent, Borrower shall not permit or cause Mortgage Borrower to (i) enter into any Lease for any portion of the Property (including, without limitation, any Unit); (ii) cancel or terminate (including by exercise of any landlord recapture rights) any Lease; (iii) approve any assignment of any Lease that releases the original Tenant from its obligations under such Lease, (iv) amend, modify or waive the provisions of any Lease in any material respect (including any amendment, modification or waiver reducing the fixed initial term of any Lease, reducing the rent payable under any Lease, changing any renewal provisions of any Lease or materially increasing the obligations of the landlord or materially decreasing the obligations of the Tenant under any Lease or pursuant to which any premises covered by such Lease is surrendered); or (v) cancel or materially modify any guaranty, or, except as may be required under the terms of the applicable Lease, release any security deposit, letter of credit, or other item constituting security pertaining to any Lease.    Under no circumstances shall Borrower permit or cause Mortgage Borrower to enter into any Lease of all or any portion of the Units, it being the intention of the parties hereto that the Units shall only be offered for sale.

(b)     Borrower shall cause Mortgage Borrower to (i) observe and perform all the obligations imposed upon the landlord under the Leases and not do or permit to be done anything to impair the value of the Leases as security for the Debt; (ii) enforce all of the terms, covenants and conditions contained in the Leases upon the part of the Tenant thereunder to be

observed or performed, short of termination thereof; and (iii) not execute any other assignment of the landlord's interest in the Leases or the Rents.

(c)     Except for security deposits, Borrower shall not permit or cause Mortgage Borrower to collect rent more than one month in advance.  Borrower, at Agent's request, shall furnish Agent with executed copies of all Leases hereafter made.

6.1.21     <u>Sales Agency Agreement</u>.

(a)     Borrower shall not permit Mortgage Borrower to enter into any agreement relating to the marketing and/or sale of Units without the express consent of Agent, <u>provided</u> <u>that</u> such consent may be conditioned upon the Sales Agent and Borrower executing an Assignment of Sales Agency Agreement.  The Sales Agency Agreement shall be in compliance with all Legal Requirements and all other applicable Condominium-Related Documents and shall provide (i) for fees payable to Sales Agent that, together with all other brokerage or sales commissions, shall not exceed eight percent (8%) of the Gross Sales Proceeds received for each Unit sold, (ii) that all of the Sales Agent's rights under the Sales Agency Agreement are subordinate to the Liens of the Security Instruments and the rights of Agent, and (iii) that the Sales Agency Agreement shall be terminable at Mortgage Borrower's option without penalty or premium upon the occurrence of any of the following (collectively, a "<u>Sales Agent Replacement Event</u>"):  (A) if an Event of Default shall occur, (B) subject to any applicable notice and cure periods, if Sales Agent breaches any of its obligations under the Sales Agency Agreement, (C) upon the gross negligence, malfeasance or willful misconduct of Sales Agent or (D) if Sales Agent shall become bankrupt or insolvent.  In no event shall any brokerage fee or commission relating to the sale of any Unit be paid to Mortgage Borrower or any Affiliate of any Borrower Party.  From and after such time as Mortgage Borrower shall have entered into a Sales Agency Agreement, Borrower shall cause Mortgage Borrower to (i) diligently perform and observe in all material respects all of the terms, covenants and conditions of the Sales Agency Agreement on the part of Mortgage Borrower to be performed and observed, (ii) promptly notify Agent of any notice to Mortgage Borrower of any default (beyond any applicable notice and cure periods) by Mortgage Borrower in the performance or observance of any of the terms, covenants or conditions of the Sales Agency Agreement on the part of Mortgage Borrower to be performed and observed and (iii) promptly notify Agent of any default  by the Sales Agent in the performance or observance of any of the terms, covenants or conditions of the Sales Agency Agreement on the part of the Sales Agent to be performed and observed.

(b)     Borrower shall not permit or cause Mortgage Borrower to surrender, terminate, cancel, modify, renew or extend the Sales Agency Agreement except in accordance with its terms, if applicable, or enter into any other agreement relating to the marketing and sale of the Units, or consent to the assignment by the Sales Agent of its interest under the Sales Agency Agreement, in each case without the express consent of Agent ; <u>provided</u>, <u>however</u>, with respect to a new sales agent such consent may be conditioned upon such new sales agent and Borrower executing an Assignment of Sales Agency Agreement.

(c)     Upon the retention of a Qualified Sales Agent, Agent shall have the right to approve any new sales agreement with such Qualified Sales Agent.

6.1.22      Manager.

(a)      Manager.

(i)      From and after the opening and operation of the Property in accordance with this Agreement, Mortgage Borrower, or the condominium association, if applicable, shall provide competent and responsible management for the Property by a professional management company pursuant to a written Management Agreement, in each case satisfying the criteria set forth herein.  Unless waived by Agent in writing, which waiver may be withheld in Agent's sole discretion, the Manager shall be a Qualified Manager.  Without Agent's prior written consent both as to the form of the Management Agreement and (other than the pre-approved Manager set forth in the preceding sentence) the identity of Manager, Borrower shall not permit Mortgage Borrower to enter into, modify or amend any Management Agreement, or permit any change in control or identity of any Manager (to the extent such change in control or identity requires Mortgage Borrower's consent under the terms of the applicable Management Agreement), or otherwise retain the services of any property management company.

(ii)      Without limitation of the foregoing, each Management Agreement (or the Assignment of Management Agreement executed and delivered by the Manager to Mortgage Lender) shall provide (x) for a Management Fee that shall not exceed the prevailing amount for compensation for management of comparable properties in the market where the Property is located, and (y) that the Management Agreement shall be terminable at Mortgage Borrower's option without penalty or premium (A) if an Event of Default shall occur, (B) if a change in control of Manager occurs in violation of the terms of the applicable Management Agreement, (C) subject to any applicable notice and cure periods, if Manager breaches any of its obligations under the Management Agreement, (D) upon the gross negligence, malfeasance or willful misconduct of Manager or (E) if Manager shall become bankrupt or insolvent (each, a "Manager Replacement Event").  If any of the foregoing Manager Replacement Events shall occur, then if requested by Agent, Borrower shall cause Mortgage Borrower to terminate the Management Agreement.  Upon termination of a Manager in accordance with the foregoing, Borrower shall cause Mortgage Borrower to retain the services of a substitute Qualified Manager acceptable to Agent.  Borrower shall cause Mortgage Borrower to cause each Manager to execute and deliver a subordination agreement satisfactory to Agent at the time of execution and delivery of any Management Agreement.  Further, if Manager is an Affiliate of Borrower, then the Management Agreement shall satisfy the requirements set forth in this Agreement applicable to transactions between Borrower and its Affiliates.  Any delegation of duties to Manager under the Management Agreement shall not stay, relieve or modify any of Borrower's obligations under this Agreement and the other Loan Documents.

(iii)      Upon the retention of a Qualified Manager, Agent shall have the right to approve any new management agreement with such Qualified Manager.

6.1.23    Termination of Agreements.  Agent shall have the right hereunder to terminate or cause Borrower to cause Mortgage to terminate any Management Agreement, Sales Agency Agreement, the General Construction Contract or any other Construction Contract, in accordance with the terms thereof, to which Borrower or Mortgage Borrower is a party, and a termination fee is required to be paid in connection therewith, Borrower shall pay, or shall cause Mortgage Borrower to pay, such fee when due and payable.

6.1.24    Approval of Material Agreements.  Borrower shall be required to obtain Agent's prior written approval of any and all Material Agreements affecting the Property or the Project and of any material modification of a Material Agreement.

6.1.25    Protection of the Property.  Borrower shall or shall cause Mortgage Borrower employ suitable means to protect the Property and all tools and building materials stored on the Property from theft or vandalism.

6.1.26    Signage.  Promptly following the date hereof, Borrower shall cause Mortgage Borrower to erect but only to the extent expressly agreed to by Agent in writing, at Mortgage Borrower's sole cost and expense and subject to applicable law, a sign satisfactory to Agent at a location on the Property satisfactory to Agent, which sign shall be furnished by Mortgage Borrower, at Mortgage Borrower's sole cost and expense, and which shall contain Agent's address and otherwise conform to Agent's specifications and shall recite, among other things, that Lender is providing the financing for the Project.

6.1.27    Withholding Taxes.

(a)    Borrower represents, warrants and covenants that, as of the Closing Date and until Borrower's obligations have been fully satisfied and performed, Borrower's obligations under the Loan Documents have been, are and shall remain in registered form within the meaning of Section 5f.103-1(c) of the United States Treasury Regulations, as well as Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (and any successor provisions), and that either and/or both of the following are true: (i) the obligations as to the Debt and any stated interest upon the indebtedness evidenced by the Notes are registered with Borrower and/or its lender and transfer of such obligations may be effected only by surrendering the instruments evidencing such obligations and either the reissuance by Borrower of the instruments to the new holders thereof and/or the issuance by Borrower of new instruments to the new holders; or (ii) the Debt, including without limitation the right to principal and any stated interest, may be transferred only through a system maintained by Borrower, Agent and/or Lender whereby ownership of an interest in the indebtedness is reflected in a record of ownership ("Book Entry System"), and the Debt has been transferred through Borrower's Book Entry System evidencing that Agent and/or Lender, and/or their successor in interest is entitled to receive such payments of principal and stated interest.  Notwithstanding anything herein to the contrary, the Obligations under the Loan Documents shall not be transferred by Borrower and/or any other Person obligated hereunder without the express written consent of Agent.  Lender may transfer and/or assign, all and/or any portion of its rights and the obligations under the Notes, and may transfer and/or assign all and/or any portion of the Notes, to any Person and/or entity with notice to Borrower.  The notice to Borrower described in the immediately preceding sentence

may be from any person and/or entity, including, without limitation, any transferee of the Loan Documents.

(b)    Subject to the following sentence, all payments made by Borrower owing under the Debt and obligations shall be made free and clear of and without deduction for any present and/or future taxes, levies, imposts, deductions, charges, and/or withholdings, and all liabilities with respect thereto, excluding taxes imposed on and/or measured by the net income of Lender and Agent and their respective members and/or partners (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings, and liabilities being hereinafter referred to collectively as "Withholding Taxes"). If Agent or Lender shall fail to provide Borrower a Form W-9 showing that Agent and Lender is a U.S. Person, (i) Borrower shall make such deductions of Withholding Taxes as required by Law, and (ii) Borrower shall timely pay the full amount deducted to the relevant tax authority and/or other authority in accordance with applicable Law.

6.2 Construction Related Covenants; Condominium Conversion Covenants.

6.2.1    Generally.

(a)    Borrower shall cause Mortgage Borrower to cause the Project to be constructed on the Land (i) in a good and workmanlike manner, substantially in accordance with the Plans and Specifications approved by Agent, (ii) in a manner in compliance with the terms of all documents of record, (iii) free and clear of Liens and claims for materials supplied or for labor or services performed in connection with the construction of the Project or otherwise (other than Permitted Encumbrances), subject to Borrower's right to contest any such Liens or claims in accordance with Section 8.3 hereof, and (iv) in accordance with this Agreement so as to cause Completion in accordance with the Construction Schedule, subject to Excusable Delay.

(b)    Borrower shall cause Mortgage Borrower to cause the Costs of the construction of the Project to be in accordance with the Budget (other than with respect to Costs due to cost overruns that are not covered under the General Contractor Agreement and that are funded from Equity Payments if any).

(c)    Borrower shall cause Mortgage Borrower to cause the construction of the Project to be diligently and continuously performed throughout the Construction Phase until Completion of the Project, subject only to Excusable Delay.

6.2.2    Construction Schedule.    Each month during the Construction Phase, Borrower shall deliver to Agent and Construction Consultant a copy of an updated Construction Schedule reflecting, among other things, the anticipated dates of completion of and the timing of disbursements of incremental amount of various subcategories of the Budget, all in such form and substance acceptable to Agent and containing such details as Agent may require.

6.2.3    Budget Adjustments.    No adjustments in the Budget shall be deemed to be approved without the prior written consent of Agent; provided, however, that Budget adjustments to reflect Change Orders approved by Agent under Section 6.2.7 shall be permitted upon Borrower's request unless otherwise specified at the time such Change Order is approved by Agent in writing.

6.2.4       Inspection of Property and Books and Records.

(a)       Borrower agrees to cause Mortgage Borrower to permit Agent and Construction Consultant, or designated representatives of any of them, to enter upon the Property, at any reasonable times during business hours on prior reasonable notice, with free access to inspect or examine or, to the extent not located on the Property, to otherwise make available at Borrower's or Agent's place of business to Agent and Construction Consultant the following:

(i)       all materials and shop drawings pertaining to the construction of the Project to the extent in the possession or control of Mortgage Borrower or its Affiliates or available to Mortgage Borrower under the General Construction Contract or other Construction Contracts;

(ii)       any contracts, bills of sale, statements, receipts or vouchers pertaining to the construction of the Project to the extent in the possession or control of Borrower or its Affiliates or available to Borrower under the General Construction Contract or other Construction Contracts;

(iii)       all work done, labor performed or materials furnished in and about the Project, including in connection with the construction of the Project;

(iv)       all books, contracts and records of Mortgage Borrower or General Contractor available to Mortgage Borrower under the General Construction Contract or other Construction Contracts pertaining to the construction of the Project; and

(v)       any other documents which are related to the construction of the Project to the extent in the possession or control of Borrower or its Affiliates or available to Borrower under the General Construction Contract or other Construction Contracts.

Borrower may satisfy the delivery or accessibility of any of the foregoing by causing General Contractor to deliver or otherwise make available such materials on a timely basis.

(b)       Borrower promptly will provide Agent and Construction Consultant with copies of any of the foregoing as Agent or Construction Consultant, as the case may be, may from time to time request.  Borrower will make its representatives available to discuss Borrower's or Mortgage Borrower's affairs, finances and accounts relating to the construction of the Project, and Borrower will  or will cause Mortgage Borrower to reasonably cooperate, and take all reasonable steps to cause the General Contractor, the Architect, the Engineers and the Trade Contractors (including Major Trade Contractors) to cooperate with Agent and Construction Consultant, or any of their designated representatives, to enable such Person to perform its functions under this Agreement.

6.2.5       Construction Consultant.       Borrower acknowledges that (a) Construction Consultant has been retained by Agent to act as a consultant to review Plans and Specifications, Construction Contracts and Draw Requests and only as a consultant to Agent in connection with the construction of the Project and has no duty to Borrower; (b) Construction

- 69 -

Consultant shall in no event or under any circumstance have any power or authority to make any decision or to give any approval or consent or to do any other act or thing which is binding upon Agent, and any such purported decision, approval, consent, act or thing by Construction Consultant on behalf of Agent shall be void and of no force or effect; (c) Agent reserves the right to make any and all decisions required to be made by Agent under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Agent, and to accept or not accept any matter or thing required to be accepted by Agent, under and in accordance with the terms of this Agreement, and without being bound or limited in any manner or under any circumstances whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by Construction Consultant to Agent with respect thereto; (d) Agent reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Agent, and (e) Agent reserves the right in its sole and absolute discretion to replace Construction Consultant with another qualified construction consultant at any time and without approval by or prior (but with subsequent) notice to Borrower.

      6.2.6      <u>Plans and Specifications</u>.  All Plans and Specifications shall be submitted to the DOB for plan review and shall have been reviewed and approved by the DOB's examiner.  Borrower shall submit the Plans and Specification to Agent and the Construction Consultant for approval.  Borrower shall not request, initiate, agree to, accept, cause or suffer directly or indirectly any changes to the Plans and Specifications without Agent's prior written consent. Borrower shall provide to Agent and Construction Consultant, concurrently with each Draw Request or at such other times as Agent or Construction Consultant may request, copies of all amendments, orders, documents or revisions to Plans and Specifications reflecting Change Orders.

      6.2.7      <u>Change Orders</u>.  Borrower shall not and shall not permit Mortgage Borrower to request, initiate, agree to, accept, cause or suffer directly or indirectly any Change Order without Agent's prior written consent, subject to verification and approval by Construction Consultant.  The approval by Agent of any Change Order (a) shall not obligate Agent or any Lender to increase the amount of the Loan, and (b) shall not obligate any Lender to make any Advance to the extent the same would not otherwise be obligated pursuant to this Agreement to make such Advance.  Borrower shall submit to Agent and Agent's Construction Consultant copies of each proposed Change Order prior to entering into it, together with documentation satisfactory to Agent and Construction Consultant, setting forth all additions and subtractions theretofore made to or from the scope of the Improvements.  Agent shall promptly review all Change Orders so submitted.  If any Change Order shall require the consent or approval of any third party, Borrower shall provide Agent with written evidence of such consent or approval.  Borrower shall submit to Agent and Construction Consultant copies of all Change Orders entered into with respect to the Project within fifteen (15) days after the same are entered into.  Nothing herein shall be deemed to restrict Borrower's ability to fund increases in Line Items, as provided under <u>Section 4.6.5</u>.

      6.2.8      <u>Correction of Work</u>.  Borrower will or will cause Mortgage Borrower to, promptly after written notice from Agent, correct any Defect in the Project or the Improvements or any material departure without Agent's prior written approval from the Plans

and Specifications.  Borrower agrees that the making of any Advance shall not constitute a waiver of Agent's right to require compliance with this Section 6.2.8 with respect to any such Defects or material departures from the Plans and Specifications.  Borrower agrees that Lender's failure to deliver such a written notice shall not constitute a waiver by Lender of any of Lender's rights in respect of such Defect.

6.2.9        Required Notices.

(a)    Without limiting any other notice requirement set forth in this Agreement, Borrower shall give notice to Agent promptly upon the occurrence of:

(i)    any cessation of construction of the Project for (i) a period in excess of 10 Business Days, and/or (ii) a period in excess of five (5) Business Days in any sixty (60) calendar day period, regardless, in each case, of whether or not such cessation is due to an Excusable Delay;

(ii)    any actual litigation or action of, or any litigation or action threatened in writing by, a Governmental Authority of which Borrower has knowledge concerning the actual or alleged presence, release, threat of release, placement on or in, or the generation, transportation, storage, treatment or disposal at, the Property and/or Project of any Hazardous Material in violation of applicable Environmental Law;

(iii)    any written notice given pursuant to any Construction Document alleging that there has occurred a default by Borrower or General Contractor in the performance of their respective obligations thereunder; and

(iv)    any condition which results in any delay, including copies of any stop-work order, and including any Excusable Delay, which would reasonably be expected to result in Completion occurring after the date therefor set forth in the Construction Schedule, or in any further delay beyond any delays of which Agent has been previously notified.

(b)    Each notice pursuant to this Section 6.2.9 shall be accompanied by a statement of Borrower setting forth details of the occurrence referred to therein and stating what action Borrower proposes to take with respect thereto, in each case, in such detail as Agent may require.

6.2.10        No Encroachments.  Borrower shall cause Mortgage Borrower to cause the Project to be constructed entirely within the perimeter of the Property and so as not to encroach upon or overhang any easement or right-of-way or any land of others in violation of any applicable Permitted Encumbrance, and when erected shall be wholly within any applicable building restriction lines, however established.

6.2.11        Compliance with Construction Documents and Contracts.  Borrower shall cause Mortgage Borrower to abide by, perform and comply with all of Mortgage Borrower's material obligations under the Architect Agreement, the Engineers Agreement, the General Construction Contract, the Trade Contracts, the other Construction Contracts and the Construction Documents, and Borrower, at its sole cost and expense, shall cause Mortgage

Borrower to use all commercially reasonable efforts to secure or enforce the performance of each and every material obligation, covenant, condition and agreement to be performed by the other parties thereunder.

6.2.12    Construction Contracts.  Except to the extent otherwise permitted herein, Borrower shall not cause or permit Mortgage Borrower to enter into, surrender, terminate, cancel, modify, amend or consent to the assignment of the Architect Agreement, the Engineers Agreement, the General Construction Contract, or consent to or approve of the entering into, surrender, termination, cancellation, modification, amendment or assignment of any Major Trade Contract by the General Contractor, without Agent's prior written consent.  If and to the extent any amendment, supplement, replacement or other modification is made to any of the foregoing which requires Agent's consent, upon request by Agent, Borrower shall cause Mortgage Borrower to promptly cause the Architect, the Engineers, General Contractor or Major Trade Contractor, as the case may be, to deliver a certificate or other written statement which confirms, on and as of the date thereof, that the Architect Consent, the Engineers Consent, the General Contractor Consent or the Major Trade Contractor Consent, as the case may be, previously delivered in connection with the Loan remains valid, true, correct and complete in all material respects as of the date so amended, supplemented, replaced or otherwise modified. Borrower promptly will give notice to Agent of the surrender, termination, cancellation, modification, amendment, substitution or assignment of the other Construction Contracts, whether or not Agent consented thereto pursuant to the immediately preceding sentence.

6.2.13    Trade Contracts.   In connection with seeking any consent of Agent, pursuant to Section 6.2.12, to Mortgage Borrower's consenting to or approving the entry into of any new Major Trade Contract by the General Contractor, Borrower may from time to time deliver to Agent and Construction Consultant a list of the names of prospective Major Trade Contractors with whom the General Contractor may contract for the construction of the Project, which may be pre-approved by Agent.  Borrower will deliver to Agent an executed copy of any Trade Contract which General Contractor enters into and will promptly give notice to Agent of the surrender, termination, cancellation, modification, amendment, substitution or assignment of any Trade Contract, whether or not Agent's consent to such action is required pursuant to Section 6.2.12.  Borrower shall deliver to Agent a copy of each subcontract entered into by the General Contractor within ten (10) days of Borrower's receipt of the same, together with a bid-leveling summary.

6.2.14    *Intentionally Omitted*.

6.2.15    Final "As-Built" Survey and Plans and Specifications.   Within ninety (90) days after Substantial Completion of the Project has occurred, Borrower shall deliver to Agent a full and complete "as-built" Survey and Plans and Specifications for the Property, dated no earlier than the Substantial Completion date, showing all Improvements constructed on the Property, and certified as Agent may then require.

6.2.16    Cessation of Business.   Borrower shall not  cause or permit Mortgage Borrower for any reason (a) cease (for (i) a period in excess of ten (10) Business Days, and/or (ii) a period in excess of five (5) Business Days in any sixty (60) calendar day period) the construction of the Project or, after the opening of the Project cease operating the Project in the

normal course, in each case, unless such cessation shall have been caused by Excusable Delay, or (b) enter into or engage in any other business not expressly permitted by the terms of this Agreement.

6.2.17    <u>Construction Permits</u>.  Promptly after obtaining any material Construction Permits for the construction of the Project after the Closing Date (including, without limitation, any renewals of Construction Permits as may be required by any Governmental Authorities), Borrower shall deliver a copy thereof to Agent.

6.2.18    <u>Certificate of Occupancy</u>.  Borrower shall cause Mortgage Borrower to obtain temporary certificates of occupancy with respect to the entire Project by the Outside Construction Completion Date (as the same may have been extended by reason of Excusable Delay) and, thereafter, shall continuously maintain in full force and effect valid certificates of occupancy for the entire Property.

6.2.19    <u>Protection Against Liens</u>.  Subject to its right of contest set forth in <u>Section 8.2</u> and <u>Section 8.3</u>, Borrower shall pay, discharge or bond all claims for labor, materials and services furnished in connection with construction of the Project and take all actions required to prevent the assertion of claims of Liens (other than Permitted Encumbrances) against the Property.  Borrower irrevocably appoints, designates and authorizes Agent as its agent (such agency being coupled with an interest) with the authority (but no obligation) to file any notice relating to claims of Liens (other than Permitted Encumbrances) that Agent deems advisable to protect its interests under the Loan Documents.  If any stop notice or claim is asserted against Agent by any Person furnishing labor, services, equipment or materials to the Project, upon demand by Agent, Borrower shall take such action as Agent may require to release Agent and Lender from any obligation or liability with respect to such stop notice or claim, including (a) if the claim is being contested in accordance with <u>Section 9.3</u> hereof, obtaining a bond or other security, in form, substance and amount satisfactory to Agent, sufficient to discharge the same of record or (b) payment of such claim, in each case.  If Borrower fails to take such action required to be taken by Borrower pursuant to this <u>Section 6.2.19</u>, Agent may, in its sole discretion, file an interpleader action requiring all claimants to interplead and litigate their respective claims, and in any such action Agent and Lender shall be released and discharged from all obligations with respect to any funds deposited in court.

6.2.20    <u>Agent's Review</u>.  Observation, inspection and approvals by Agent of the Plans and Specifications, any other Construction Documents, the construction of the Project and the workmanship and materials used therein shall impose no responsibility or liability of any nature whatsoever on Agent or Construction Consultant, and no Person shall, under any circumstances, be entitled to rely upon such inspections and approvals by Agent or Construction Consultant for any reason.  Approvals granted by Agent for any matters covered under this Agreement shall be narrowly construed to cover only the parties and facts identified in any such approval.  Construction Consultant has been or will be retained by Agent solely as a consultant and has no authority to bind or otherwise act for or on behalf of Agent.

6.2.21    <u>Submission of Evidence</u>.  Any condition of this Agreement which requires the submission of evidence of the existence or non-existence of a specified fact or facts implies as a condition the existence or non-existence, as the case may be, of such fact or facts

and Agent shall, at all times, be free to independently establish to its satisfaction such existence or non-existence.

6.2.22    <u>Contractors</u>.  Except as provided by law, no Trade Contractors or any other Person dealing with Mortgage Borrower, including the Architect, the Engineers and the General Contractor, shall be, nor shall any of them be deemed to be, third party beneficiaries of this Agreement, but each shall be deemed to have agreed (a) that the Trade Contractor(s) or other Person in question shall look to Mortgage Borrower or such Person, as the case may be, as their sole source of recovery if not paid and (b) except as otherwise agreed to in writing between Agent and the Trade Contractor(s) or other Person in question, that they may not claim against Agent and Lender under any circumstances.

6.2.23    <u>Completion of the Project</u>.  Borrower covenants and agrees to cause Mortgage Borrower to cause the Project and any portion thereof to be Substantially Completed on or before the applicable Outside Construction Completion Date described in <u>Schedule V</u>, and that within sixty (60) days after Substantial Completion of the Project and any portion thereof as more fully described in <u>Schedule V</u>, it shall cause Mortgage Borrower to cause the following to occur, in each case, subject to Excusable Delay and <u>provided</u> <u>that</u>, if Mortgage Borrower or Borrower reasonably and in good faith determines the applicable action cannot be reasonably expected to be completed within such 60-day period using standard industry project management practices, Borrower shall deliver notice of same to Agent within ten (10) days after such determination by Borrower and such notice shall identify a schedule for such actions based upon standard industry project management practices for the nature and scope of the actions to be completed, which schedule Agent shall accept or reject in its discretion within ten (10) Business Days of receipt of same:

(a)    the development, construction and equipping of the Project (or any portion thereof) will have been Completed substantially in accordance with the Plans and Specifications, including the Punchlist Items;

(b)    Borrower will have furnished Agent with final lien waivers, subordination of liens and sworn statements as to the Project (or such portion thereof in accordance with <u>Schedule V</u>) from the General Contractor and the Architect, the Engineers and that the General Contractor and the other Contractors shall have furnished to Borrower and Agent with final lien waivers from all of such Contractor's subcontractors and material suppliers who have provided materials, labor or both with respect to the development and construction of the Improvements and/or the Project; <u>provided</u> <u>that</u>, with respect to any items in dispute, such disputed items shall be covered by issued and outstanding bonds or other security;

(c)    Borrower shall have delivered to Agent the final "as-built" electrical, sprinkler, HVAC and plumbing drawings, together with the latest updated architectural and structural drawings;

(d)    Borrower shall have furnished Agent with:  (i) temporary (or permanent) certificates of occupancy for the Project or such portion thereof in accordance with <u>Schedule V</u> from the applicable Governmental Authority having jurisdiction thereof (<u>provided</u> <u>that</u> if a temporary certificate of occupancy is obtained, Borrower shall have a continuing obligation

hereunder to cause Mortgage Borrower to diligently pursue the issuance of the related permanent certificate of occupancy thereafter and shall cause Mortgage Borrower to renew, if applicable, the temporary certificate until the permanent certificate of occupancy is obtained); and (ii) such other certificates, approvals, Licenses and Permits of each Governmental Authority required (or customarily procured) concerning the then existing development, construction, use, occupancy and operation of the Project or such portion thereof;

(e)     Borrower shall have furnished to Agent a certificate from Borrower, currently dated, certifying that: (i) no written notices from any Governmental Authority of any claimed violations of applicable Legal Requirements arising from the development or operation of the Project or such portion thereof which have not been cured were served upon Borrower or any contractor or subcontractor or their respective agents or representatives and (ii) there are no circumstances which could give rise to the issuance of any such notice of claimed violation;

(f)     Borrower shall have furnished to Agent a certificate from the Architect stating that, to the best of the Architect's knowledge:  (i) the Project or such portion thereof has been Completed substantially in accordance with the Plans and Specifications, and (ii) the Project (or such portion thereof) as so Completed complies with all applicable Legal Requirements;

(g)     Agent shall have received a certificate from the Construction Consultant, in form and substance reasonably satisfactory to Agent, that the Project or such applicable portion thereof has been Completed substantially in accordance with the Plans and Specifications;

(h)     All fixtures, furnishings, equipment, all inventory and all other property contemplated under the Budget and the Plans and Specifications to be incorporated into or installed in the Project or such applicable portion thereof shall have been, to the extent required for the Completion of the Project in accordance with the terms hereof, incorporated or installed free and clear of all liens and security interests other than the Permitted Encumbrances;

(i)     Borrower shall have furnished to Agent a Title Continuation or endorsement in the full outstanding principal amount of the Building Loan advanced; and

(j)     Borrower shall have furnished Agent with current searches of all Uniform Commercial Code financing statements filed with the Secretary of the State, and the County Recorder for Westchester County and Queens County, against Borrower as debtor, showing that no Uniform Commercial Code financing statements are filed or recorded against Borrower in which the collateral is described as any of the collateral for the Loan, including any fixtures, furnishings and equipment or other personal property located on the Property or used in connection with the Property, other than filings pursuant to the Loan Documents or the Mortgage Loan Documents.

6.2.24     Condominium Conversion; Sales Contracts.  The provisions of this Section 6.2.24(a) – (e) shall apply in connection with the Borrower's conversion of the Project to a condominium regime of ownership (the "Condominium Conversion") (but only to the extent such Condominium Conversion has not yet occurred).

- 75 -

(a)     Provided that the Offering Plan shall have been declared effective and that a temporary or permanent certificate of occupancy shall have been issued with respect to the Units, subject in all events to the terms and conditions of this Agreement, Borrower shall cause Mortgage Borrower to convert the Project to a condominium form of ownership in accordance with all applicable Legal Requirements, including, the Condominium Act, and shall record or file, as appropriate and to the extent required by applicable Legal Requirements, the Condominium Declaration and the Condominium Plans and obtain all approvals of Governmental Authorities necessary in order to (i) subject the Property to a Condominium regime, (ii) create the Units; and (iii) commence the closing of sales of Units pursuant to the terms of the Offering Plan and Unit Sales Contracts for each such Unit.

(b)     Prior to the date which is three  (3) months following the Closing Date, Borrower shall submit to Agent an offering plan or offering plans for the sale of Units at the Property (each, an "Offering Plan"), which Offering Plan(s) (including all documents contained therein) shall be subject to Agent's approval.  The form of purchase agreement for the Units shall be included within the Offering Plan submitted to Agent for approval (each, a "Unit Sales Contract").  Agent shall approve or disapprove or otherwise respond to Borrower's request for approval of the Offering Plan within thirty (30) days after Agent's receipt thereof.  Borrower shall cause Mortgage Borrower, subject to Agent's prior approval, submit said Offering Plan to the DOL for review within five (5) Business Days after receipt of Agent's approval.  Borrower shall cause Mortgage  Borrower to respond to comments or deficiencies to the Offering Plan (the "DOL Comments") provided by the DOL within ten (10) days from the date that the DOL provides the DOL Comments to Mortgage Borrower (or such other shorter or longer time frame required by the DOL at the time in question); provided, however, that Agent acknowledges and agrees that Borrower shall have the right to request reasonable extensions to respond to the DOL Comments, as same may be necessary or appropriate.  Borrower shall promptly deliver to Agent copies of all written DOL Comments received by Borrower or Borrower's counsel.  Borrower's responses to DOL Comments shall be subject to Agent's prior written consent.  Borrower shall provide to Agent, on or prior to the date which is eleven (11) months following the Closing Date, a letter from the DOL accepting the Offering Plan for filing.

(c)     Borrower shall cause Mortgage Borrower, subject to Agent's prior approval, promptly submit all amendments and supplements to such Offering Plan which Mortgage Borrower intends to file with the DOL, including supplements and amendments required by Legal Requirements.  Agent shall approve or disapprove such amendments and supplements to the Offering Plan within ten (10) Business Days after delivery thereof.  Notwithstanding the foregoing, Agent's prior consent shall not be required for:  (i) amendments which solely increase sales prices of any of the Units; (ii) amendments that solely make ministerial administrative changes to the operation of the Project and have no material adverse impact on the Property or correcting a typographical or other similar scrivener's error in the Condominium Documents; (iii) an amendment, the primary purpose of which is to extend the term of the Offering Plan pursuant to 13 NYCRR §20.5(c); (iv) an amendment, the primary purpose of which is to declare the Offering Plan effective pursuant to 13 NYCRR §20.5(e); (v) an amendment, the primary purpose is to amend the Offering Plan to incorporate new rules or regulations promulgated by the DOL; or (vi) an amendment, the primary purpose of which is to disclose post-closing information pursuant to 13 NYCRR §20.5(f) (collectively, a "Non-Substantive Plan Amendment"), as long as, in each case, Agent receives a copy of any such

- 76 -

amendment not later than five (5) Business Days prior to the submission thereof to the DOL, except that an amendment pursuant to clause (i) above may be submitted to Agent simultaneously with submission thereof to DOL or DOF.

(d)    If Agent disapproves the Offering Plan or any amendment or supplement thereto, Agent shall furnish Borrower with a written statement setting forth, in reasonable detail, the reasons for such disapproval, the particular sections of the Offering Plan that were objectionable, and Agent's requested revisions to such sections so as to render the Offering Plan acceptable to Agent.  Borrower shall not be obligated to make any changes to the Offering Plan that are rejected by the DOL or are not in compliance with Legal Requirements.  If Agent fails to approve or disapprove any request to review and approve the Offering Plan, any amendments, or any proposed responses by Borrower to DOL comments within the time frames set forth above, then Borrower may send to Agent a notice in an envelope marked "PRIORITY" containing a bold-faced, conspicuous legend at the top of the first page thereof stating that stating that "SECOND AND FINAL NOTICE:  THIS IS A REQUEST FOR CONSENT UNDER THE MEZZANINE LOAN AGREEMENT – **DENARDO CAPITAL II LLC**.  IF YOU FAIL TO PROVIDE A SUBSTANTIVE RESPONSE (E.G., APPROVAL, DENIAL OR REQUEST FOR CLARIFICATION OR MORE INFORMATION) TO THIS REQUEST FOR APPROVAL IN WRITING WITHIN FIVE (5) BUSINESS DAYS, YOUR APPROVAL SHALL BE DEEMED GIVEN" and Agent fails to provide a substantive response to such request for approval within such five (5) Business Day period after the effectiveness of such notice, Agent shall be deemed to have approved of such Offering Plan or amendment or supplement thereto, as the case may be. Notwithstanding the foregoing, if the last day of any such time frame set forth above for Agent to approve or disapprove of the Offering Plan, any amendments thereto, or any DOL Comments shall expire beyond any date required by the DOL, the Condominium Act or any other Legal Requirement for submission, Borrower shall have the right to submit the Offering Plan, amendment, or responses to DOL Comments, as the case may be, to DOL; provided that if Agent shall thereafter notify Borrower prior to the expiration of the applicable time frame of any objections in accordance with this Section, Borrower shall contact DOL and request modification of the item so submitted or Borrower shall file a new amendment with the DOL to incorporate Agent's objections.

(e)    Borrower shall cause the Condominium-Related Documents to comply with all applicable Legal Requirements.

(f)    Borrower shall comply with all Legal Requirements in connection with the offering and sale of the Units, including the Federal Reserve Board Regulations "B" (Equal Credit Opportunity Act) and "Z" (Truth-in-Lending), the Interstate Land Sales Full Disclosure Act and the Department of Housing and Urban Development Regulation "X" (RESPA), and any requirement for each such Unit to have a certificate of occupancy.

(g)    Borrower shall cause any deposits in connection with any Unit Sales Contract to be held in an Eligible Account maintained by the "escrow agent" (as designated under the Offering Plan) (the "Unit Sales Escrow Agent"), or another escrow agent acceptable to Agent, and Borrower shall not withdraw such deposits for any purpose except as expressly provided in the applicable Unit Sales Contract, and in accordance with Legal Requirements and the Condominium-Related Documents.  Without limiting the foregoing, Borrower shall not

permit the proceeds of any such deposits to be used to pay for construction or other costs related to the Improvements without Agent's prior written consent and unless any such use is permitted by all Legal Requirements.  Borrower shall not accept any letters of credit or bonds in lieu of such deposits without Agent's prior written consent, which consent shall be in Agent's sole discretion.

   (h) If the purchaser under any Unit Sales Contract or shall default in performance of its obligations thereunder beyond all applicable grace, notice and cure periods and Borrower shall be permitted under applicable law to retain the deposit thereunder as liquidated damages, then Borrower may in its commercially reasonable discretion postpone terminating the applicable Sales Contract and causing the Unit Sales Escrow Agent to remit the entire amount of such deposit to Agent, <u>provided that</u> Borrower shall cause in such instances such deposit to be remitted to Agent within ten (10) calendar days if the purchaser under such defaulted Sales Contract has not closed on the Unit in such excess 10-day period and the release of such deposit is permitted under all applicable Legal Requirements, and Agent shall apply such amount equal to the deposit (net of collection of expenses reasonably incurred) in any order of priority as determined by Agent in its sole discretion or deposit such funds into the General Reserve.

   (i) Without the prior written consent of Agent, Borrower shall not:

    (i) amend, modify, supplement or terminate any of the Condominium Documents, other than filing a Non-Substantive Plan Amendment with the DOL;

    (ii) exercise any right it may have under the Condominium Documents to vote for (A) the expenditure of Proceeds for the Restoration, (B) subject to <u>Section 10.2</u>, any additions or improvements to the common elements established on the Property that are managed by the Condominium Board, except to the extent required by Legal Requirements and/or the Offering Plan, insurance requirements or are otherwise set forth in the Plans and Specifications, or (C) any borrowing on behalf of the board of managers of the Condominium or association established under the Condominium Documents;

    (iii) sell or offer for sale any Units except in compliance with the Condominium-Related Documents and all applicable Legal Requirements;

    (iv) enter into any Unit Sales Contract unless (A) the same is a *bona fide* contract substantially in the form included in the Offering Plan with such changes to such form as may be negotiated by Mortgage Borrower in good faith and on an arms-length basis, <u>provided that</u> such changes shall not contravene any of the requirements provided for in this Agreement, (B) the purchaser thereunder is not an Affiliate of Borrower, Mortgage Borrower or any Guarantor, (C) the sale price will result in Agent receiving upon the sale an amount greater than or equal to the Minimum Release Price for such Unit, (D) except for downpayment(s), the sales price is payable in full by bank or certified check or wire transfer of immediately available funds at closing, (E) the Offering Plan has been accepted for filing by the DOL and is then current and duly extended as required, (F) such Unit Sales Contract shall require the purchaser, simultaneously with the execution thereof by purchaser, to deposit with the Escrow Agent a

cash amount equal to not less than ten percent (10%) of the gross sales price of the Unit subject to the Unit Sales Contract and shall provide that such amount shall be retained by Mortgage Borrower as liquidated damages upon default beyond all applicable grace, notice and cure periods by the purchaser of its purchase obligation under such Unit Sales Contract, except as otherwise required by Legal Requirements and (G) such Unit Sales Contract shall be subject to no conditions upon the purchaser's obligation to complete the purchase (except for customary title conditions, outside closing dates, Completion of the Improvements, rights of rescission required by Legal Requirements (a Unit Sales Contract which satisfies all of the foregoing requirements, a "Bona Fide Residential Sales Contract");

(v)    convey any Units to the board of managers of the Condominium or any association established under the Declaration of Condominium;

(vi)    (A) amend, modify or supplement any Unit Sales Contract in any manner which would materially adversely affect Borrower, Agent, Lender or the Property, or terminate any Unit Sales Contract (except for default on the part of a purchaser thereto or as otherwise required by any Legal Requirement, but with prompt written notice to Agent), or permit any of the foregoing actions to be taken, or (B) release any deposit under any Unit Sales Contract, except in each case, in accordance with the terms of such Unit Sales Contract and this Agreement, except as required by applicable law or DOL regulations or directive of the DOL, or by other Legal Requirements; or

(vii)    abandon or materially change its plan for submission of the Property to the condominium form of ownership.

(j)    *Intentionally Omitted.*

(k)    Borrower shall not cause or permit Mortgage Borrower to submit for recording or filing the Condominium Declaration or the Condominium Plans unless all of the conditions set forth in Sections 6.2.24(j) have been satisfied..

(l)    Borrower shall deliver to Agent a true and correct copy of each Unit Sales Contract, in each case within five (5) Business Days after the execution of the applicable Unit Sales Contract by all applicable parties thereto.

(m)    Borrower shall cause Mortgage Borrower to comply in all material respects with all of the terms, covenants and conditions of the Condominium Declaration and any rules and regulations that may be adopted for the condominium established thereunder, as the same shall be in force and effect from time to time.

(n)    Borrower shall cause Mortgage Borrower to pay, or cause to be paid, all assessments for Common Charges and expenses made against the Units owned by Mortgage Borrower pursuant to the Condominium Documents as the same shall become due and payable. Borrower hereby covenants that, for so long as Borrower's obligations under the Loan are outstanding, Borrower shall not exercise any right to, or otherwise elect to, guaranty to any condominium association, or indemnify any such condominium association for, expenses incurred by such association in lieu of paying any assessments that would otherwise be due and

payable by Borrower, and Borrower shall cause the Condominium Documents to reflect Borrower's obligation set forth in this Section.

(o)      Borrower shall promptly notify Agent of any written notices received by Mortgage Borrower alleging a default by Mortgage Borrower under, or variance from, or noncompliance with any executed Unit Sales Contract, or any Condominium-Related Document exists or is about to occur, and Borrower shall (i) do all such commercially reasonable acts and undertake all such commercial reasonable steps and institute all such commercially reasonable proceedings as may be necessary to cure or avert such default, variance or noncompliance or (ii) dispute the veracity of such allegations and diligently pursue a resolution to such dispute following which, if necessary, Borrower shall take the actions required under clause (i), and Borrower will promptly forward to Agent copies of any such notices Borrower receives in regard to any of the foregoing matters.

6.2.25      Condominium-Related Documents.  From and after such time as Mortgage Borrower shall have converted the Project to a Condominium, all Condominium-Related Documents shall comply with all applicable statutes of the State (including condominium statutes), Federal and state securities laws, Federal and state Truth-in-Lending Statutes, HUD filings regarding interstate sales, and the requirements of any Governmental Authority having jurisdiction; provided, however, that after such time as Mortgage Borrower no longer controls the board of managers of the Condominium established under the Condominium Documents (the "Condominium Board"), the foregoing covenant shall apply only with respect to (i) all Condominium-Related Documents other than the Condominium Documents, (ii) any changes made to the Condominium Documents by Mortgage Borrower (to the extent Mortgage Borrower is permitted to make such changes independent of the board of managers of the Condominium) and (iii) any changes made by the condominium board at Mortgage Borrower's request.  Moreover, the filing of the Condominium Declaration will create a valid Condominium in conformance with the laws of the State.  Borrower shall at all times (regardless of whether Borrower controls the board of managers of the Condominium) cause its representatives on the Condominium Board to vote to be in compliance with the terms, provision, covenants, requirements and conditions set forth in this Section 6.2.25.

6.2.26   Unit Sales Contracts.  From and after such time as Mortgage Borrower shall have converted the Project to a Condominium, the Unit Sales Contracts submitted to Lender by Borrower and all future Unit Sales Contracts relating to individual Units (upon the execution and delivery of the applicable Unit Sales Contract to Mortgage Borrower by all applicable parties thereto), are and will be, (i) subject to the terms and conditions therein contained and applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), the valid and binding obligations of the purchaser thereunder, and (ii) subject to no conditions upon the purchaser's obligation (except for customary title conditions, outside closing dates, Completion of the Improvements, rights of rescission required by Legal Requirements, financing contingencies for the benefit of such purchaser (provided such contingency is consistent with the terms of the Offering Plan or is otherwise approved of by Lender), and other customary conditions).

- 80 -

6.2.27    <u>Unit Sales Commencement; Closing Schedule</u>.  Borrower shall cause Mortgage Borrower to commence the sale of Units and shall close the first such sale within the time period required by Legal Requirements for the effectiveness of the Offering Plan (subject to Excusable Delays) and shall thereafter use commercially reasonable efforts to close additional sales of Units until all Units are sold.

6.2.28    <u>Demolition</u>.  Borrower shall not perform any demolition work or other construction activities at the Property without the prior written consent of Lender.

6.2.29    <u>Labor</u>.

(a)    Borrower will cause Mortgage Borrower to, in a timely manner, pay (or cause to be paid), or satisfy (or cause to be satisfied) when due all bills, costs, or other obligations incurred by Mortgage Borrower or on its behalf in connection with the employees employed by Mortgage Borrower in connection the operation of the Property, including but not limited to any obligations under ERISA, the Multiemployer Pension Plan Amendments Act, the Internal Revenue Code, federal or state wage and hour law, the Labor Agreements, or applicable State or Federal plant closing laws (any such bills, costs, or liabilities a "<u>Labor Liability</u>"). Borrower further covenants and agrees to deliver to Agent promptly, and in any event within ten (10) days after receipt thereof by Borrower  or Mortgage Borrower or any of its Affiliates, a copy of each notice concerning a claim of Labor Liability.

(b)    Borrower will comply in all material respects with all applicable state and federal anti-discrimination laws and all applicable state and federal laws regarding the payment of wages and benefits to its employees in connection with the operation of the Property.

6.3  <u>Intentionally Omitted.</u>

6.4  <u>Intentionally Omitted.</u>

6.5  <u>Intentionally Omitted.</u>

6.6  <u>Negative Covenants</u>.  From the Closing Date until the payment and performance in full of all of the obligations of Borrower under the Loan Documents (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive the indefeasible satisfaction of the Note in full, Borrower covenants and agrees with Agent that it will not do, directly or indirectly, or suffer or permit, any of the following:

(a)    <u>Incur Indebtedness</u>.  Incur, create, assume or permit any Indebtedness other than Permitted Debt and Indebtedness secured by the Loan Documents or Mortgage Loan Documents;

(b)    <u>Encumbrances</u>.  Incur, create or assume or permit the incurrence, creation or assumption of any Indebtedness secured by any direct or indirect interest in Borrower or Mortgage Borrower, except in connection with the Loan and the Mortgage Loan;

(c)    <u>Engage in Different Business</u>.    Engage, directly or indirectly, in any business other than that of entering into this Agreement and the other Loan Documents, the Mortgage Loan Documents to which Borrower or Mortgage Borrower is a party and the acquisition, ownership, use, management, leasing renovation, financing, development, construction, operation and maintenance of the Property or Borrower's interest in Mortgage, and, to the extent permitted hereunder, the subdivision and sale thereof, and activities related thereto;

(d)    <u>Make Advances</u>.    Make advances (other than payments to Contractors, subcontractors or other service providers) or make loans to any Person, or hold any investments, except as permitted under this Agreement, the Acquisition Loan Agreement and the Building Loan Agreement;

(e)    <u>Partition</u>.    Partition the Property, other than in connection with the Condominium-Related Documents or as expressly permitted under the Loan Documents;

(f)    <u>Guarantee Obligations</u>.    Guarantee any obligations of any Person;

(g)    <u>Transfer Assets</u>.    Transfer any material asset other than in the ordinary course of business, or Transfer all or any portion of the Property or any interest therein or permit the Transfer of any direct or indirect interest in Borrower or Mortgage Borrower, except in each case as permitted pursuant to the terms of this Agreement or any of the other Loan Documents;

(h)    <u>Amend Organizational Documents</u>.    Amend or modify any organizational documents of any SPE Entity without Agent's prior written consent

(i)    <u>Dissolve</u>.    Cause, whether directly or indirectly, any SPE Entity to dissolve, wind-up, terminate, liquidate, merge with or consolidate into another Person;

(j)    <u>Bankruptcy</u>.    (i) File a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to Borrower or all or any portion of the Mortgage Borrower, (ii) dissolve, liquidate, consolidate, merge or sell all or substantially all of Borrower's or Mortgage Borrower's assets other than in connection with the repayment of the Loan, (iii) engage in any other business activity not expressly permitted under the Loan Documents or (iv) solicit, consent or acquiesce to the filing of an involuntary bankruptcy petition against Borrower;

(k)    <u>ERISA</u>.    Engage in any activity that would subject it to regulation under ERISA or qualify as an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) subject to ERISA (each, a "<u>Plan</u>") and Borrower's or Mortgage Borrower's assets do not and will not constitute Plan assets;

(l)    <u>Distributions</u>.    Make any distributions to or for the benefit of any of its partners or members or its or their respective Affiliates, other than (i) payments under Affiliate Agreements permitted under <u>Section 6.6(r)</u> (which agreements were expressly approved by Agent after disclosure to Agent of such Affiliate's fees) and (ii) cash distributions to Borrower by Mortgage Borrower to the extent permitted hereunder to satisfy the portion of Aggregate Debt Service payable under the Loan, and any other disbursements by Mortgage Lender to Lender pursuant to the terms of the Loan Documents;

- 82 -

(m)    Zoning Reclassification.  Without the prior written consent of Agent, (i) initiate or consent to any zoning reclassification of any portion of the Property, (ii) seek a variance under any existing zoning ordinance that could result in the use of the Property becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, or (iii) allow any portion of the Property to be used in any manner that could result in the use of the Property becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation;

(n)    *Change of State of Formation.  Change the state in which it is formed without first giving Lender thirty (30) days prior written notice (but in any event, within the period required pursuant to the UCC).* Debt Cancellation.  Cancel or otherwise forgive or release any material claim or material Indebtedness owed to it by any Person, except for adequate consideration or in the ordinary course of its business, other than termination of any Leases to the extent permitted under Section 6.1.19;

(o)    Misapplication of Funds.  Distribute any revenue from the Property or any Proceeds in violation of the provisions of this Agreement, misappropriate any security deposit or portion thereof or misapply the proceeds of the Loan;

(p)    Single Purpose Entity.  Fail to be a Single Purpose Entity or take or suffer any action or inaction the result of which would be to cause any SPE Entity to cease to be a Single Purpose Entity;

(q)    Affiliate Agreements.  Without the prior written consent of Agent, which consent shall not be unreasonably withheld or delayed, enter into or materially modify, change, supplement, alter or amend any agreement between Borrower and any Affiliate of Borrower (an "Affiliate Agreement"), other than any contracts for the providing of goods and services in the ordinary course of Borrower's business and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms which are fully disclosed to Agent and are no more onerous to it than it would obtain in a comparable arm's length transaction with a Person not its Affiliate; or

(r)    Developer Fees.  Borrower shall not use any proceeds of the Loan to pay Borrower or any Affiliate thereof any developer's fee or other fee unless in the Budget approved by Agent.

(s)    Name Change.  Change its name or otherwise do anything which would make the information set forth in the financing statements covering any of the Collateral governed by the Uniform Commercial Code materially misleading without immediately notifying Agent of the same.

## ARTICLE VII.    INSURANCE; CASUALTY; CONDEMNATION; RESTORATION.

7.1 Insurance Requirements.

7.1.1    Borrower shall cause Mortgage Borrower to obtain and maintain, or cause to be maintained, insurance for Mortgage Borrower and the Property satisfying the requirements of Article VII of the Mortgage Loan Agreements.

7.1.2      <u>Policies</u>. All insurance provided for in <u>Section 7.1.1</u> of the Mortgage Loan Agreements shall be obtained under valid and enforceable policies (including, if applicable, the Condominium Board Policy, collectively, the "Policies" or in the singular, the "Policy") and shall be subject to the reasonable approval of Agent as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A" or better by S&P, or "A2" or better by Moody's, or "A-X" or better by A.M. Best (but in such case only to the extent that such Rating Agency rates the applicable insurer) or such other insurance company as may be acceptable to Agent. The Policies described in <u>Section 7.1.1</u> of the Mortgage Loan Agreements (other than those strictly limited to liability protection) shall designate Agent as mortgagee and loss payee. Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Agent, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Agent of payment of the premiums due thereunder (the "<u>Insurance Premiums</u>"), shall be delivered by Borrower to Agent. Complete copies of the Policies shall be submitted to Agent upon request; <u>provided that</u> if such Policies have not been issued by the insurers, Borrower shall request and diligently pursue such Policies and submit to Agent the Policies upon issuance.

7.1.3      <u>Insureds</u>. All Policies provided for or contemplated by Section 7.1.1 of the Mortgage Loan Agreements shall name Mortgage Borrower as a named insured and, in the case of liability coverages (except for the Policies referenced in <u>Section 7.1.1(e)</u> and <u>(h)</u>) of the Mortgage Loan Agreements), shall name Agent as an additional insured, as its interests may appear, and in the case of property coverages, including but not limited to all risk, builder's risk, boiler and machinery, terrorism and flood insurance, shall contain a standard non-contributing mortgagee clause in favor of Agent providing that the loss thereunder shall be payable to Agent.

7.1.4      <u>No Cancellation</u>. All Policies provided for in <u>Section 7.1.1</u> of the Mortgage Loan Agreements shall: (i) provide that no act or negligence of Borrower, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Agent is concerned; (ii) provide that the Policies shall not be canceled without at least thirty (30) days' notice to Agent, except ten (10) days' notice for non-payment of premium; (iii) provide that the issuers thereof shall give notice to Agent if the issuers of such Policies elects not to renew ten (10) days prior to its expiration; and (iv) not contain provisions that would make Agent liable for any Insurance Premiums thereon or subject to any assessments thereunder except to the extent provided by the standard New York mortgage clause.

7.1.5      <u>Right to Cure</u>. If at any time Agent is not in receipt of written evidence that all Policies are in full force and effect, Agent shall have the right, without prior notice to Borrower, to take such action as Agent deems necessary to protect Lender's interest in the Property, including the obtaining of such insurance coverages as are required by Agent pursuant to <u>Section 7.1</u> of the Mortgage Loan Agreements; and if such action is taken, Agent shall promptly deliver written notice of same to Borrower. All premiums incurred by Agent or any Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Agent and Lender upon demand and, until paid, shall be secured by the Pledge Agreement and shall bear interest at the Default Rate. If Borrower or Mortgage Borrower thereafter obtains such Policies acquired by Agent, Borrower may give notice of same

and upon Agent's reasonable determination that such Policies acquired by Borrower or Mortgage Borrower meet the terms of this Agreement, Agent shall cause the Policies it acquired to be terminated.  Borrower shall promptly forward to Agent a copy of each written notice received by Borrower or Mortgage Borrower of any modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies.

        7.1.6        Major Trade Contractor/Design Professional Insurance.  Borrower shall also furnish Agent with evidence or certificates from insurance companies indicating that Architect, the Engineers, the Other Design Professionals and the Major Trade Contractors responsible for the design or construction of the Improvements are covered by professional liability insurance or other liability insurance, as applicable, as required by the applicable contract approved by Agent; such evidence or certificates to be delivered to Agent (a) on or before the date of this Agreement, with respect to the Architect, Engineers, the Other Design Professionals and those Major Trade Contractors whose contracts are then in effect and (b) within ten (10) days after execution, with respect to any Major Trade Contracts, Engineers Agreement or Other Design Professional Agreements executed after the date of this Agreement.

        7.1.7        Condominium Board Policy.  Notwithstanding the foregoing provisions, to the extent that the Condominium Board maintains a "master" or "blanket" policy (the "Condominium Board Policy") on the Improvements relating to the Project and/or the common elements and areas which provides insurance coverage in the amounts, for the periods, by companies and against the hazards described in Section 8.1, including fire, windstorm and hazards included within the term "extended coverage," and is otherwise in form and substance reasonably satisfactory to Agent, then Borrower's obligation under Section 7.1 to maintain hazard insurance coverage on the Property (including, but not limited to, all such common elements and areas) is deemed satisfied to the extent that the required coverage is provided by the Condominium Board Policy.

    7.2 Condemnation and Insurance Proceeds.

        7.2.1        Notification.  Borrower shall promptly notify Agent in writing upon obtaining any knowledge of (a) the institution of any proceedings relating to any Taking (whether material or immaterial) of, or (b) the occurrence of any Casualty to the Property or any portion thereof.  In addition, each such notice shall set forth such good faith estimate of the cost of repairing or restoring such Casualty or Taking in reasonable detail if the same is then available and, if not, as soon thereafter as it can reasonably be provided.

        7.2.2        Proceeds.  Subject to Mortgage Lender's rights under Section 7.2 of the Mortgage Loan Agreements, in the event of any Casualty or any Taking, Borrower shall cause Mortgage Borrower to deposit with lender all right, title and interest in and to all compensation, awards, proceeds, damages, claims, insurance recoveries, causes and rights of action (whether accrued prior to or after the Closing Date) and payments which Mortgage Borrower may receive or to which Mortgage Borrower may become entitled with respect to the Property or any part thereof other than payments received in connection with any liability or loss of rental value or business interruption insurance (collectively, "Proceeds"), in connection with any such Taking of, or Casualty to, the Property or any part thereof are hereby assigned by Borrower to Agent and, except as otherwise herein provided, shall belong to and shall be paid to

Agent.  Borrower shall cause Mortgage Borrower to file and prosecute, in good faith and in a commercially reasonable manner, the adjustment, compromise or settlement of any claim for Proceeds and, subject to Mortgage Borrower's right to receive direct payment of any Proceeds as herein provided in <u>Section 7.2</u> of this Agreement and the Mortgage Loan Agreements, shall cause the same to be paid directly to Agent to be held and applied in accordance with the provisions of this Agreement subject to Mortgage Borrower's obligation to deposit such amounts with Mortgage Lender pursuant to <u>Section 7.2</u> of the Mortgage Loan Agreements.  Except upon the occurrence and during the continuance of a monetary Default or an Event of Default, Borrower may cause or allow Mortgage Borrower to settle any insurance claim with respect to Proceeds which does not exceed the Casualty Amount.  Whether or not a monetary Default or an Event of Default shall have occurred and be continuing, Lender shall have the right to approve any settlement which might result in any Proceeds in excess of the Casualty Amount and Borrower shall deliver or cause to be delivered to Agent all instruments requested by Agent  in connection therewith.  Borrower shall cause Mortgage Borrower to pay all out-of-pocket costs, fees and expenses incurred by Agent (including all attorneys' fees and expenses, the fees of insurance experts and adjusters and costs incurred in any litigation or arbitration), and interest thereon at the Default Rate to the extent not paid within ten (10) days after delivery of a request for reimbursement by Agent, in connection with the settlement of any claim for Proceeds and seeking and obtaining of any payment on account thereof in accordance with the foregoing provisions.  If any Proceeds less than the Casualty Amount  are received by Borrower(either singly or in the aggregate), such Proceeds may be retained by Borrower for purposes of Restoration only pursuant to this <u>Section 7.2</u>, and such Proceeds shall, until the completion of the related Restoration, be held in trust for Agent and shall be segregated from all other funds of Borrower to be used to pay for the cost of the Restoration in accordance with the terms hereof, and in the event such Proceeds exceed the Casualty Amount, such Proceeds shall be forthwith paid directly to and held by Agent in the General Reserve, in each case to be applied or disbursed in accordance with this <u>Section 7.2</u>.  If an Event of Default shall have occurred and be continuing, or if Borrower fails to file and/or prosecute any insurance claim for a period of fifteen (15) days, Borrower hereby irrevocably empowers Agent, in the name of Borrower as its true and lawful attorney-in-fact, to file and prosecute such claim (including settlement thereof) with counsel satisfactory to Agent and to collect and to make receipt for any such payment, all at Borrower's expense (including payment of interest at the Default Rate for any amounts advanced by Agent or Lender pursuant to this <u>Section 7.2</u>) , in each case, subject to the rights of Mortgage Lender under the Mortgage Loan Documents. Notwithstanding anything to the contrary set forth in this Agreement, and excluding situations requiring prepayment of the Note, to the extent any Proceeds (either singly or when aggregated with all other than unapplied Proceeds with respect to the Property) do not exceed the Casualty Amount, such Proceeds are to be paid directly to Mortgage Borrower as set forth in Section 7.2 of the Mortgage Loan Agreements, or, if the Mortgage Loan is no longer outstanding, to Mortgage Borrower to be applied to Restoration of the Property in accordance with the terms hereof and the Mortgage Loan Agreements..

       7.2.3        <u>Agent to Take Proceeds</u>.  As long as the Mortgage Loan remains outstanding, all Proceeds shall be held, disbursed and applied as set forth in Section 7.2 of the Mortgage Loan Agreements. From and after such time that the Mortgage Loan is no longer outstanding and Proceeds are held by Lender and not Mortgage Lender, Lender agrees to make Proceeds actually received by Lender available to Borrower and Mortgage Borrower for purposes of paying for the cost of Restoration in accordance with the provisions of this Section

7.2.3 and Sections 7.2.4 and 7.2.5 below; provided, however, if the Proceeds are less than the Casualty Amount, then such Proceeds (other than the proceeds of any business interruption insurance) will be disbursed to Mortgage Borrower in one payment for purposes of paying for the costs of Restoration (or, if no Restoration is feasible or necessary, for such purposes as Borrower shall determine)::

      (a)    no Event of Default shall have occurred and be continuing;

      (b)    if (i) Completion of the Project has occurred prior to a Casualty and (ii) the Proceeds are insurance proceeds, less than twenty-five percent (25%) of the total floor area of the Improvements on the Property is damaged, destroyed or rendered unusable as a result of such Casualty;

      (c)    if (i) Completion of the Project has occurred prior to a Taking and (ii) the Proceeds are condemnation proceeds, less than ten percent (10%) of the land constituting the Property is taken, such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land or is being taken;

      (d)    if Completion of the Project has occurred prior to a Casualty or Taking, at least seventy five percent (75%) of the total saleable space in the Property as of the date of the applicable Casualty or Taking shall remain in full force and effect after the completion of the Restoration;

      (e)    Agent shall have determined that the proceeds of any applicable business interruption insurance (together with any projected revenues and any additional funds to be deposited with Agent for such purposes) are sufficient to pay all (i) Aggregate Debt Service coming due under the Loan Documents and the Mortgage Loan Documents, and (ii) Operating Expenses through the end of the Restoration;

      (f)    Agent shall be satisfied that the Project shall be Substantially Completed on or before the earliest to occur of (i) the Outside Construction Completion Date, (ii) such time as may be required under applicable Legal Requirements, and (iii) the expiration of any business interruption insurance coverage required hereunder;

      (g)    the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements in all material respects;

      (h)    such Casualty or Taking, as the case may be, does not result in the loss of access to the Property or the related Improvements;

      (i)    *Intentionally Omitted*;

      (j)    if Completion of the Project has occurred, the loan to value ratio, after giving effect to the Restoration, shall be equal to or less than the loan to value ratio in effect immediately prior to the applicable Casualty or Taking;

(k)    Borrower shall deliver to Agent for Agent's reasonable approval a detailed budget certified by Borrower's architect or engineer to accurately describe the entire cost of completing the Restoration; and

(l)    the Proceeds, together with any cash or cash equivalent deposited by Borrower with Agent, are sufficient in Agent's determination (which determination shall be deemed conclusive absent manifest error) to cover the cost of Restoration. So long as any portion of the Debt or the Mortgage Debt remain outstanding, any Proceeds not made available to Borrower for Restoration shall be held by or on behalf of Agent in the General Reserve and applied towards reimbursement of Agent's and Lender's out-of-pocket fees, costs and expenses incurred in connection with recovery of any such Proceeds (including legal fees and costs, administrative costs and inspection fees) and thereafter, applied by Agent against the Debt in any order of priority as determined by Agent in its sole discretion and thereafter, if the Loan is then outstanding, to Agent for application in accordance with the terms of the Loan Documents; and thereafter, if the Loan has been paid in full, to Borrower.  After payment in full of the Debt and the Mortgage Debt, any remaining Proceeds not made available to Borrower for Restoration shall be paid to Borrower.

7.2.4    Mortgage Borrower to Restore.

(a)    As long as the Mortgage Loan remains outstanding, Borrower shall cause Mortgage Borrower to comply with the terms and conditions of Section 7.2.4(a) of the Mortgage Loan Agreements. If Proceeds are made available to Mortgage Borrower by Agent in accordance with the terms of this Agreement or the Mortgage Loan Agreements (if Agent is required to make Proceeds available to Borrower pursuant to the terms of this Agreement), promptly after the occurrence of any damage or destruction to all or any portion of the Property or a Taking of a portion of the Property, Borrower shall cause Mortgage Borrower to commence and diligently prosecute, or cause to be commenced and diligently prosecuted, to completion, subject to Excusable Delays, the repair, restoration and rebuilding of the Property (in the case of a partial Taking, to the extent it is capable of being restored) so damaged, destroyed or remaining after such Taking in full compliance with all material Legal Requirements and free and clear of any and all Liens except Permitted Encumbrances (such repair, restoration and rebuilding are sometimes hereinafter collectively referred to as the "Restoration").  During the Construction Phase, the Restoration shall be conducted in accordance with the Plans and Specifications, as the same may be modified from time to time in compliance with the terms and conditions of this Agreement and the Mortgage Loan Agreements.  If the Restoration is commenced following the expiration of the Construction Phase, the plans and specifications for the Restoration shall require that the Restoration be done, and Borrower shall cause Mortgage Borrower to cause the work to be done, in a first-class workmanlike manner at least equivalent to the quality and character prior to the damage or destruction (provided, however, that in the case of a partial Taking, the Restoration shall be done to the extent reasonably practicable after taking into account the consequences of such partial Taking), so that upon completion thereof, the Property shall be at least equal in value and general utility to the Property prior to the damage or destruction; it being understood, however, that Borrower shall not be obligated to cause Mortgage Borrower to restore the Property to the precise condition of the Property prior to any partial Taking of, or Casualty to, the Property, if the Restoration actually performed, if any, or failed to be performed, shall have no Material Adverse Effect on the value of the Property from

the value that the Property would have had if the same had been restored to its condition immediately prior to such Taking or Casualty. Subject to Borrower's right to prepay the Loan in full, in the event of a Casualty or a partial Taking affecting the Property, Borrower shall be obligated to cause Mortgage Borrower to restore the Property in accordance with the provisions of this Section 7.2 whether or not the Proceeds shall be sufficient, provided that the Proceeds shall be made available to Borrower or Mortgage Borrower by Agent in accordance with this Agreement or by Mortgage Lender to Mortgage Borrower in accordance with the Mortgage Loan Agreements, as applicable.

(b)    As long as the Mortgage Loan remains outstanding, all Proceeds shall be held, disbursed and applied as set forth in Section 7.2.4(b) of the Mortgage Loan Agreements. If the Mortgage Loan is no longer outstanding and if Proceeds are not required to be applied toward payment of the Debt pursuant to the terms hereof, then Agent shall make the Proceeds which it is holding pursuant to the terms hereof (after payment of any out-of-pocket expenses actually incurred by Agent in connection with the collection thereof plus interest thereon at the Default Rate (from the date advanced through the date of reimbursement) to the extent the same are not paid within ten (10) Business Days after request for reimbursement by Lender) available to Mortgage Borrower for payment of or reimbursement of Mortgage Borrower's expenses incurred with respect to the Restoration, upon the terms and subject to the conditions set forth in paragraphs (i), (ii) and (iii) below and in Section 7.2.5:

(i)    at the time of loss or damage or at any time thereafter while Borrower or Mortgage Borrower is holding any portion of the Proceeds, there shall be no continuing monetary Default or Event of Default;

(ii)    each of Lender and Construction Consultant (during the Construction Phase) or an Independent Architect (following the expiration of the Construction Phase) shall have reasonably approved any modifications to the Plans and Specifications (during the Construction Phase) or the plans and specifications for the Restoration (following the expiration of the Construction Phase) and any change orders in connection with such plans and specifications; and

(iii)    Lender shall, within a reasonable period of time prior to request for initial disbursement, be furnished with an estimate of the cost of the Restoration accompanied by Construction Consultant's or Independent Architect's (as the case may be) certification as to such costs and the Plans and Specifications, including any modifications thereto, or appropriate plans and specifications for the Restoration. Upon Lender's reasonable approval of said costs and any modifications to the Plans and Specifications or such plans and specifications, as the case may be, Borrower shall cause Mortgage Borrower to restore all Improvements such that when they are materially restored and/or repaired, such Improvements and their contemplated use comply in all material respects with all applicable Legal Requirements, including zoning, environmental and building laws, codes, ordinances and regulations.

7.2.5    Disbursement of Proceeds.

7.2.6   As long as the Mortgage Loan remains outstanding, all Proceeds shall be held, disbursed and applied as set forth in Section 7.2.5(a) of the Mortgage Loan Agreements. If the Mortgage Loan is no longer outstanding, subject to the introductory paragraph proviso of Section 7.2.3, Disbursements of the Proceeds to Borrower or Mortgage Borrower hereunder shall be made from time to time (but not more frequently than once in any month) by Agent but only for as long as no Default or Event of Default shall have occurred and be continuing, as the Restoration progresses upon receipt by Agent of (i) an Officer's Certificate dated not more than ten (10)  days prior to the application for such payment, requesting such payment or reimbursement and describing the Restoration performed that is the subject of such request, the parties that performed such Restoration and the actual cost thereof, and also certifying that such Restoration and materials are or, upon disbursement of the payment requested to the parties entitled thereto, will be free and clear of Liens other than Permitted Encumbrances, (ii) evidence reasonably satisfactory to Agent that (A) all materials installed and work and labor performed in connection with such Restoration that was the subject of the prior disbursement of Proceeds have been paid for in full or will be paid upon receipt of such disbursement, and (B) there exists no notices of pendency, stop orders, mechanic's liens or notices of intention to file same (unless the same is required by State law as a condition to the payment of a contractor) or any Liens, other than Permitted Encumbrances, on the Property arising out of the Restoration which, subject to Borrower's and Mortgage Borrower's right of contest set forth in Section 8.3 or Section 8.3 of the Mortgage Loan Agreement have not been either fully bonded to the satisfaction of Agent and discharged of record or, in the alternative if Agent shall in its sole discretion consent in advance thereto, fully insured to the satisfaction of Agent by the Title Company which issued the Title Policy, and (iii) an Independent Architect's certificate certifying performance of the Restoration together with an estimate of the cost to complete the Restoration.  No payment made prior to the final completion of the Restoration, as certified by the Construction Consultant or Independent Architect (as the case may be), except for payment made to contractors whose Restoration shall have been fully completed and from which final lien waivers have been received, shall exceed ninety percent (90%) of the value of the Restoration performed and materials furnished and incorporated into the Improvements from time to time, and at all times the undisbursed balance of said Proceeds together with all amounts deposited, bonded, guaranteed or otherwise provided for pursuant to Section 7.2.4(b) above, shall be at least sufficient to pay for the estimated cost of completion of the Restoration; final payment of all Proceeds remaining with Agent shall be made upon receipt by Agent of a certification by the Construction Consultant or Independent Architect (as the case may be), as to the completion of the Restoration substantially in accordance with the plans and specifications approved by Agent, final lien releases, and the filing of a notice of completion or the expiration of the period provided under the law of the State for the filing of mechanics' and materialmens' liens which are entitled to priority as to other creditors, encumbrances and purchasers, as certified pursuant to an Officer's Certificate, and delivery of a temporary certificate of occupancy with respect to the Restoration, or, if not applicable, an Officer's Certificate to the effect that a certificate of occupancy is not required.

7.2.7   As long as the Mortgage Loan remains outstanding, all Proceeds shall be held, disbursed and applied as set forth in Section 7.2.5(b) of the Mortgage Loan Agreements. If the Mortgage Loan is no longer outstanding, after the Restoration is completed and all costs of completion have been paid, there are excess Proceeds, Agent shall apply such excess Proceeds with respect to the Taking of or Casualty to the Property (and any proceeds received from Mortgage Lender under Section7.2.5(b) of the Mortgage Loan Agreements) to the payment or

prepayment of all or any portion of the Debt in any order of priority as determined by Agent and thereafter, if the Mortgage Loan is then outstanding, to Agent for application in accordance with the terms of the Mortgage Loan Documents; and thereafter, if the Mortgage Loan has been repaid in full, to Borrower.

7.3 <u>Requirements of Condominium Documents</u>.  Notwithstanding anything to the contrary set forth in this Agreement or in the other Loan Documents, so long as the Condominium Documents shall be in full force and effect, the terms and provisions of the Condominium Documents relating to the restoration of the Property and the disbursement of Proceeds shall supersede and govern over any contrary or conflicting provision of this Agreement or the other Loan Documents.  Without limiting the generality of the foregoing, if the Condominium Documents require that Proceeds be disbursed for Restoration, all Proceeds shall be deposited with and held by the insurance depositary designated or appointed under the Condominium Documents and shall be disbursed pursuant to the Condominium Documents; <u>provided</u>, <u>however</u>, that if Mortgage Borrower has the right or ability to vote for or designate such insurance depositary, then Borrower shall cause Mortgage Borrower to vote for or designate Agent as such insurance depositary.

## ARTICLE VIII.        IMPOSITIONS, LIENS AND OTHER ITEMS.

8.1 <u>Borrower to Pay Impositions</u>.

(a)    Borrower shall cause Mortgage Borrower to pay all Impositions now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable.  Borrower will deliver to Agent receipts for payment or other evidence reasonably satisfactory to Agent that the Impositions have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Impositions would otherwise be delinquent if not paid.  Notwithstanding the foregoing, Borrower's obligation to cause Mortgage Borrower to directly pay Impositions for which Agent is reserving funds pursuant to <u>Section 13.2</u> of the Mortgage Loan Agreements(and to provide evidence of the same) shall be suspended for as long as Borrower complies with the terms and provisions of <u>Section 13.2</u> of the Mortgage Loan Agreements.  Nothing contained in this Agreement or the other Loan Documents shall be construed to require Agent or any Lender to pay any tax, assessment, levy or charge imposed on Borrower in the nature of a franchise, capital levy, estate, inheritance, succession, income or net revenue tax.

(b)    Nothing contained in this Agreement shall be deemed to require Borrower to cause Mortgage Borrower to pay any amount, as long as Mortgage Borrower is in good faith, and by proper legal proceedings, diligently contesting the validity, amount or application thereof in accordance with <u>Section 8.3</u>.  Notwithstanding anything set forth herein, in no event shall Mortgage Borrower be permitted under this <u>Section 8.1(b)</u> or under <u>Section 8.3</u> to enter into a note or other instrument for borrowed money.

8.2 <u>No Liens</u>.  Subject to its right of contest set forth in <u>Section 8.3</u>, Borrower shall cause Mortgage Borrower to at all times keep, or cause to be kept, the Property free from all Liens (other than Permitted Encumbrances) and shall pay when due and payable (or bond over) all claims and demands of mechanics, materialmen, laborers and others which, if

unpaid, might result in or permit the creation of a Lien on the Property or any portion thereof and shall in any event cause the prompt, full and unconditional discharge of all Liens imposed on or against the Property or any portion thereof within fifteen (15) Business Days after receiving written notice of the filing (whether from Agent, the lienor or any other Person) thereof.  Upon the occurrence of an Event of Default with respect to its obligations as set forth in this Article VIII, Agent may (but shall not be obligated to) make such payment or discharge such Lien, and Borrower shall reimburse Agent on demand for all such advances pursuant to Section 16.12 (together with interest thereon at the Default Rate plus any legal fees and costs incurred by Agent in connection therewith).

8.3 Contest.  Borrower, at its own expense, may cause Mortgage Borrower to contest (after prior written notice to Agent) by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Impositions, any Liens imposed on the Property, and the application of any Legal Requirement, provided that (a) no Event of Default shall exist and be continuing hereunder; (b) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument and any applicable Legal Requirements to which Borrower or the Property is subject; (c) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (d) Borrower shall keep Agent informed of the status of such contest at reasonable intervals, (e) if Borrower or Mortgage Borrower is not providing security as provided in clause (g) below or in accordance with the Mortgage Loan Agreements, adequate reserves with respect thereto are maintained on Borrower's or Mortgage Borrower's books (as determined by an Independent Accountant), (f) either such contest operates to suspend collection or enforcement as the case may be, of the contested Imposition, Lien or Legal Requirement and such contest is maintained and prosecuted continuously and with diligence or the Imposition or Lien is bonded; provided, however, that with respect to any Lien filed by any Contractor in respect of work or services performed or materials supplied to the Property, the same shall be required to be discharged of record (whether by bonding, payment or otherwise) regardless of amount within forty-five (45) days from the date such Lien first encumbers the Property, and (g) in the case of Impositions and Liens which are not bonded (other than those required to be discharged of record pursuant to subclause (f) hereof or which have been paid in full), during such contest, (i) if the Mortgage Loan remains outstanding, Borrower shall cause Mortgage Borrower to deposit with or deliver to Mortgage Lender, (and (ii) of the Mortgage Loan is no longer outstanding, Borrower or Mortgage Borrower shall deposit with or deliver to Lender, in each case either Cash and Cash Equivalents or Letter(s) of Credit in an amount equal to one hundred fifty percent (150%) of (i) the amount of Borrower's obligations being contested *plus* (ii) any additional interest, charge, or penalty arising from such contest.  Notwithstanding the foregoing, the creation of any such reserves or the furnishing of any bond or other security, Borrower shall cause Mortgage Borrower promptly shall comply with any contested Legal Requirement or shall pay any contested Imposition or Lien, and compliance therewith or payment thereof shall not be deferred, if, at any time the Property or any portion thereof shall be, in Agent's judgment, in imminent danger of being forfeited or lost or Agent or Lender are  likely to be subject to civil or criminal damages as a result thereof (and Agent shall make any deposit held by it in connection therewith available for such compliance by Mortgage Borrower).  Borrower shall  cause Mortgage Borrowers to promptly upon final determination thereof pay the amount of any such Impositions, or Lien,

together with all costs, interest and penalties which may be payable in connection therewith, and comply with any such contested Legal Requirement.

## ARTICLE IX.        TRANSFERS.

9.1 <u>Reliance by Agent and Lender.</u>  Borrower acknowledges that Agent and Lender have examined and relied on the experience of Borrower and its members and principals in owning the Collateral, and the experience of Mortgage Borrower and its members and principals in owning, leasing, developing, constructing and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's owning the Collateral and Mortgage Borrower's owning, leasing, development and construction of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Obligations under the Loan Documents.  Borrower acknowledges that Agent, on behalf of Lender, has a valid interest in maintaining the value of the Collateral and the  Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Obligations, Agent can recover the Debt by a sale of the Collateral.

9.2 <u>No Transfers.</u>  Except for Permitted Transfers as provided in <u>Section 9.3</u>, without the prior written consent of Agent, Borrower shall not, and shall not permit to occur, any (a) Transfer of (i) the Property or the Collateral, any part thereof, or any legal or beneficial interest therein, or (ii) any direct or indirect Equity Interest in any Restricted Party, or (b) change of Control of a Restricted Party.  Agent shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer without Agent's consent in violation of this <u>Article IX</u> that constitutes an Event of Default. The provisions of <u>this Section 9.2</u> shall apply to every such Transfer (other than a Permitted Transfer) regardless of whether voluntary or not, or whether or not Agent has consented to any previous such Transfer.

9.3 <u>Permitted Transfers.</u>  Notwithstanding the foregoing provisions of <u>Section 9.2</u>, the following Transfers (each, a "<u>Permitted Transfer</u>" and, collectively, the "<u>Permitted Transfers</u>") shall be permitted without Agent's prior written consent thereto, but shall be subject to the satisfaction of the terms and conditions precedent set forth below:

(a)    (i) The pledge by Borrower of its direct Equity Interest in Mortgage Borrower to Lender pursuant to the Loan Documents; and (ii) the acquisition of such Equity Interests by any Person in connection with the exercise by Lender of remedies under the Loan Documents;

(b)    Leases entered into in accordance with the terms and conditions of the Loan Documents;

(c)    The conversion of the Property to a condominium form of ownership in compliance with the provisions of <u>Section 6.2.24</u>;

(d)     Transfers of Units pursuant to Bona Fide Residential Sales Contracts in conjunction with a release of such Unit in compliance with the provisions of Section 2.15;

(e)     Transfers that occur upon the death or incapacity of a natural person that was the holder of such interest by will or devise, or by operation of law to a member of the immediate family of such interest holder or a trust (or other entity) or family conservatorship established for the benefit of such immediate family member;

(f)     Transfers (but not pledges, collateral assignments, hypothecations, or encumbrances) for bona fide estate planning purposes to any trust or trusts for the benefit of any one or more of the foregoing persons described in this clause (h); provided, however, that with respect to the applicable Transfers described above, the following conditions must also be satisfied:

(A)     with respect to Transfers described in clauses (c) through (h) above, no Event of Default shall then exist and be continuing;

(B)     subsequent to each such transfer, the following conditions have been satisfied: (a) the Guarantors shall in the aggregate own no less than the direct or indirect interests in Borrower owned as of the Closing Date, (b) Guarantors shall continue to control the day-to-day operations of the Project and (c) any transferee shall satisfy Agent's and Lender's Patriot Act/Know-Your Customer compliance requirements;

(C)     each SPE Entity will continue to be a Single Purpose Entity, Borrower will continue to own one hundred percent (100%) of the direct Equity Interests in Mortgage Borrower, and such Transfer will not result in the termination or dissolution of Borrower or Mortgage Borrower, by operation of law or otherwise;

(D)     Borrower shall have reimbursed Agent for all out-of-pocket expenses (including attorneys' fees and expenses) incurred by Agent and Lender in connection with such Transfer;

(E)     upon request from Agent, Borrower shall promptly provide Agent with a revised version of the organizational chart delivered to Agent in connection with the closing of the Loan to the extent necessary to reflect changes thereto;

(F)     if notice to Agent is not otherwise required pursuant to separate provisions under this Agreement, Borrower shall give Agent written notice of such Transfer together with copies of all instruments effecting such Transfer, not less than ten (10) Business Days prior to the date of such Transfer; provided, however, that the foregoing requirement shall not apply to any Transfer described in clause (g) above.

## ARTICLE X.                    MAINTENANCE OF PROPERTY

10.1    _Maintenance of Property_.  Borrower shall cause Mortgage Borrower to keep and maintain, or cause to be kept and maintained, the Property and every part thereof it owns or controls in good condition and repair, subject to ordinary wear and tear, and, subject to Excusable Delays and the provisions of this Agreement with respect to damage or destruction caused by Casualty or Takings, shall not permit or commit any waste, impairment, or deterioration of any portion of the Property in any material respect.  Borrower further covenants to do or cause Mortgage Borrower to be done all other acts which from the character or use of the Property may be reasonably necessary to protect the security hereof, the specific enumerations herein not excluding the general.  Borrower shall not cause or permit Mortgage Borrower to remove or demolish any Improvement on the Property except as the same may be necessary in connection with the Project or an Alteration or a Restoration in connection with a Taking or Casualty, or as otherwise permitted herein, in each case in accordance with the terms and conditions hereof.

10.2    _Conditions to Alterations_.  Other than as provided herein with respect to the Improvements, and _provided that_ no Event of Default shall have occurred and be continuing hereunder, following the expiration of the Construction Phase, Borrower shall have the right to cause Mortgage Borrower to undertake any alteration, improvement, demolition or removal of the Property or any portion thereof (any such alteration, improvement, demolition or removal, an "Alteration") as long as (a) Borrower provides Agent with prior written notice of any Material Alteration, (b) such Alteration is undertaken in compliance with all applicable Legal Requirements and otherwise in accordance with the applicable provisions of the Loan Documents and the Condominium-Related Documents, the Loan Documents and the Mortgage Loan Documents (c) any Material Alteration shall be conducted under the supervision of an Independent Architect and, in connection with any Material Alteration, Borrower shall deliver to Agent, for approval by Agent, detailed plans and specifications and cost estimates therefor, prepared by such Independent Architect, and (d) in the case of any Material Alteration, Agent shall have given its written consent thereto prior to the commencement thereof.  Such plans and specifications may be revised at any time and from time to time by such Independent Architect, _provided that_, in the case of any Material Alteration, material revisions of such plans and specifications are approved by Agent.  All work done in connection with any Alteration shall be performed with due diligence in a good and workmanlike manner.  All materials used in connection with any Alteration shall not be less than the standard of quality of the materials used at the Property for Completion of the Improvements and all materials used shall be in compliance with all applicable Legal Requirements and Insurance Requirements.

## ARTICLE XI.        BOOKS AND RECORDS, FINANCIAL STATEMENTS, REPORTS AND OTHER INFORMATION.

11.1    _Books and Records_.  Borrower shall keep and maintain books and records separate from any other Person in which accurate and complete entries shall be made of all dealings or transactions of or in relation to the Notes, the Property, and the business and affairs of Borrower relating to the Property, which shall reflect, on a Fiscal Year basis, all items of income and expense in connection with the operation on an individual basis of the

Property and in connection with any services, equipment or furnishings provided in connection with the operation of the Property, in accordance with GAAP. Agent and its authorized representatives shall have the right at reasonable times on a Business Day and upon reasonable notice to examine the books and records of Borrower relating to the operation of the Property and to make such copies or extracts thereof as Agent may require. Borrower shall pay any out-of-pocket costs and expenses actually incurred by Agent to examine Borrower's accounting records with respect to the Property, as Agent shall determine to be necessary or appropriate in the protection of Agent's interests under the Loan Documents. Upon Agent's request, Borrower shall provide such other information necessary and sufficient to fairly represent the financial condition of Borrower and the Property.

11.2    Reporting.

11.2.1    Monthly Reports. During the Construction Phase, Borrower shall provide or cause to be provided to Agent monthly, within fifteen (15) days after the end of each calendar month, a written report and narrative on construction progress, including pictures and a list of issues and concerns.

11.2.2    Quarterly Reports. Borrower shall provide or cause to be provided to Agent quarterly, within forty-five (45) days after the end of each fiscal quarter, (a) a complete copy of Borrower's and Mortgage Borrower's quarterly financial statements setting forth the financial condition of Borrower and Mortgage Borrower, which shall be provided by an Independent Accountant on an income tax basis in accordance with principles consistently applied (or such other accounting basis acceptable to Agent and consistently applied), if an Event of Default shall exist or if requested by Agent, and (b) an Officer's Certificate from Borrower (i) certifying that such quarterly financial statements are true and correct and fairly present the financial condition of Borrower and Mortgage Borrower, and (ii) representing whether any Events of Default then exist (and if so, the nature thereof, the period of time it has existed, and the action then being taken to remedy the same).

11.2.3    Annual Reports. Within one hundred twenty (120) days following the end of each calendar year (beginning with fiscal year 2016), Borrower shall provide or cause to be provided to Agent the following: (a) a complete copy of Borrower's and Mortgage Borrower's annual financial statements setting forth the financial condition of Borrower and Mortgage Borrower, which shall be provided by an Independent Accountant on an income tax basis in accordance with principles consistently applied (or such other accounting basis acceptable to Agent and consistently applied), if an Event of Default shall exist or if requested by Agent, and (b) an Officer's Certificate from Borrower (i) certifying that such annual financial statements are true and correct and fairly present the financial condition of Borrower and Mortgage Borrower, and (ii) representing whether any Events of Default then exist (and if so, the nature thereof, the period of time it has existed, and the action then being taken to remedy the same). Borrower shall deliver Agent copies of all federal income tax returns filed by Borrower and Mortgage Borrower within forty-five (45) days after the filing thereof.

11.2.4    Units Monthly Reports. From and after such time as the Offering Plan shall have been declared effective, Borrower shall furnish to Agent, within twenty (20) days following the end of each calendar month, a sales report in form acceptable to Agent with respect

to the Units, showing: (i) all currently pending sales (separated into new sales entered into during the month being reported on and sales contracted for in preceding months and setting forth the purchase prices and deposit amounts), (ii) all closings which took place during the month being reported on, (iii) all pending sales previously reported that will not close as scheduled for any reason, (iv) material written revisions, if any, to Mortgage Borrower's marketing plan and (v) any other matters reasonably expected to have a material effect upon the marketing and sales of the Units. Together with each monthly sales report, Borrower shall also submit copies of any Unit Sales Contracts entered into during such reporting period.

11.3    <u>Management Agreement; Sales Agency Agreement</u>.    Borrower shall deliver to Agent, within ten (10) days after the receipt thereof by Borrower or Mortgage Borrower, a copy of all material reports prepared by Manager pursuant to the Management Agreement (including the Annual Operating Budget and any inspection reports), and by Sales Agent under the Sales Agency Agreement (including sales and marketing materials, reports of pre-sale, pricing models and other reports and materials produced by Sales Agent).

11.4    <u>Predevelopment Updates</u>.    Borrower shall deliver to Agent monthly updates of (i) the status of all material approvals or licenses (including changes to zoning status) by, or permit applications with, any Governmental Authorities concerning the Project, (ii) the Budget and (iii) the monthly progress of pre-development work and construction work during the Construction Phase.

11.5    <u>Copies of Documents Relating to Property</u>.    Borrower shall deliver to Agent, within ten (10) days of the receipt thereof by Borrower or Mortgage, copies of all material filings, material correspondence, approvals, proposals and similar materials relating or delivered to applicable Governmental Authorities which relate to the Property.

11.6    <u>Other Information</u>.    Borrower shall furnish to Agent, within five (5) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower or Mortgage Borrower (including a rent roll) as may be requested by Agent. Borrower shall give prompt written notice to Agent of any litigation or governmental proceedings pending or threatened in writing against Borrower or Mortgage Borrower or Guarantor which would reasonably be expected to have a Material Adverse Effect.

11.7    <u>Annual Operating Budget</u>.    For any partial year period commencing on the date that is at least thirty (30) days prior to Substantial Completion of any portion of the Project, and for each Fiscal Year thereafter, Borrower shall submit to Agent an Annual Operating Budget not later than fifteen (15) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Agent. The Annual Operating Budget submitted shall be subject to Agent's written approval (each such Annual Operating Budget, an "<u>Approved Annual Operating Budget</u>"), which approval shall not be unreasonably withheld or delayed. In the event that Agent objects to a proposed Annual Operating Budget submitted by Borrower, Agent shall advise Borrower of such objections within ten (10) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such reasonable objections), and Borrower shall cause Mortgage Borrower to promptly revise such Annual Operating Budget and resubmit the same to Agent. Agent shall

advise Borrower of any objections to such revised Annual Operating Budget within ten (10) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall cause Mortgage Borrower to promptly revise the same in accordance with the process described in this <u>Section 11.7</u> until Agent approves the Annual Operating Budget.  If Agent transmits in writing any request by Agent for such additional information as may be reasonable under the circumstances within said ten (10) Business Day Period, then Agent shall be deemed to have responded on a timely basis. Until such time that Agent and, as long as the Mortgage Loan remains outstanding, Mortgage Lender, approves a proposed Annual Operating Budget, the most recently Approved Annual Operating Budget shall apply; <u>provided</u>, <u>however</u>, that such Approved Annual Operating Budget shall be adjusted to reflect actual increases in Impositions, Insurance Premiums and utilities expenses.

## ARTICLE XII.        SECONDARY MARKET TRANSACTIONS

12.1        <u>Secondary Market Transactions.</u>

(a)        Borrower acknowledges and agrees that any Agent and/or Lender may, subject to the provisions of <u>Section 12.1(c)</u>, (i) sell, transfer or assign all or any portion of its interest in the Loan and the Loan Documents, (ii) grant or issue one or more participations therein, and/or (iii) create within the Loan Documents one or more senior and subordinate notes or multiple components of such note or notes, and thereafter sell, assign, participate or syndicate all or any part of any variant of the Note (together with any other such sales, transfers and/or participations, collectively, a "<u>Secondary Market Transaction</u>"); <u>provided</u>, <u>however</u>, that:

(A)        after giving effect to such Secondary Market Transaction, the total maximum principal amount of the Loan and the Mortgage Loan and/or any Tranches therein created by a Secondary Market Transaction shall not exceed the sum of the Loan Amount and the Mortgage Loan Amount;

(B)        except to the extent set forth in <u>Section 12.2</u>, the Secondary Market Transaction shall not increase (other than with respect to ministerial and other de minimis matters) Borrower's or any Guarantor's obligations or materially decrease (other than with respect to ministerial and other *de minimis* matters) their rights under the Loan Documents; and

(C)        Borrower shall not be obligated to incur any cost and expense in connection therewith.

If Agent and/or Lender determines at any time to participate in a Secondary Market Transaction, then Agent may forward to each actual or potential purchaser, transferee, assignee, servicer, participant or investor in the Loan, and their counsel, and accountants, all documents and information which Agent now has or may hereafter acquire relating to the Loan, Borrower, any Guarantor, and any direct or indirect equity owner of Borrower, which shall have been furnished to Agent in connection with the Loan, as Agent and/or Lender in its discretion determines necessary or desirable to complete the Secondary Market Transaction; <u>provided that</u>, in each case

Agent shall require that each recipient of such information execute a commercially reasonable confidentiality agreement in form and substance acceptable to Agent.

(b)     Agent and/or Lender, acting solely for this purpose as non-fiduciary agent of Borrower, shall maintain a register for the recordation of the name and address of the Lender and principal amounts (and stated interest) of each of the Notes (the "Register").  The entries in the Register shall be conclusive absent manifest error, and Borrower, Agent and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as Agent and/or Lender hereunder for all purposes of this Agreement, including the right to receive payments of principal and interest hereunder, notwithstanding notice to the contrary.  The Register shall be available for inspection by Borrower, Agent and Lender, at any reasonable time and from time to time upon reasonable prior notice.  Any assignment or sale of all or part of such Note may be effected only by registration of such assignment or sale on the Register.  In addition, if Lender sells a participation, acting solely for this purpose as a non-fiduciary agent of Borrower, Lender shall maintain a register on which it enters the name of all participants in the Notes held by it and the principal amount (and stated interest thereon) of the portion of the Note which is the subject of the participation (the "Participant Register").  A Note may be participated in whole or in part only by registration of such participation on the Participant Register.  Any participation of such Note may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by Borrower at any reasonable time and from time to time upon reasonable prior notice.

12.2     Borrower Cooperation.

(a)     In connection with any Secondary Market Transaction, upon written request, Borrower shall execute and deliver to Agent such documents, instruments, certificates, financial statements and assignments and use commercially reasonable efforts to do such other acts and provide such information, and participate in such meetings and discussions, in each case that are reasonably necessary to facilitate the consummation of each Secondary Market Transaction, including executing and delivering such documents and agreements (and delivering such opinions of counsel with respect thereto as Agent may require) necessary to (i) restructure the Loan into multiple notes (which may include component notes and/or senior and junior notes) and/or reduce the number of notes, and/or (ii) establish different interest rates between the Loan and the Mortgage Loan and to require the payment of the Loan and the Mortgage Loan in such order or priority as may be designated by Agent (collectively, "Tranches"), and/or (iii) modify the Payment Dates, the Interest Determination Date, and the Interest Period under the Loan Documents; provided, however, that (A) the aggregate principal amount of such Tranches as of their date of creation shall comply with the conditions in clauses (A)-(B) of Section 12.1(a), (B) the interest rate of all such Tranches on both the Loan and the Mortgage Loan shall be set such that, absent an Event of Default,  taking into account the then current projected draw schedule, amounts actually funded under each of the Loan and the Mortgage Loan, and the aggregate amount of interest projected to be paid on the Loan and the Mortgage Loan, interest on the Loan and the Mortgage Loan shall be equal to the aggregate amount of the Make Whole Fee and interest that would be paid on a loan which funded on the same draw schedule and had an interest rate equal to the Blended Rate, and (C) Borrower shall not be required to take any action that would cause a breach of any term or provision of the Mortgage Loan Documents.  If Borrower fails to cooperate with Agent within ten (10) days of written request by Agent, Agent

is hereby appointed as Borrower's attorney in fact, coupled with an interest, to execute any and all documents necessary to accomplish such modifications (but in any event the Loan Documents shall be deemed to have been modified to incorporate any such modifications as Agent may so notify Borrower of in writing) and at Agent's option, declare such failure to be an Event of Default.

(b)    At the request of Agent, Borrower shall provide information, regarding Borrower, Mortgage Borrower, Guarantors or the Property which is not in the possession of Agent and which may be required by Agent in order to satisfy the market standards to which Agent customarily adheres or which may be required by prospective investors or required by applicable Legal Requirements in connection with any such Secondary Market Transaction, including to: (i) provide additional and/or updated information concerning Borrower, Mortgage Borrower, any Guarantor, Manager, or the Property, together with appropriate verification and/or consents related to such information through letters of auditors acceptable to Agent (the "Updated Information"); (ii) work with third-party service providers engaged by Agent (subject to Borrower's right to limit expenditures or be reimbursed for same by Agent, as provided in this Article XII) to obtain, collect, and deliver information requested or required by Agent; (iii) use commercially reasonable efforts to deliver such additional tenant estoppel letters or, if applicable, estoppels from parties to agreements that affect the Property and who are required to provide the same, which estoppel letters shall be reasonably satisfactory to Agent; (iv) make such representations and warranties as of the closing date of the Secondary Market Transaction with respect to the Property, Borrower, Mortgage Borrower any Guarantor and the Loan Documents as may be requested by Agent and consistent with the facts covered by the representations and warranties made in the Loan Documents except in cases where any such prior representations and warranties (A) were expressly made as of and applicable only to the Closing Date or (B) became untrue since last being made and prior to such date because of a change in facts and circumstances; (v) if requested by Agent, review any information regarding the Property, Borrower, Mortgage Borrower, any Guarantor, Manager and the Loan which is contained in a disclosure document to be used by Agent and/or Lender; and (vi) supply to Agent updates to such documentation, financial statements and reports which were delivered at or prior to the Closing Date in form and substance required in order to comply with any applicable securities laws (the "Financial Information"), in each case, provided that in no event, shall Borrower be required to provide any tax returns for any Guarantor.

(c)    From and after the Closing Date, Borrower shall be obligated to incur all costs and expenses (other than Borrower counsel fees or other costs and expenses of Borrower) in connection with complying with the requests made under Section 12.1 or this Section 12.2 and under Sections 12.1 and 12.2 of this Agreement.

12.3    Loan Servicing.  Borrower shall be responsible for the payment of a monthly Usage Fee in connection with the servicing of the Loan, which aggregate amount through the Maturity Date shall be deemed earned by Lender on the Closing Date.

## ARTICLE XIII.        ESTABLISHMENT OF COLLATERAL ACCOUNTS; RESERVE FUNDS.

13.1        <u>Interest Reserve Account</u>.  Borrower agrees and acknowledges that on the Closing Date, Borrower shall establish an interest reserve account (the "<u>Interest Reserve Account</u>") and fund to Agent or Loan Servicer (as determined by Agent) on behalf of both Lender and Lender an amount equal to $1,000,000.00 utilizing proceeds from the Loan. From time to time, provide no Event of Default is continuing and sufficient funds exist in the Interest Reserve Account, Borrower may utilize funds therein to make Debt Service and other payments, including, without limitation, payment of the monthly Usage Fee as they become due and owing under the Loan Documents and Mortgage Loan Documents on the applicable Payment Date.   Notwithstanding anything in the Loan Documents or in the Mortgage Loan Documents to the contrary, Borrower shall at all relevant times be primarily liable for making any and all payments to Agent as they become due and owing under the Loan Documents and Mortgage Loan Document, irrespective of whether or not sufficient funds exist in the Interest Reserve Account.   From time to time in accordance with the terms of the Loan Documents and as may be otherwise determined by Agent in its sole discretion, the Interest Reserve Account may be funded with a portion of funds derived from the LIC Proceeds and Required Release Price.  Notwithstanding anything in this Agreement or in the other Loan Documents or Mortgage Loan Documents to the contrary, Agent may require to replenish the Interest Reserve utilizing Borrower's funds in such amounts as determined by Agent.  Borrower agrees and acknowledges that, in the event Borrower properly exercises the Extension Option, Borrower shall fund the Interest Reserve Account from Borrower's funds and not from an Advance, an additional sum to be determined by Agent in its sole discretion for the purpose of the payment of monthly interest under the Loan on the Debt and under the Mortgage Loan on the Mortgage Debt at the Interest Rate for the Extension Period.  Upon written demand by Agent, Borrower shall fund any shortage in Interest Reserve Account (a) within five (5) Business Days of written request from Agent and in such amount as determined by Agent in its sole discretion. Any unapplied funds in the Interest Reserve Account remaining upon the indefeasible payment in full of the Debt and the Mortgage Debt (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents or Mortgage Loan Documents to survive the indefeasible satisfaction of the Note(s) in full) shall be disbursed to Borrower.

13.2        <u>Tax Reserve Account</u>.

On the Closing Date, Borrower shall establish with Agent or Loan Servicer (as determined by Agent) a tax reserve account (the "<u>Tax Reserve Account</u> On the Closing Date, Borrower shall fund the Tax Reserve Account on a monthly basis in an amount equal to one-twelfth $(1/12^{th})$ of all annual taxes for the Property in order to pay all Impositions through and including the Initial Maturity Date.  To the extent available, the Tax Reserve Account may be funded from available funds in the other Collateral Accounts.        Borrower agrees and acknowledges that, in the event Borrower properly exercises the Extension Option, Borrower shall pay to Agent, from Borrower's funds and not from an Advance, an additional sum to be determined by Agent in its sole discretion for the purpose of the payment of all Impositions for the Extension Period.  On the Payment Date first occurring after the expiration of the Construction Phase, Borrower shall deposit into the Tax Reserve Account the amount that

- 101 -

Agent estimates will be necessary in order to accumulate (together projected Monthly Tax Reserve Amount deposits thereafter) sufficient funds to pay the next installment of Impositions due, at least thirty (30) days prior to its due date, and on each Payment Date thereafter, Borrower shall deposit into the Tax Reserve Account an amount equal to one-twelfth of the annual Impositions that Agent estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Agent sufficient funds to pay all such Impositions at least thirty (30) days prior to the imposition of any interest, charges or expenses for the non-payment thereof (hereinafter called the "Monthly Tax Reserve Amount", and the aggregate amount of funds held in the Tax Reserve Account being the "Tax Reserve Amount"). Agent will apply the Monthly Tax Reserve Amount to payments of Impositions required to be made by Borrower pursuant to this Agreement and under the Security Instruments, subject to Borrower's right to contest Impositions in accordance with Section 8.3. In making any payment relating to the Tax Reserve Account, Agent may do so according to any bill, statement or estimate procured from the appropriate public office, without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof until such time as Borrower shall notify Agent of a potential inaccuracy in any bill, statement or estimate or challenge the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of funds in the Tax Reserve Account shall exceed the amounts due for Impositions pursuant to this Agreement, Agent shall credit such excess against future payments to be made to the Tax Reserve Account. Upon payment of the Impositions, Agent shall reassess the amount necessary to be deposited in the Tax Reserve Account for the succeeding period, which calculation shall take into account any excess amounts remaining in the Tax Reserve Account. If at any time Agent determines that the Tax Reserve Amount is not or will not be sufficient to pay Impositions by the dates set forth above, Agent shall notify Borrower of such determination and Borrower shall increase its monthly payments to Agent by the amount that Agent estimates is sufficient to make up the deficiency. Any Tax Reserve Amount remaining on deposit in the Tax Reserve Account upon the indefeasible payment in full of the Debt (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive the indefeasible satisfaction of the Note(s) in full) shall be disbursed to Agent for application in accordance with the Loan Documents, or if the Loan shall no longer be outstanding, to Borrower.

13.3    Construction Reserve Account. On the Closing Date, Borrower shall establish with Agent or Loan Servicer (as determined by Agent) a construction reserve account (the "Construction Reserve Account") in an amount equal to the Construction Loan Amount (less applicable closing, fees, charges and costs as more specifically described in the Construction Loan Agreement) pursuant to the terms and provisions of the Construction Loan Agreement. Funds in Construction Reserve Account shall be disbursed to Borrower, from time to time, pursuant to the Budget and for purposes of constructing the Improvements, all in accordance with the Building Loan Agreement. From time to time in accordance with the terms of the Loan Documents and Section 13.4 hereof, the Construction Reserve Account may be funded with a portion of funds derived from the LIC Proceeds and the Required Release Price (or with funds from Borrower as may be required by Agent).

13.4   <u>General Reserve Account</u>.   On the Closing Date, Borrower shall establish with Agent or Loan Servicer (as determined by Agent), a general reserve account (the "<u>General Reserve Account</u>").   The LIC Proceeds from time to time thereafter, Net Sale Proceeds, shall first be deposited into the General Reserve.   Funds in the General Reserve Account may be allocated by Agent between any or all of the Collateral Accounts in such order of priority and in such amounts, if any, as determined by Agent in its sole and absolute discretion.   Nothing in this Agreement or in any of the other Loan Documents or in the Mortgage Loan Documents shall obligate Agent or Lender to make available to Borrower any funds in the General Reserve Account.   Agent may, in its sole and absolute discretion, at any time, utilize all or any portion of funds in the General Reserve Account to pay such portion of the unpaid Aggregate Loan Amount (or any portion of the Debt or Mortgage Debt).

13.5   <u>Reserve Funds, Generally</u>.

(a)   Borrower grants to Agent on behalf of Lender, a second-priority perfected security interest in each of the Reserve Funds and the related Collateral Accounts and any and all monies now or hereafter deposited in each Reserve Fund and related Collateral Account as additional security for payment of the Debt.   Until expended or applied in accordance herewith, the Reserve Funds and the related Collateral Accounts shall constitute additional security for the Debt.

(b)   Upon the occurrence of an Event of Default, Agent may, in addition to any and all other rights and remedies available to Agent, apply all or any sums then present in any or all of the Reserve Funds (or direct Loan Servicer to apply all or any such sums) to the payment of the Debt in any order in its sole discretion.

(c)   The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Agent.

(d)   Borrower hereby consents to Agent's placement of the Reserve Funds into the Collateral Accounts maintained and held in the name of Agent, Loan Servicer or an affiliate and/or subsidiary thereof. Agent, Loan Servicer (as directed by Agent) or a designated representative or an affiliate or subsidiary of Agent shall have the sole right to make withdrawals from the Collateral Accounts.

(e)   The insufficiency of any balance in Reserve Funds shall not relieve Borrower from its obligation to fulfill all its covenants and obligations as set forth in the Loan Documents.

(f)   Borrower shall not, without obtaining the prior written consent of Agent, further pledge, assign or grant any security interest in any Reserve Fund or related the Collateral Accounts or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Agent as the secured party, to be filed with respect thereto.

(g)     Borrower shall indemnify Agent, Lender and Loan Servicer and hold each of them harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and attorneys' fees and expenses) arising from or in any way connected with the Reserve Funds or the related Collateral Accounts or the performance of the obligations for which the Reserve Funds or the related Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Agent, Lender, Loan Servicer, their agents or employees.  Borrower hereby assigns to Agent all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds or the related Collateral Accounts; provided, however, that Agent may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

(h)     Notwithstanding anything set forth in this Agreement, so long as the Tax Reserve Account, Insurance Reserve Account, and Condominium Reserve Account are maintained pursuant to the Acquisition Loan Agreement, then Borrower shall not be required to maintain such accounts under this Agreement.  If the Acquisition Loan is satisfied or if for any reason any of such accounts are not maintained under the Acquisition Loan Agreement (including as a result of any waiver of such accounts by the Acquisition Loan lender), then such account or accounts shall be maintained under this Agreement pursuant to the terms of this Agreement.

## ARTICLE XIV.        DEFAULTS.

14.1        Event of Default.

(a)     Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

(i)     if (A) the Debt is not paid in full on the Maturity Date; (B) any regularly scheduled monthly payment of interest hereunder is not paid in full on the applicable Payment Date; provided, however, that no Event of Default under this clause (B) shall be deemed to have occurred if no other Event of Default exists and sufficient Reserve Funds in the Interest Reserve Account remain to pay regularly scheduled monthly payment of interest hereunder and Agent fails to pay the same when due if required pursuant to the terms of this Agreement; or (C) any prepayment of principal due under this Agreement or the Note is not paid when due;

(ii)     if any deposit to any Collateral Account required to be made by Borrower pursuant to the terms of this Agreement is not made when due;

(iii)     subject to Borrower's right to contest as set forth in Section 8.3, if any of the Impositions are not paid prior to the imposition of any interest, penalty, charge or expense for the non-payment thereof; provided that no Event of Default under this clause (iii) shall be deemed to have occurred if no other Event of Default then exists and the funds reserved hereunder for the payment of Impositions are sufficient to pay the same and Lender fails to pay the same when due;

(iv)    if any amount payable by Borrower pursuant to this Agreement, the Note or any other Loan Document (excluding (A) any of the deposits or payments set forth in clauses (i) through (iii) above and (B) any amount payable by Borrower pursuant to this Agreement, the Note or any other Loan Document that has an established written notice period or grace or cure period for such payment amount that is separate from this clause (iv)) is not paid in full when due and payable in accordance with the provisions of the applicable Loan Document and such failure continues for ten (10) days after Lender delivers written notice thereof to Borrower;

(v)    if (A) the Policies required by Section 7.1 are not kept in full force and effect, (B) certified copies of any of such Policies or certificates of insurance are not delivered to Agent within ten (10) days after Agent delivers written request to Borrower therefor or (C) Borrower shall fail to otherwise comply with the terms and provisions of Article VII; provided that no Event of Default under the foregoing subclause (A) shall be deemed to have occurred if no other Event of Default then exists and the funds reserved hereunder for the payment of Insurance Premiums are sufficient to pay the same and Agent fails to pay the same when due;

(vi)    if a Transfer in violation of Article IX shall occur;

(vii)    if any representation or warranty made by Borrower herein or by Borrower or any Guarantor in any (A) other Loan Document or (B) certificate, financial statement or other instrument, agreement or document made by Borrower or any Guarantor and furnished to Agent, shall have been knowingly false or misleading in any material respect as of the date the representation or warranty was made or is deemed to have been remade;

(viii)    if Borrower or Mortgage Borrower shall make an assignment for the benefit of creditors;

(ix)    if a receiver, liquidator or trustee shall be appointed for Borrower, Mortgage Borrower, or if Borrower or Mortgage Borrower shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Mortgage Borrower, or if any proceeding for the dissolution or liquidation of Borrower or Mortgage Borrower shall be instituted (each, a "Bankruptcy Event"), unless such appointment, adjudication, petition or proceeding was involuntary and not consented to or acquiesced in by Borrower or Mortgage Borrower and the same is discharged, stayed or dismissed within ninety (90) days;

(x)    if Borrower assigns its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(xi)    if Borrower or Mortgage Borrower fails to fund any Deficiency Collateral as and when required under Section 4.7(b);

(xii)    if Borrower breaches any of its covenants contained in Sections 6.1 or 6.2 hereof;

(xiii)    if Borrower or Mortgage Borrower breaches any of the negative covenants contained in Section 6.6 hereof;

(xiv)    if this Agreement or any other Loan Document or any Lien granted hereunder or thereunder, in whole or in part, shall terminate or shall cease to be effective or shall cease to be a legally valid, binding and enforceable obligation of Borrower, or any Loan Document to which any Guarantor is a party shall terminate or cease to be effective or shall cease to be a legally valid, binding and enforceable obligation of such Guarantor, or any Lien securing the Debt shall, in whole or in part, cease to be a perfected Lien of the requisite priority, subject to the Permitted Encumbrances (except in any of the foregoing cases in accordance with the terms hereof or under any other Loan Document or by reason of any affirmative act or omission of Agent);

(xv)    if, after the appointment and retention of a Manager, the Management Agreement is terminated and a Qualified Manager is not appointed as a replacement manager pursuant to the provisions of this Agreement within thirty (30) days after such termination, subject to the receipt of Agent's approval of such appointment as required under the terms of this Agreement;

(xvi)    if Borrower or Mortgage Borrower shall be in default beyond the expiration of any applicable cure period of any of its obligations under any existing easement, covenant or restriction which affects the Property (including the Condominium-Related Documents) and such default has a Material Adverse Effect;

(xvii)    if there shall occur any Event of Default under and as defined in the Mortgage Loan Agreements or any of the other Mortgage Loan Documents;

(xviii)    if there shall occur any Event of Default under and as defined in the Loan Agreement or any of the other Loan Documents

(xix)    if a financial covenant Event of Default under any Guaranty has occurred which is not cured within the applicable notice, grace or cure period (if any) under the terms of the applicable Guaranty;

(xx)    if any Guarantor (A) shall make an assignment for the benefit of creditors or (B) is the subject of any Bankruptcy Event;

(xxi)    if for any reason there is a discontinuance of construction of the Project for a period in excess of ten (10) Business Days and/or a period in excess of five (5) Business Days in any sixty (60) calendar day period, in each case, subject to Excusable Delay;

(xxii)    if Borrower shall not have caused Substantial Completion of the Project to occur on or before the Outside Construction Completion Date, as the same may be extended by reason of Excusable Delay;

(xxiii) if any federal tax Lien or state or local income tax Lien is filed against Borrower, Mortgage Borrower, Guarantor or the Property and same is not discharged of record within forty-five (45) days after same is filed;

(xxiv) if a final, non-appealable judgment is filed against Borrower or Guarantor which is not vacated or discharged within thirty (30) days;

(xxv) if any final, non-appealable order or decree of judgment is rendered in any judicial or administrative proceeding declaring the Property (or any portion thereof) to be in violation of any Legal Requirements and the same is not cured within thirty (30) days of said order or decree or such longer period of time as provided in such order or decree;

(xxvi) if (x) Borrower is unable to satisfy any condition of Borrower's right to the receipt of an Advance hereunder for a period in excess of thirty (30) days after the Draw Request for such Advance is submitted to Lender, (y) Mortgage Borrower is unable to satisfy any condition of Mortgage Borrower's right to the receipt of a Building Loan Advance under the Building Loan Agreement for a period in excess of thirty (30) days after the Draw Request for such Building Loan Advance is submitted to Mortgage Lender or (z) Mortgage Borrower is unable to satisfy any condition of Mortgage Borrower's right to the receipt of a Project Loan Advance under the Project Loan Agreement for a period in excess of thirty (30) days after the Draw Request for such Project Loan Advance is submitted to Mortgage Lender;

(xxvii) if Agent, the Construction Consultant or their representatives are not permitted upon not less than two (2) Business Days' notice to enter upon the Property, inspect the Improvements and the construction thereof and all materials, fixtures and articles used or to be used in the construction and to examine all the Plans and Specifications, or if Borrower shall fail to furnish to Agent or its authorized representative, when requested upon not less than two (2) Business Days' notice, copies of the Plans and Specifications;

(xxviii) if a material adverse change in Borrower's financial condition shall occur which would, in Agent's determination, materially and adversely affect Borrower's ability to perform its Obligations under this Agreement or any other document evidencing or securing the Loan beyond any applicable notice and grace periods expressly set forth in the Loan Documents;

(xxix)   the neglect, failure or refusal of Borrower to keep in full force a Construction Permit that is not fully reinstated within thirty (30) days after the lapse of effectiveness of such Construction Permit;

(xxx)   if Borrower shall fail to comply with the terms and provisions of Article XIII hereof and such failure remains uncured for five (5) Business Days after notice from Agent to Borrower;

(xxxi) if, after the initial acceptance and/or declaration of effectiveness of the Offering Plan by the DOL, (1) any governmental, judicial or legal authority having

- 107 -

jurisdiction over the Property or the Project orders or requires that the marketing, offering and/or sale of Units be suspended or halted, and within ninety (90) days, such order or requirement is not rescinded; or (2) Borrower otherwise withdraws or terminates the Offering Plan (except as required by Legal Requirements);

(xxxii) if Borrower offers or markets (whether pursuant to an amendment to the Offering Plan or otherwise), or enters into any agreement to sell, any Unit for less than the Minimum Release Price without Agent's prior written consent (which may be granted or withheld in Agent's sole discretion);

(xxxiii) Borrower or Mortgage Borrower or 34th Street is in default under any of the Acquisition Loan Documents or Building Loan Documents; or

(xxxiv) if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not specified in subsections (i) through (xxxii) above for thirty (30) days after notice thereof from Agent; provided, however, that if such Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period, then, as long as Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter continuously and diligently prosecutes the curing of such default to completion, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, which additional period shall not exceed sixty (60) days.

(b)     Unless waived in writing by Agent, upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in clauses (a)(viii), (a)(ix), (a)(x) or (a)(xx) above), Agent may, without notice or demand, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action that Agent deems advisable to protect and enforce its rights against Borrower and in the Property, including (i) declaring immediately due and payable the entire principal amount of the Loan together with interest thereon and all other sums due by Borrower under the Loan Documents, (ii) collecting interest on the principal amount of the Loan at the Default Rate whether or not Agent elects to accelerate the Note and (iii) enforcing or availing itself of any or all rights or remedies set forth in the Loan Documents against Borrower and the Property, including all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (a)(viii), (a)(ix), (a)(x) or (a)(xx) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.  The foregoing provisions shall not be construed as a waiver by Agent of its right to pursue any other remedies available to it under this Agreement, the Loan Mortgage, the other Loan Documents or any other Loan Document.  Any payment due hereunder may be enforced and recovered in whole or in part at such time by one or more of the remedies provided to Agent in the Loan Documents.

14.2     Remedies.

(a)     Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Agent against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Agent at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Agent shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Collateral.  Any such actions taken by Agent shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Agent may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Agent permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) to the extent permitted by law, Agent shall not be subject to any one action or election of remedies law or rule, (ii) all liens and other rights, remedies or privileges provided to Agent shall remain in full force and effect until Agent has exhausted all of its remedies against the Collateral and the Pledge Agreement has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full; and (iii) Agent may, in their sole discretion, without impairing or otherwise affecting any other rights and remedies of Agent hereunder, at law or in equity, apply, ex parte, for the appointment of a custodian, trustee, receiver, keeper, liquidator or conservator of the Property or any part thereof, irrespective of the adequacy of the security for the Debt and without regard to the solvency of Borrower or of any Person liable for the payment of the Debt, to which appointment Borrower does hereby consent and such receiver or other official shall have all rights and powers permitted by applicable law and such other rights and powers as the court making such appointment may confer, but the appointment of such receiver or other official shall not impair or in any manner prejudice the rights of Agent to receive all Operating Income with respect to the Collateral pursuant to this Agreement or any other Loan Document.

(b)     Upon the occurrence and during the continuance of an Event of Default, with respect to the Account Collateral, the Agent may:

(i)     without notice to Borrower, except as required by law, and at any time or from time to time, charge, set-off and otherwise apply all or any part of the Account Collateral against the Debt, Operating Expenses and/or Capital Expenditures for the Property or any part thereof;

(ii)     in Agent's sole discretion, at any time and from time to time, exercise any and all rights and remedies available to it under this Agreement, and/or as a secured party under the UCC;

(iii)     demand, collect, take possession of or receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Account Collateral (or any portion thereof) as Agent may determine in its sole discretion; and

(iv)     take all other actions provided in, or contemplated by, this Agreement.

(c)    With respect to Borrower, the Account Collateral and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Agent to resort to the Collateral for the satisfaction of any of the Debt, and Agent may seek satisfaction out of the Collateral or any part thereof, in its absolute discretion in respect of the Debt.  In addition, Agent shall have the right from time to time to partially foreclose this Agreement and the Pledge Agreement in any manner and for any amounts secured by this Agreement or the Pledge Agreement then due and payable as determined by Agent in its sole discretion, including the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal or interest and such default constitutes an Event of Default, Agent may foreclose this Agreement and the Pledge Agreement to recover such delinquent payments, or (ii) in the event Agent elects to accelerate less than the entire Outstanding Principal Balance, Agent may foreclose this Agreement and the Pledge Agreement to recover so much of the principal balance of the Loan as Agent may accelerate and such other sums secured by this Agreement or the Pledge Agreement as Agent may elect.  Notwithstanding one or more partial foreclosures, the Collateral shall remain subject to this Agreement and the Pledge Agreement to secure payment of sums secured by this Agreement and the Agreement and not previously recovered.

(d)    Any amounts recovered from the Collateral or any other collateral for the Loan after an Event of Default may be applied by Agent toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Agent determines.

14.3    <u>Remedies Cumulative; Waivers.</u>    The rights, powers and remedies of Agent under this Agreement and the Pledge Agreement shall be cumulative and not exclusive of any other right, power or remedy which Agent may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Agent's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Agent may determine in Agent's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower or Guarantor shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or Guarantor or to impair any remedy, right or power consequent thereon.

14.4    <u>Costs of Collection</u>.    If after and during the continuance of an Event of Default:  (a) the Note or any of the Loan Documents is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding; (b) an attorney is retained to represent Agent in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under the Note or any of the Loan Documents; or (c) an attorney is retained to protect or enforce the lien or any of the terms of this Agreement, the Pledge Agreement or any of the Loan Documents; then Borrower shall pay to Agent all attorney's fees, costs and expenses actually incurred in connection therewith, including costs of appeal, together with interest on any judgment obtained by Agent at the Default Rate.

14.5        Construction Related Remedies.

(a)        Right to Stop Disbursing Funds.  In addition to any other rights and remedies which Agent may have pursuant to this Agreement and the other Loan Documents or pursuant to law or equity, and without limitation thereof, (i) as long as an Event of Default shall exist, the Agent may elect to decline to make all or any portion of such further Advances as the Agent may elect and/or (ii) as long as an Event of Default shall exist, any or all obligations of the Agent under this Agreement, at the option of Agent, shall cease and terminate; provided, however, that the Agent may make all or any portion of any Advance as long as any such Event of Default shall exist without thereby becoming obligated to make all or a portion of any other or further Advance or waiving the rights to exercise any of Agent's rights and remedies pursuant to any one or more of the Loan Documents or as may be available at law or equity.

(b)        Right to Complete.  In addition to any other rights and remedies which Agent may have under this Agreement and the other Loan Documents or pursuant to law or equity, and without limitation thereof, after the occurrence of any Event of Default and upon acceleration of the Loan, Agent may, subject to the rights of Mortgage Lender under the Mortgage Loan Documents, including, without limitation, under Article XIV of the Mortgage Loan Agreements, enter upon the Property and into possession of the Property and any other Property (and exclude Mortgage Borrower and any other persons therefrom) and cause Completion of the construction of the Project substantially in accordance with the Plans and Specifications, with such changes therein as Agent may from time to time deem appropriate, all at the sole risk, cost and expense of Borrower.  Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, including Article XIV of the Mortgage Loan Agreements, Agent shall have the right, at any and all times, in its sole discretion to discontinue any work commenced by Agent with respect to the construction of the Project or to change any course of action undertaken by it and shall not be bound by any limitations or requirements of time whether set forth herein or otherwise.  Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, including Article XIV of the Mortgage Loan Agreements, upon acceleration of the Loan, Agent shall have the right and power (but shall not be obligated) to assume all or any portion of the obligations of Borrower under any or all Construction Documents as Agent may elect and to take over and use all or any part or parts of the labor, materials, supplies and equipment contracted for by or on behalf of Borrower, whether or not previously incorporated into the Property.  Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, including Article XIV of the Mortgage Loan Agreements, in connection with any portion of the construction of the Project undertaken by Agent pursuant to the provisions of this Section 14.5(b), Agent may do any or all of the following as Agent, in its sole discretion may elect:

(i)        engage builders, General Contractors, general and trade contractors, suppliers, architects, engineers, inspectors and others for the purpose of furnishing labor, materials, equipment and fixtures in connection with the construction of the Improvements;

(ii)        amend, modify or terminate any then-existing contracts between Borrower and any of the Persons described in the preceding clause (i);

- 111 -

(iii)    pay, settle or compromise all bills or claims which may become Liens against the Property, or which have been or may be incurred in any manner in connection with the construction of the Project or for the discharge of liens, encumbrances or defects in the title of the Property; and

(iv)    take such other action (including the employment of watchmen and the taking of other measures to protect the Property) or refrain from acting under this Agreement as Agent may in its sole and absolute discretion from time to time determine without any limitation whatsoever.

(c)    <u>Sums Advanced</u>.  Borrower shall be liable to Agent for all sums paid or incurred by Agent and/or Lender for the construction of the Project whether the same shall be paid or incurred pursuant to the provisions of this <u>Section 14.5</u> or otherwise, and all other payments made or liabilities incurred by Agent and/or Lender under this Agreement of any kind whatsoever (except to the extent it is determined by a court of competent jurisdiction, beyond right of appeal, that such liabilities arose solely and directly out of the gross negligence or willful misconduct of Agent or Lender), all of which shall be paid by Borrower to Agent upon demand with interest at the Default Rate to the date of payment to Agent, and all of the foregoing sums, including such interest at the Default Rate, shall be deemed and shall constitute advances under this Agreement and be evidenced by the Note and secured by the Pledge Agreement and the other Loan Documents.

(d)    <u>Completion Guaranty</u>.  Notwithstanding any of the foregoing provisions of this <u>Section 14.5</u> and during the existence and continuance of a Default or an Event of Default, Lender shall not be obligated to make any Advances and/or make any Deficiency Collateral available to the Guarantors under the Completion Guaranty and under the Completion Guaranty.

ARTICLE XV.        <i>INTENTIONALLY OMITTED.</i>

ARTICLE XVI.        MISCELLANEOUS.

16.1    <u>Survival</u>.    This Agreement and all covenants, indemnifications, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Agent of the Note, and shall continue in full force and effect as long as all or any of the Debt in connection with the Loan is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.    All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Agent and Lender.

16.2    <u>Agent's Discretion</u>.    Whenever pursuant to this Agreement, Agent exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Agent, the decision of Agent to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise

- 112 -

specifically herein provided) be in the sole discretion of Agent and shall be final and conclusive.

      16.3    <u>GOVERNING LAW</u>.

      (A)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE THE MORTGAGE LOAN WAS MADE BY AGENT AND LENDER AND ACCEPTED BY BORROWER IN THE STATE, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF BORROWER, AGENT AND LENDER) HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

      (B)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST AGENT, LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER, AGENT AND LENDER EACH WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON-CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER, AGENT AND LENDER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

      16.4    <u>Modification, Waiver in Writing</u>.  Any provision of this Agreement, the Loan  Notes or other Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by Borrower and Agent.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

16.5     Delay Not a Waiver.   Neither any failure nor any delay on the part of Agent in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Agent shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

16.6     Notices.   All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if sent by (a) electronic mail; (b) hand delivery against receipt or (c) expedited prepaid delivery service for next Business Day delivery, either commercial or United States Postal Service, with proof of attempted delivery, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section 16.6):

| If to Agent: | Silver Point Finance, LLC, as Agent<br>Two Greenwich Plaza, 1st Floor<br>Greenwich, Connecticut 06830<br>Attention:  Andrew Scott<br>E-mail:  ascott@silverpointcapital.com |
|---|---|
| With a copy to: | Mahadeva, PLLC<br>80 Business Park Drive, Suite 201<br>Armonk, New York 10504<br>Attention:  Prassana Mahadeva<br>E-Mail:  pmahadeva@mahadevalaw.com |
| If to Borrower: | c/o DeNardo Capital Management LLC<br>50 South Buckhout Street, Suite 307<br>Irvington, New York 10533<br>Attenion:  Sylvia and Joseph DeNardo<br>E-mail: sd@denardodev.com; jd@denardodev.com |
| With a copy to: | Penachio Malara LLP<br>245 Main Street, Suite 450<br>White Plains, New York 10601<br>Attention:  Anne Penachio<br>E-mail:  anne@pmlawllp.com |

Any party may change the address to which any notice is to be delivered, by furnishing ten (10) days' prior written notice of such change to the other parties in accordance with the provision of this <u>Section 16.6</u>.  All notices, elections, requests and demands under this Agreement shall be effective and deemed received upon the earliest of (i) the actual receipt of the same by personal delivery or otherwise, (ii) one (1) Business Day after being deposited with a nationally recognized overnight courier service as required above, or (iii) three (3) Business Days after being deposited in the United States mail as required above, <u>provided that</u> notices to Agent under <u>Article II</u> shall not be effective until received.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, election, request, or demand sent.  Notices may be sent by a party hereto or on its behalf by its attorney.

16.7    <u>TRIAL BY JURY</u>.  BORROWER, AGENT AND LENDER AND ALL PERSONS CLAIMING BY, THROUGH OR UNDER ANY OF THEM, HEREBY EXPRESSLY, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT, THE PLEDGE AGREEMENT, THE NOTE OR ANY OTHER LOAN DOCUMENT, INCLUDING ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, THE PLEDGE AGREEMENT, THE NOTE OR ANY OTHER LOAN DOCUMENT (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH OF BORROWER, AGENT AND LENDER HEREBY AGREES AND CONSENTS THAT AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION MAY BE FILED WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT HERETO TO THE WAIVER OF ANY RIGHT TO TRIAL BY JURY. EACH OF BORROWER, AGENT AND LENDER ACKNOWLEDGES THAT IT HAS CONSULTED WITH LEGAL COUNSEL REGARDING THE MEANING OF THIS WAIVER AND ACKNOWLEDGES THAT THIS WAIVER IS AN ESSENTIAL INDUCEMENT FOR THE MAKING OF THE LOAN.  THIS WAIVER SHALL SURVIVE THE REPAYMENT OF THE LOAN.

16.8    <u>Headings</u>.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

16.9    <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

16.10    <u>Preferences</u>.  To the extent Borrower makes a payment or payments to Agent, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Agent.

16.11    <u>Waiver of Notice</u>.  Borrower shall not be entitled to any notices of any nature whatsoever from Agent except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Agent to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives, to the extent permitted by applicable Legal Requirements, the right to receive any notice from Agent with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Agent to Borrower.

16.12    <u>Expenses; Indemnity</u>.

(a)    Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Agent upon receipt of written notice from Agent for all out-of-pocket fees, costs and expenses (including attorneys' fees and disbursements) incurred by Agent and Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including any opinions requested by Agent pursuant to this Agreement); (ii) Agent's and Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters as required herein or under the other Loan Documents; (iv) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (v) the filing and recording fees and expenses, mortgage recording taxes, title insurance and fees and expenses of counsel for providing to Agent and Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Lien in favor of Agent pursuant to this Agreement and the other Loan Documents; (vi) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; (vii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a work out or of any insolvency or bankruptcy proceedings and (viii) procuring Policies pursuant to <u>Section 7.1</u>; <u>provided</u>, <u>however</u>, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts,

fraud or willful misconduct of Agent or Lender, other than Borrower's internal administrative costs.

(b)      Borrower will protect, indemnify and save harmless Agent, Lender and Loan Servicer and all of their respective officers, directors, stockholders, members, partners, employees, agents, successors and assigns (collectively, the "Indemnified Parties") from and against all actual liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including all attorneys' fees and expenses actually incurred) imposed upon or incurred by or asserted against the Indemnified Parties or the Property or any part of its interest therein, by reason of the occurrence or existence of any of the following (to the extent Proceeds payable on account of the following shall be inadequate; it being understood that in no event will the Indemnified Parties be required to actually pay or incur any costs or expenses as a condition to the effectiveness of the foregoing indemnity, except in all cases to the extent caused by the actual willful misconduct or gross negligence of the Indemnified Parties (other than such willful misconduct or gross negligence imputed to the Indemnified Parties because of their interest in the Property):  (A) ownership of Borrower's interest in the Property, or any interest therein, or receipt of any Rents or other sum therefrom, (B) any accident, injury to or death of any persons or loss of or damage to property occurring on or about the Property, (C) any design, construction, operation, repair, maintenance, use, non-use or condition of the Property, including claims or penalties arising from violation of any Legal Requirement or Insurance Requirement, as well as any claim based on any patent or latent defect, whether or not discoverable by Agent, and any claim the insurance as to which is inadequate, (D) any Default under this Agreement or any of the other Loan Documents, (E) any failure on the part of Borrower to perform or comply with any of the terms of any Lease within the applicable notice or grace periods, (F) any performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof, (G) any negligence or tortious act or omission on the part of Borrower or any of its agents, contractors, servants, employees, sublessees, licensees or invitees, or (H) any contest referred to in Section 8.3 hereof.  Any amounts the Indemnified Parties are legally entitled to receive under this Section 16.12 which are not paid within ten (10) days after written demand therefor (the "Indemnification Date") by the Indemnified Parties or Agent, setting forth in reasonable detail the amount of such demand and the basis therefor, shall bear interest from the date of demand at the Default Rate, and shall, together with such interest, be part of the Debt secured by the Pledge Agreement.  In case any action, suit or proceeding is brought against the Indemnified Parties by reason of any such occurrence, Borrower shall at Borrower's expense resist and defend such action, suit or proceeding or will cause the same to be resisted and defended by counsel at Borrower's reasonable expense for the insurer of the liability or by counsel designated by Borrower (unless disapproved by Agent promptly after Agent has been notified of such counsel); provided, however, that nothing herein shall compromise the right of Agent (or any Indemnified Party) to appoint its own counsel at Borrower's expense for its defense with respect to any action which in its reasonable opinion presents a conflict or potential conflict between Agent and Borrower that would make such separate representation advisable; provided, further, that if Lender shall have appointed separate counsel pursuant to the foregoing, Borrower shall not be responsible for the expense of additional separate counsel of any Indemnified Party unless there is an actual conflict of interest between such Indemnified Party, on the one hand, and Agent, on the other hand.  As long as Borrower is resisting and defending such action, suit or proceeding as provided above in a prudent and commercially reasonable manner, Agent and the Indemnified Parties be entitled to settle such action, suit or

proceeding without Borrower's consent; provided, however, that if Borrower is not diligently defending such action, suit or proceeding in a prudent and commercially reasonable manner as provided above, and Agent (or such Indemnified Party) has provided Borrower with thirty (30) days' prior written notice, or shorter period if mandated by the requirements of applicable law, and opportunity to correct such determination, Agent or such Indemnified Party may settle such action, suit or proceeding and claim the benefit of this Section 16.12 with respect to settlement of such action, suit or proceeding without Borrower's consent.  Any Indemnified Party will give Borrower prompt notice after such Indemnified Party obtains actual knowledge of any potential claim by such Indemnified Party for indemnification hereunder.  No Indemnified Party shall settle or compromise any action, proceeding or claim as to which it is indemnified hereunder without notice to Borrower.

16.13    Exhibits and Schedules Incorporated.    The Exhibits and Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

16.14    Offsets, Counterclaims and Defenses.    Any assignee of Agent's or Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower or in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

16.15    Liability of Assignees of Lender.    No assignee of Agent or Lender shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any other Loan Document or any amendment or amendments hereto made at any time or times, heretofore or hereafter, any different than the liability of Agent and/or Lender hereunder.  In addition, no permitted assignee shall have at any time or times hereafter any personal liability, directly or indirectly, under or in connection with or secured by any agreement, lease, instrument, encumbrance, claim or right affecting or relating to the Property or to which the Property is now or hereafter subject any different than the liability of Agent and/or Lender hereunder.  The limitation of liability provided in this Section 16.15 is (a) in addition to, and not in limitation of, any limitation of liability applicable to the permitted assignee provided by law or by any other contract, agreement or instrument, and (b) shall not apply to any assignee's gross negligence or willful misconduct.

16.16    No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)    Borrower, Agent and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy in common, or joint tenancy relationship between Borrower on the one hand, and Agent and/or Lender on the other hand, nor to grant Agent or Lender any interest in the Collateral, other than that of mortgagee, beneficiary or lender.

- 118 -

(b)      This Agreement and the other Loan Documents are solely for the benefit of Borrower, Agent and Lender and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Agent, Lender or Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.   All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

16.17      <u>Publicity</u>.  All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced all or in part by the Loan Documents, to Agent, or any of its Affiliates shall be subject to the prior written approval of Agent which may be withheld.

16.18      <u>Waiver of Marshaling of Assets</u>.  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshaling of the assets of Borrower, Borrower's members and others with interests in Borrower and of the Collateral, and agrees not to assert any right under any laws pertaining to the marshaling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Agent and/or Lender under the  Loan Documents to a sale of the Collateral for the collection of all or any portion of the Debt without any prior or different resort for collection or of the right of Agent to the payment of the Debt out of the net proceeds of the Collateral in preference to every other claimant whatsoever.

16.19      <u>Waiver of Counterclaim and other Actions</u>.  Borrower hereby expressly and unconditionally waives, in connection with any suit, action or proceeding brought by Agent on this Agreement, the Note, the Pledge Agreement or any other Loan Document, any and every right it may have to (i) interpose any counterclaim therein (other than a counterclaim which can only be asserted in the suit, action or proceeding brought by Agent on this Agreement, the Note, the Pledge Agreement or any other Loan Document and cannot be maintained in a separate action), <u>provided</u> <u>that</u> the foregoing shall not be deemed a waiver of Borrower's right to assert a good faith defense that Borrower has complied with its obligations under the Loan Documents and (ii) have any such suit, action or proceeding consolidated with any other or separate suit, action or proceeding.

16.20      <u>Conflict; Construction of Documents; Reliance</u>.   In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.   The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in

entering into the Loan without relying in any manner on any statements, representations or recommendations of Agent or any parent, subsidiary or Affiliate of Agent. Agent shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Agent or Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Agent's exercise of any such rights or remedies. Borrower acknowledges that Agent and Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or their Affiliates.

16.21   <u>Brokers and Financial Advisors</u>. Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement other than Broker who shall be paid a commission by Borrower on the Closing Date. Borrower, Agent and Lender hereby agree to indemnify each other, defend and hold each other harmless from and against any and all claims, liabilities, costs and expenses of any kind (including each other's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of such party in connection with the transactions contemplated herein. The provisions of this <u>Section 16.21</u> shall survive the expiration and termination of this Agreement and the payment of the Debt.

16.22   <u>Prior Agreements</u>. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto with respect to the Loan and the transactions contemplated hereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents and unless specifically set forth in a writing contemporaneous herewith the terms, conditions and provisions of any and all such prior agreements do not survive execution of this Agreement.

16.23   <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document.

16.24   <u>Remedies of Borrower; Limitation of Liability</u>.

(a)   In the event that a claim or adjudication is made that Agent, Lender or any of their agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Agent or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Agent, nor Lender nor any of their agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Agent or Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

(b)   No claim may be made by Borrower or any other Person against Agent, Lender or any of their affiliates, directors, officers, employees, attorneys or agents of any of

them for any consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or by the other Loan Documents, or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

    16.25  <u>Non-liability of Agent and Lender</u>.  Borrower acknowledges and agrees that:

    (a)  any inspections of the construction of the Improvements made by or through Agent are for purposes of administration of the Loan only and Borrower is not entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship, conformity to the Plans and Specifications, state of completion or otherwise; Borrower shall make its own inspections of such construction to determine that the quality of the Improvements and all other requirements of such construction are being performed in a manner satisfactory to Borrower and in conformity with the Plans and Specifications and all other requirements; and Borrower shall immediately notify Agent, in writing, should the same not be in conformity with the Plans and Specifications and all other requirements;

    (b)  by accepting or approving anything required to be observed, performed, fulfilled or given to Agent pursuant to the Loan Documents, including any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy, Agent shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by Agent;

    (c)  Agent does not undertake nor assume any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Property, including, without limitation, matters relating to the quality, adequacy or suitability of: (i) the Plans and Specifications, (ii) architects, contractors, subcontractors and materialmen employed or utilized in connection with the construction of the Improvements, or the workmanship of or the materials used by any of them, or (iii) the progress or course of construction and its conformity or nonconformity with the Plans and Specifications; and Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrower by Agent in connection with such matters is for the protection of Agent and Lender only and neither Borrower nor any third party is entitled to rely thereon;

    (d)  Agent and Lender owe no duty of care to protect Borrower against negligent, faulty, inadequate or defective building or construction;

    (e)  Agent and Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any person or property arising from any construction on, or occupancy or use of, any of the Property, including, without limitation, any loss, claim, cause of action, liability,

indebtedness, damage or injury caused by, or arising from: (i) any defect in any building, structure, grading, fill, landscaping or other improvements. thereon or in any on site or off site improvement or other facility therein or thereon; (ii) any act or omission of Borrower, the parties comprising Borrower or any of Borrower's agents, employees, independent contractors, licensees or invitees; (iii) any accident in or on the Land and Improvements or any fire, flood or other casualty or hazard thereon; (iv) the failure of Borrower, any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain the Property in a safe condition; and (v) any nuisance made or suffered on any part of the Property; and

### 16.26    Acquisition of Mortgage Loan; Intercreditor Agreement.

(a)    None of the Borrower Group shall acquire or agree to acquire the Mortgage Loan, or any portion thereof or any interest therein, or any direct or indirect ownership interest in the holder of any interest in the Mortgage Loan, by purchase, transfer, exchange or otherwise, unless such member of the Borrower Group simultaneously either acquires the Loan or extinguishes, satisfies and discharges the Mortgage Loan.

(b)    Without obtaining the prior written consent of Lender, Borrower shall not cause or permit any of the Borrower Group to (i) amend, modify, consolidate, spread, restate, waive or terminate any of the Mortgage Loan Documents except, with respect to termination or amendment, in accordance with their terms; (or (ii) grant any additional collateral to, or incur any guaranty, indemnity or other obligation on account of the Mortgage Loan in favor of the Mortgage Lender, except for collateral and guaranty, indemnity and other obligations as required pursuant to the Mortgage Loan Documents as in effect on the Closing Date. Subject to the foregoing, Borrower shall deliver to Lender a copy of any amendment or modification to any Mortgage Loan Document within two (2) Business Days after the execution thereof.

(c)    Borrower acknowledges and agrees that (i) the Intercreditor Agreement is intended solely for the benefit of Lender, on the one hand, and Mortgage Lender, on the other hand, (ii) neither Borrower nor Mortgage Borrower is an intended third-party beneficiary of any of the provisions therein or entitled to rely on any of the provisions contained therein, and (iii) the Intercreditor Agreement may allow Mortgage Lender certain additional forbearances and accommodations not otherwise available to Borrower (including, among other things, additional time to cure defaults by Borrower and the right to purchase the Loan under certain circumstances) and that Borrower hereby waives any objection thereto, and acknowledges and agrees that such forbearances and accommodations were agreed to at the request of the Borrower in order to accommodate Borrower's desire to obtain Lender's consent to the Mortgage Loan. Neither Lender nor any Mortgage Lender shall have any obligation to disclose to Borrower the contents of the Intercreditor Agreement.  Borrower's obligations hereunder are and will be independent of the Intercreditor Agreement and shall remain unmodified by the terms and provisions thereof.  In connection with the exercise of its rights set forth in the Loan Documents or the Intercreditor Agreement, Agent shall have the right at any time to discuss the Property, the Loan, the Mortgage Loan or any other matter relating to the Property, Mortgage Loan or the Loan directly with Mortgage Lender or such Mortgage Lender's consultants, agents or representatives, without notice to or permission from Borrower or any Guarantor, nor shall Agent have any obligation to disclose such discussions or the contents thereof with Borrower or

any Guarantor.  If any action, proposed action or other decision is consented to or approved by Mortgage Lender, such consent or approval shall not be binding or controlling on Agent and/or Lender.  Borrower hereby acknowledges and agrees that (A) the risks of Mortgage Lender in making the Mortgage Loan is different from the risks of Lender in making the Loan, (B) in determining whether to grant, deny, withhold or condition any requested consent or approval Agent or Lender may reasonably reach different conclusions, and (C) Agent has an absolute independent right to grant, deny, withhold or condition any requested consent or approval in accordance with the Loan Documents based on its own point of view.  Further, the denial by Agent of a requested consent or approval shall not, in and of itself, create any liability or other obligation of Agent if the denial of such consent or approval results directly or indirectly in a default under the Mortgage Loan, and Borrower hereby waives any claim of liability against Agent and Lender arising from any such denial.

16.27     Special Mezzanine Loan Provisions.

(a)     Borrower shall cause Mortgage Borrower to: (i) pay all principal, interest and other sums required to be paid by Mortgage Borrower under and pursuant to the provisions of the Mortgage Loan Documents; (ii) diligently perform and observe in all material respects all of the terms, covenants and conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed and observed; and (iii) promptly deliver to Lender a true and complete copy of any written notice delivered by Mortgage Lender to Mortgage Borrower under the Mortgage Loan Documents and of any other written correspondence relating to an event of circumstance that could reasonably be expected to result in a Mortgage Event of Default (including electronically transmitted items) given or received by Mortgage Borrower to or from the Mortgage Lender.

(b)     During the continuance of any Mortgage Loan Event of Default, Borrower agrees that Lender shall have the right (but not the obligation), upon prior notice to Borrower (which notice Lender shall make good faith efforts to provide to Borrower, provided, that (i) Lender shall have no liability to Borrower for any failure to so notify Borrower and (ii) Lender's failure to so notify Borrower shall not affect Lender's rights and remedies under this Agreement, the Pledge Agreement and the other Loan Documents or the validity of any action which Lender is entitled to take in furtherance of its rights and remedies under this Agreement, the Pledge Agreement and the other Loan Documents), to (A) pay all or any part of the Mortgage Loan and any other sums that are then due and payable, and perform any act or take any action on behalf of Mortgage Borrower as may be required, to cause all of the terms, covenants and conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed or observed thereunder to be promptly performed or observed, and (B) subject to the rights of Mortgage Lender under the Mortgage Loan Documents, pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem necessary to protect or preserve the rights and interests of Lender in the Loan and/or the Collateral. If Lender makes any payment in respect of the Mortgage Loan, Lender shall be subrogated to all of the rights of Mortgage Lender under the Mortgage Loan Documents against the Property and Mortgage Borrower in addition to all other rights Lender may have under the Loan Documents or applicable law.

(c)      Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Borrower grants Lender and its designees the right to enter upon the Property at any time following the occurrence and during the continuance of any Mortgage Loan Event of Default for the purpose of taking any such action or to appear in, defend or bring any action or proceeding to protect the Lender's interest in the Loan. Lender may take such action as Lender deems reasonably necessary to carry out the intents and purposes of this Section (including communicating with Mortgage Lender with respect to any Mortgage Loan defaults), upon prior notice to (which notice Lender shall make good faith efforts to provide to Borrower, provided, that, (i) Lender shall have no liability to Borrower for any failure to so notify Borrower and (ii) Lender's failure to so notify Borrower shall not affect Lender's rights and remedies under this Agreement, the Pledge Agreement and the other Loan Documents or the validity of any action which Lender is entitled to take in furtherance of its rights and remedies under this Agreement, the Pledge Agreement and the other Loan Documents), but without consent from, Borrower or Mortgage Borrower. Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender. All sums so paid and the costs and expenses incurred by Lender in exercising rights under and in accordance with this Section (including, without limitation, reasonable attorneys' and other reasonable professional fees), with interest at the Default Rate, for the period from the date that is five (5) Business Days following the date of written demand by Lender to Borrower for such payments to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Pledge Agreement and shall be due and payable to Lender within five (5) Business Days following written demand therefor.

(d)      If Lender shall receive a copy of any notice of a Mortgage Loan Event of Default sent by Mortgage Lender, such notice shall, solely during the continuance of such Mortgage Loan Event of Default, constitute protection to Lender for any action taken or omitted to be taken by Lender, pursuant to and in accordance with this Section and in good faith, in reliance thereon. As a material inducement to Lender to make the Loan, Borrower hereby releases and waives all claims against the Lender arising out of Lender's exercise of its rights and remedies provided in this Section, except for Lender's (or its designee's) gross negligence, bad faith or willful misconduct.

(e)      Lender shall have the right at any time to acquire all or any portion of the Mortgage Loan or any interest in any holder of, or participant in, the Mortgage Loan without notice to or consent of Borrower, Mortgage Borrower or any Affiliate thereof, in which event Lender shall have and may exercise all rights of the Person whose interests Lender acquired under the Mortgage Loan Documents (to the extent of its interest), including, if applicable, the right (i) to declare that the Mortgage Loan is in default in accordance with the terms of the Mortgage Loan Documents, and (ii) to accelerate the "Debt" (as defined in the Mortgage Loan Agreements), in accordance with the terms of the Mortgage Loan Documents, and (iii) to pursue all remedies against any obligor under the Mortgage Loan Documents in accordance with the terms of the Mortgage Loan Documents.

(f)      Without the express prior written consent of Lender, Borrower shall not, and Borrower shall not cause, suffer or permit Mortgage Borrower to, enter into, execute, deliver, or consent to, as the case may be, any deed-in-lieu, assignment-in-lieu or consensual foreclosure with or for the benefit of Mortgage Lender or any of its Affiliates or designees. Without the express prior written consent of Lender, Borrower shall not, and Borrower shall not

cause, suffer or permit Mortgage Borrower to, enter into any consensual sale or other transaction in connection with the Mortgage Loan which is reasonably likely to diminish, modify, terminate, impair or otherwise adversely affect, in each case, in any material respect, the interests of Lender or Borrower in the Collateral or any portion thereof or the interests of Mortgage Borrower in the Property or any portion thereof.

(g)    If any action, proposed action or other decision is consented to or approved by Mortgage Lender, such consent or approval shall not be binding or controlling on the Lender, except as otherwise expressly provided in this Section 16.27. Borrower hereby acknowledges and agrees that in determining whether to grant, deny, withhold or condition any requested consent or approval, Mortgage Lender and Lender may reasonably reach different conclusions, and, except as otherwise expressly provided in this Section 16.27, Lender has an absolute independent right to grant, deny, withhold or condition any requested consent or approval based on its own point of view, but subject to the standards of consent set forth herein.

## ARTICLE XVII.    AGENT.

17.1    Appointment.  Silver Point Finance, LLC is hereby appointed as Agent hereunder and under each of the other Loan Documents, and each Lender hereby irrevocably authorizes the Agent to act as agent for the Lenders and to take such actions as the Lenders are obligated or entitled to take under the provisions of this Agreement and the other Loan Documents and to exercise such powers as are set forth herein or therein, together with such other powers as are reasonable and commercially incidental thereto.  Agent agrees to act as such upon the express conditions contained in this Article in substantially the same manner that it would act in dealing with a loan held for its own account.  Agent shall not have a fiduciary relationship with respect to any Lender by reason of this Agreement.  The provisions of this Article are solely for the benefit of the Agent and the Lenders, and Borrower shall not have any rights to rely on or enforce any of the provisions hereof except as provided in Section 17. 2 below.  In performing its functions and duties hereunder, the Agent shall act solely as agent of each Lender and does not assume, and shall not be deemed to have assumed, any obligations toward or relationship of agency or trust with or for the Borrower.

17.2    Reliance on Agent.  All acts of and communications by the Agent, as agent for each Lender, shall be deemed legally conclusive and binding; and Borrower shall rely on any and all communications or acts of the Agent with respect to the exercise of any rights or the granting of any consent, waiver or approval on behalf of any Lender in all circumstances where an action by such Lender is required or permitted pursuant to this Agreement or the provisions of any other Loan Documents or by applicable law without the right or necessity of making any inquiry of any individual Lender as to the authority of Agent with respect to such matter.  In no event shall any of the foregoing limit the rights or obligations of any Lender with respect to any other Lender pursuant to this Article XVII

17.3    Powers.  The Agent shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Agent by the terms of each thereof, together with such powers as are reasonable and commercially incidental thereto, and may exercise all other powers of the Lenders as are not made subject to the consent of the

Required Lenders pursuant to <u>Section 17.7(a)</u> or to the consent of all Lenders pursuant to <u>Section 17.7(b)</u>.  The Agent shall not be considered, or be deemed, a separate agent of any Lender hereunder, but is, and shall be deemed, acting in its contractual capacity as Agent, exercising such rights and powers under the Loan Documents as are specifically delegated to the Agent or Agent is otherwise entitled to take hereunder.  Agent shall have no implied duties to any Lender, or any obligation to any Lender to take any action except any action specifically provided by the Loan Documents to be taken by the Agent.  Agent shall have the sole right and power to direct any servicer designated  by Lender with respect to any and all matters regarding administration of the Loan.

17.4    <u>Resignation or Replacement of Agent</u>.

(a)    Agent, or any other party serving as "Agent" (i) has, or has a direct or indirect parent company that has, (X) become the subject of a proceeding under the Bankruptcy Code, or (Y) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (ii) is a Defaulting Lender, then the Required Lenders (other than the Agent if it is a Lender) may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Agent, appoint a successor Agent. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "<u>Removal Effective Date</u>"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(b)    Following an Event of Default, Agent, or any successor Agent, may resign from the performance of all its functions and duties under this Agreement at any time by giving at least thirty (30) days prior written notice to each Lender and Borrower.  Such resignation shall take effect on the date set forth in such notice or as otherwise provided below. Such resignation by Agent shall not affect its obligations under this Agreement, if any, as a Lender.

(c)    Upon resignation by Agent, or any successor Agent, the Required Lenders shall appoint a successor Agent.  The Required Lenders shall be permitted to appoint a successor Agent who is not a Lender provided such successor Agent is an Eligible Assignee.  If no successor Agent shall have been so appointed by the Required Lenders, or if no successor Agent shall have accepted such appointment by the Required Lenders within thirty (30) days after the retiring Agent's giving notice of resignation, then the retiring Agent may appoint a successor Agent.  Upon the acceptance of any appointment as an Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the Agent and the Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement and under the other Loan Documents other than its liability, if any, for duties and obligations accrued prior to its retirement.  After any retiring Agent's resignation hereunder as an Agent, the provisions of this <u>Article XVII</u> shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as an Agent under this Agreement and under the other Loan Documents.

17.5    General Immunity.  Neither Agent nor any of its directors, officers, agents or employees shall be liable to Borrower or any Lender for any action taken or omitted to be taken by it or them hereunder or under any of the other Loan Documents or in connection herewith or therewith, except for its or their own gross negligence or willful misconduct.  In the absence of gross negligence, the Agent shall not be liable for any apportionment or distribution of payments made by it in good faith pursuant to Section 17.6, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due, but not made, shall be to recover from the recipients of such payments any payment in excess of the amount to which they are determined to have been entitled.

17.6    No Responsibility for Loan, Recitals, etc.  Neither Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into, or verify (i) any statement, warranty or representation made in connection with any Loan Documents or any use of the Loan; (ii) the performance or observance of any of the covenants or agreements of any party to any Loan Documents; (iii) the satisfaction of any condition specified in this Agreement, except receipt of items purporting to be the items required to be delivered to any Agent; or (iv) the validity, effectiveness or genuineness of any Loan Documents or any other instrument or writing furnished in connection therewith, provided that the foregoing shall not release Agent from liability for its gross negligence or willful misconduct.

17.7    Action on Instructions of Lenders.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder and under any other Loan Documents in accordance with written instructions signed or consented to by each Lender (or the Required Lenders, if such action may be directed hereunder by the Required Lenders), and such instructions and any action taken or failure to act pursuant thereto shall be binding on each Lender.  Each Lender hereby agrees to indemnify Agent against and hold it harmless from any and all liability, cost and expense that it may incur by reason of taking or continuing to take any such action, provided that the foregoing shall not release Agent from liability for its gross negligence or willful misconduct.

17.8    Employment of Agents and Counsel.  The Agent may undertake any of its duties as Agent hereunder and under any other Loan Documents by or through employees, agents, and attorneys-in-fact and shall not be liable to Lenders, except as to money or securities received by them or their authorized agents, for the default or misconduct of any such agents or attorneys-in-fact selected by it with reasonable care.  The Agent shall be entitled to advice of counsel concerning all matters pertaining to the agency hereby created and its duties hereunder and under any other Loan Documents.

17.9    Reliance on Documents; Counsel.  The Agent shall be entitled to rely upon any notice, consent, certificate, affidavit, letter, telegram, statement, paper or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and, in respect to legal matters, upon the opinion of counsel selected by the Agent, which counsel may be an employee of Agent, provided that the foregoing shall not release the Agent from liability for its gross negligence or willful misconduct.  Any such counsel shall be deemed to be acting on behalf of each Lender in assisting the Agent with

respect to the Loan, but shall not be precluded from also representing Agent in any matter in which the interests of Agent and any Lender may differ.

17.10     Notice of Events of Default.  Should Agent receive any written notice of the occurrence of a default or Event of Default, or should the Agent send Borrower a notice of Default or Event of Default, the Agent shall promptly furnish a copy thereof to each Lender.

17.11     Modifications to Article XVII.  Borrower acknowledges and agrees that the provisions of this Article XVII are intended to govern the relationship among Lender and Agent and the provisions of this Article XVII may accordingly be modified without Borrower's consent so long as (i) Borrower is provided with prior written notice thereof, and (ii) such modifications do not materially or adversely alter any of Borrower's rights or obligations under this Agreement or any of the other Loan Documents or otherwise alter the economic terms of the Loan in any manner adverse to Borrower.

[Signature Pages Follow]

[SIGNATURE PAGE TO MEZZANINE LOAN AND SECURITY AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

DENARDO CAPITAL MANAGEMENT LLC,
A New York limited liability company,

By: _____
Name: Sylvia DeNardo
Title: Member

By: _____
Name: Joseph DeNardo
Title: Managing Member

[SIGNATURE PAGE TO MEZZANINE LOAN AND SECURITY AGREEMENT]

**AGENT:**

SILVER POINT FINANCE, LLC,
a Delaware limited liability company,
as Administrative Agent and Collateral Agent

By: _____

Name: ___Michael Gatto___

Title:  Authorized Signatory

[SIGNATURE PAGE TO MEZZANINE LOAN AND SECURITY AGREEMENT]

**LENDER**:

SPECIALTY CREDIT HOLDINGS, LLC,
a Delaware limited liability company

By: _____

Name: __Michael Gatto_____

Title: Authorized Signatory

[SIGNATURE PAGE TO MEZZANINE LOAN AND SECURITY AGREEMENT]

**LENDER**:

ZEE BRIDGE CAPITAL LLC,
a Delaware limited liability company

By: _____
Name:  Lawrence I. Linksman
Title:   Authorized Signatory

## EXHIBIT A

Legal Description

**ALL THAT CERTAIN** plot, piece or parcel of land, situate, lying and being in the Village of Irvington, in the Town of Greenburgh, County of Westchester, City and State of New York, bounded and described as follows:

BEGINNING at a point formed by the division line between property now or formerly lands of Irvington Estates, Inc., Old Croton Aqueduct on the west and Lot 28-HOA Open Space as shown on a map entitled "Subdivision Map prepared for DeNardo Capital Corp." dated August 19, 2016, last revised November 1, 2016 and filed in the Westchester County Clerk's Office (Division of Land Records) on March 21, 2017 as Map No. 29037, said point being the point of beginning;

THENCE from said point of beginning along said division line, South 85 degrees 52 minutes 50 seconds East, a distance of 425.19 feet to a point on the westerly side of South Broadway;

THENCE along said westerly side of South Broadway, South 00 degrees 11 minutes 12 seconds West, a distance of 81.89 feet;

THENCE continuing along the westerly side of South Broadway and Lot 28-HOA Open Space, South 01 degree 00 minutes 20 seconds West, a distance of 63.59 feet;

THENCE South 01 degrees 19 minutes 06 seconds West, a distance of 104.89 feet; THENCE South 03 degrees 19 minutes 34 seconds West, a distance of 98.61 feet; THENCE South 04 degrees 11 minutes 11 seconds West, a distance of 93.35 feet; THENCE South 08 degrees 22 minutes 30 seconds West, a distance of 59.38 feet;

THENCE along the division line between Lot 27 and westerly side of South Broadway, South 05 degrees 00 minutes 26 seconds East, a distance of 26.45 feet;

THENCE South 08 degrees 33 minutes 18 seconds West, a distance of 25.50 feet;

THENCE along the easterly side of Lot 27, Lot 28-HOA Open Space and westerly side of South Broadway, South 22 degrees 07 minutes 58 seconds West, a distance of 78.06 feet;

THENCE South 53 degrees 41 minutes 38 seconds West, a distance of 39.78 feet;

THENCE along the northerly side of Station Road and Lot 28-HOA Open Space, South 78 degrees 06 minutes 18 seconds West, a distance of 28.00 feet;

THENCE South 81 degrees 27 minutes 18 seconds West, a distance of 18.65 feet; THENCE South 85 degrees 59 minutes 18 seconds West, a distance of 30.33 feet;

THENCE South 86 degrees 44 minutes 18 seconds West, a distance of 18.42 feet;

THENCE South 88 degrees 33 minutes 18 seconds West, a distance of 36.50 feet; THENCE North 88 degrees 28 minutes 42 seconds West, a distance of 12.10 feet; THENCE North 83 degrees 50 minutes 42 seconds West, a distance of 16.65 feet; THENCE North 79 degrees 47 minutes 42 seconds West, a distance of 17.67 feet; THENCE North 75 degrees 03 minutes 42 seconds West, a distance of 18.72 feet;

THENCE North 70 degrees 32 minutes 42 seconds West, a distance of 53.62 feet to a point on the division line between property now or formerly lands of Isler and Lot 28-HOA Open Space;

THENCE along said division line, North 16 degrees 56 minutes 48 seconds East, a distance of 197.62 feet;

THENCE North 81 degrees 46 minutes 00 seconds West, a distance of 141.29 feet to the easterly side of property of the Old Croton Aqueduct;

THENCE along the division line between Lot 28-HOA Open Space and the Old Croton Aqueduct, North 16 degrees 27 minutes 10 seconds East, a distance of 85.65 feet;

THENCE North 73 degrees 32 minutes 50 seconds West, a distance of 69.33 feet;

THENCE Northerly, a distance of 55.65 feet along a non tangent curve to the left of which the radius point lies North 79 degrees 56 minutes 50 seconds West, a radius of 646.29 feet, and having a central angle of 04 degrees 56 minutes 00 seconds;

THENCE North 05 degrees 07 minutes 10 seconds East, a distance of 298.31 feet to the division line between Lot 28-HOA Open Space and property now or formerly lands of Irvington Estates, Inc. and shown on the aforesaid filed Map No. 29037, the point and place of BEGINNING.

## SCHEDULE I

Borrower's Organization Structure

SEE ATTACHED

## IRVINGTON PROPERTY



<u>SCHEDULE II</u>

Litigation

NONE

<u>SCHEDULE II</u>

Material Agreements

NONE

## SCHEDULE IV

### Definition of Single Purpose Entity

"Single Purpose Entity" means a Person, other than a natural person, which, since the date of its formation and at all times prior to, on and after the date hereof until such time as the Debt has been indefeasibly paid in full (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive the indefeasible satisfaction of the Note(s) in full), has complied with and shall at all times comply with the following requirements:

(a)     was, is and will be formed solely for the purpose of (i) in the case of Borrower, acquiring, developing, constructing, owning, holding, selling, leasing, ground leasing, transferring, exchanging, entering into a condominium regime, managing and operating the Property, entering into this Agreement, the Acquisition Loan Documents and the Building Loan Documents with or for the benefit of Lender, entering into any other Loan Document to which Borrower is a Party, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary or appropriate to accomplish the foregoing; or (ii) in the case of Borrower, acting as the sole member of Mortgage Borrower and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(b)     has not been, is not, and will not be engaged in any business unrelated to (i) in the case of Borrower, acquiring, developing, constructing, owning, holding, selling, leasing, transferring, exchanging, entering into a condominium regime, managing and operating the Property, entering into this Agreement, the Acquisition Loan Documents and the Building Loan Documents with or for the benefit of Lender, entering into any other Loan Document to which Borrower is a Party, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, or (ii) in the case of Borrower, acting as the sole member of Mortgage Borrower and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(c)     has not had, does not have and will not have any assets other than (i) in the case of Borrower, the Property and such incidental personal property necessary for the ownership, operation and development of the Property; or (ii) in the case of Borrower, its interest in Mortgage Borrower;

(d)     has not engaged, sought or consented to, and will, to the fullest extent permitted by law, not engage in, seek or consent to, (i) any dissolution, winding up, liquidation, consolidation, merger, or sale of all or substantially all of its assets, (ii) except as permitted under the terms of this Agreement, any transfer of membership interests, or (iii) any amendment of its certificate of formation or operating agreement with respect to the matters set forth in this definition without the written consent of Lender;

(e)     has been, is and intends to remain solvent and has paid and intends to continue to pay its debts and liabilities (including, as applicable, shared personnel and overhead

expenses) from its assets as the same have or shall become due, and has maintained, is currently maintaining and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided, however, that in no event shall the foregoing create liability of Borrower on account of Borrower's insolvency due to insufficiency of capital or require any member of Borrower or any other Person to make any additional capital contribution, advance, loan or any other type of financing to Borrower;

(f)    has not failed, and will not fail, to correct any known misunderstanding regarding the separate identity of such entity;

(g)    has maintained and will maintain its accounts, books and records separate from any other Person and has filed and will file its own tax returns, except to the extent that it (i) has been or is required to file consolidated tax returns by law or (ii) is treated as a disregarded entity for federal or state tax purposes;

(h)    has maintained and will maintain its own resolutions and agreements;

(i)    (i) has not commingled, and will not commingle, its funds or assets with those of any other Person and (ii) has not participated and will not participate in any cash management system with any other Person;

(j)    has held and will hold its assets in its own name;

(k)    has conducted and will conduct its business in its name;

(l)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person and has not permitted, and will not permit, its assets to be listed as assets on the financial statement of any other entity except as permitted by GAAP, provided that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(m)    has paid and will pay its own liabilities and expenses, including the salaries of its own employees (if any), out of its own funds and assets, and has maintained and will maintain a sufficient number of employees (if any) in light of its contemplated business operations; provided, however, that in no event shall the foregoing create liability of Borrower on account of Borrower's insolvency due to insufficiency of capital or require any member of Borrower or any other Person to make any additional capital contribution, advance, loan or any other type of financing to Borrower;

(n)    has observed and will observe in all material respects all partnership, corporate or limited liability company formalities, as applicable;

(o)    has no and will have no Indebtedness (as defined herein) other than (i) in the case of Borrower, (A) the Debt, (B) the Permitted Debt, and (C) such other liabilities that are permitted pursuant to this Agreement, and (ii) in the case of Borrower, unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership of its

limited liability company interests in the Mortgage Borrower in amounts not to exceed $10,000.00, which liabilities are not due more than thirty (30) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances;

(p)    except in connection with the Loan Documents, has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to this Agreement;

(q)    has not acquired and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate (other than the securities of Mortgage Borrower held by Borrower);

(r)    has allocated and will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including paying for shared office space and services performed by any employee of an Affiliate; provided, however, that in no event shall the foregoing create liability of Borrower on account of Borrower's insolvency due to insufficiency of capital or require any member of Borrower or any other Person to make any additional capital contribution, advance, loan or any other type of financing to Borrower;

(s)    has maintained and used, now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing its name, and all stationery, invoices, and checks utilized by such Person or utilized to collect its funds or pay its expenses have borne and shall bear its own name and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being such Person's agent;

(t)    unless otherwise specifically permitted under the Loan Documents, has not pledged and will not pledge its assets for the benefit of any other Person;

(u)    has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under its own name;

(v)    has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(w)    has not made and will not make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity;

(x)    has not identified and will not identify its constituent partners, members or shareholders (as applicable), or any Affiliate of any of them, as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

(y)    has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are arms-length, commercially reasonable and

are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party;

(z)    has not had and will not have any obligation to indemnify, and has not indemnified and will not indemnify, its partners, officers, directors, managers or members, as the case may be, unless such an obligation was and is fully subordinated to the Obligations and will not constitute a claim against the Obligations in the event that cash flow in excess of the amount required to pay the Obligations is insufficient to pay such obligation;

(aa)    has considered and shall consider the interests of such Person, including its creditors, in connection with all company actions;

(bb)    except as provided in the Loan Documents, does not and will not have any of its obligations guaranteed by any Affiliate;

(cc)    from and after the Closing Date, has and will have an express acknowledgment in its organizational documents that, during the Term of the Loan, Lender is an intended third-party beneficiary of the "single purpose/separateness/bankruptcy remote" provisions (as applicable) of such organizational documents;

(dd)    if such entity is a limited liability company, has been, now is, and will be a limited liability company formed under the laws of the State of Delaware that will have an operating agreement which provides that as long as any portion of the Debt remains outstanding: (i) the company shall have at least one (1) Independent Manager, and the limited liability company shall not institute proceedings to have the company be adjudicated bankrupt or consent to the institution of bankruptcy or insolvency proceedings against the company or file a voluntary bankruptcy petition with respect to the company, to file or consent to the filing of any petition to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute or other laws relating to the relief from debts or the protection of debtors generally, with respect to the company, or to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the company or all or a portion of its property, or to make any assignment for the benefit of creditors of the limited liability company, or to admit in writing the company's inability to pay its debts generally as they become due, or to take action in furtherance of any such actions, or, to the fullest extent permitted by law, dissolve or liquidate the company (each such action, a "Bankruptcy Action") unless, (a) such Bankruptcy Action is approved by the prior unanimous written consent of the member of the limited liability company and each Independent Manager and (b) at the time of such action there are at least one (1) Independent Manager; each Independent Manager shall be a "manager" of the limited liability company within the meaning of Section 18-101(10) of the Delaware Limited Liability Company Act (the "Act"); provided, however, the Independent Manager shall only have the rights and duties expressly set forth in the limited liability company agreement; (ii) upon the occurrence of any event that causes the last member of the limited liability company to cease to be a member of such limited liability company (other than upon an assignment by such member of all of its limited liability company interest in such limited liability company and the admission of the transferee in accordance with the limited liability company agreement), (1) the person(s) acting as Independent Manager(s) of such limited liability company shall, without any action of any Person and simultaneously with such member ceasing to be a member of such limited

liability company, automatically be admitted as the "Special Member" and shall preserve and continue the existence of such limited liability company without dissolution, and (2) without limiting the provisions of clause (1), upon the occurrence of any event that causes the last remaining member of the limited liability company to cease to be a member of the limited liability company or that causes the sole member to cease to be a member of the limited liability company (other than upon continuation of the limited liability company without dissolution upon an assignment by the member of all of its limited liability company interest in the limited liability company and the admission of the transferee in accordance with the limited liability company agreement), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in such limited liability company, agree in writing to continue the limited liability company without dissolution and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of such limited liability company, effective as of the occurrence of the event that terminated the continued membership of such member in such limited liability company; (iii) no Special Member may voluntarily resign or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to such limited liability company as a Special Member, and (B) such successor Special Member has also accepted its appointment as an Independent Manager and executed a counterpart to the limited liability company agreement; provided, however, that the Special Member shall automatically cease to be a member of the limited liability company upon the admission to the limited liability company of a substitute member; the Special Member shall be a member of the limited liability company that has no interest in the profits, losses and capital of the limited liability company and has no right to receive any distributions of limited liability company assets; pursuant to Section 18-301 of the Act, a Special Member shall not be required to make any capital contributions to the limited liability company and shall not receive a limited liability company interest in the limited liability company; (iv) a Special Member, in its capacity as Special Member, may not bind the limited liability company; (v) except as required by any mandatory provision of the Act, a Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the limited liability company, including the merger, consolidation or conversion of the limited liability company; (vi) in order to implement the admission to the limited liability company of each Special Member, each Person acting as an Independent Manager shall execute a counterpart to the limited liability company agreement; (vii) prior to its admission to the limited liability company as Special Member, each Person acting as an Independent Manager shall not be a member of the limited liability company; (viii) such limited liability company shall be dissolved, and its affairs shall be would up only upon the first to occur of the following (but subject to clause (ii) above):  (A) the termination of the legal existence of the last remaining member of such limited liability company or the occurrence of any other event which terminates the continued membership of the last remaining member of such limited liability company in such limited liability company unless the business of such limited liability company is continued in a manner permitted by its limited liability company agreement or the Act, or (B) the entry of a decree of judicial dissolution of the limited liability company under Section 18-802 of the Act; (ix) neither the bankruptcy of any member of the limited liability company or the Special Member shall cause such member or Special Member, respectively, to cease to be a member of such limited liability company and upon the occurrence of such an event, the business of such limited liability company shall continue without

dissolution; (x) in the event of dissolution of such limited liability company, such limited liability company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of such limited liability company in an orderly manner), and the assets of such limited liability company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and (xi) to the fullest extent permitted by law, except as otherwise expressly provided in the limited liability company agreement, each member of the limited liability company and the Special Members shall irrevocably waive any right or power that they might have to cause such limited liability company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of such limited liability company, to compel any sale of all or any portion of the assets of such limited liability company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of such limited liability company; provided, however, that notwithstanding the foregoing, Lender acknowledges and agrees that the provisions of subsection (xi) above are required to be included in the organizational documents of such entity only from and after the Closing Date (and not during the period from the date of such entity's formation to the Closing Date); and

(ee)    the organizational documents of such entity shall further provide that:  (i) the board of directors or managers of such entity (if such entity has a board of directors or managers) and the constituent members or other direct equity owners of such entity (the "Constituent Equity Members") shall not take any action which, under the terms of any organizational documents of such entity, requires a unanimous written consent of the board of directors or managers of such entity (if applicable) or the Constituent Equity Members unless at the time of such action there shall be at least one (1) Independent Director or Independent Manager engaged as provided by the terms hereof;  (ii) no Independent Director or Independent Manager may be removed or replaced except for Cause; (iii) any resignation, removal or replacement of any Independent Director or Independent Manager shall not be effective without five (5) Business Days prior written notice to Lender (in each case, unless such resignation, removal or replacement occurs as a result of the death or incapacity of such Independent Director or Independent Manager, or the termination of such individual's employment with the applicable service provided, in which case Borrower shall provide written notice of the removal and replacement of such Independent Director or Independent Manager promptly following such resignation, removal or replacement) accompanied by a statement as to the reasons for such removal, the identity of the proposed replacement Independent Director or Independent Manager, and a certificate that the replacement Independent Director or Independent Manager satisfies the applicable terms and conditions of the definition of "Independent Director/Independent Manager"; (iv) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Director or Independent Manager shall consider only the interests of the Constituent Equity Members and such entity (including such entity's creditors) in acting or otherwise voting on a Bankruptcy Action (which such fiduciary duties to the Constituent Equity Members and such entity's creditors, in each case, shall be deemed to apply solely to the extent of their respective economic interests in such entity exclusive of (x) all other interests of the Constituent Equity Members, (y) the interests of other affiliates of the Constituent Equity Members and such entity and (z) the interests of any group of affiliates of which the Constituent Equity Members or such entity is a part); (v) other than as provided in subsection (iv) above, to the fullest extent permitted by law the Independent Director or Independent Manager shall not

have any fiduciary duties to (A) any Constituent Equity Members or (B) any Person bound by the operating agreement of such entity, provided that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; and (vi) to the fullest extent permitted by applicable law, including Section 18-1101(e) of the Act, an Independent Director or Independent Manager shall not be liable to such entity, any Constituent Equity Member or any other Person bound by the limited liability company agreement for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director or Independent Manager acted in bad faith or engaged in willful misconduct; provided, however, that notwithstanding the foregoing, Lender acknowledges and agrees that the provisions of this clause (ee) are required to be included in the organizational documents of such entity only from and after the Closing Date (and not during the period from the date of such entity's formation to the Closing Date).

As used in the definition of Single Purpose Entity, the following terms shall have the following meanings:

"Indebtedness" means, with respect to any Person at any time, (i) indebtedness or liability of such Person for borrowed money whether or not evidenced by bonds, debentures, notes or other instruments, or for the deferred purchase price of property or services (excluding trade obligations); (ii) obligations of such Person as lessee under leases which should have been or should be, in accordance with GAAP, recorded as capital leases; (iii) current liabilities of such Person in respect of unfunded vested benefits under plans covered by Title IV of ERISA; (iv) obligations issued for, or liabilities incurred on the account of, such Person; (v) obligations or liabilities of such Person arising under letters of credit, credit facilities or other acceptance facilities; (vi) obligations of such Person under any guarantees or other agreement to become secondarily liable for any obligation of any other Person, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person or otherwise to assure a creditor against loss; (vii) obligations of such Person secured by any Lien on any property of such Person, whether or not the obligations have been assumed by such Person; or (viii) obligations of such Person under any interest rate or currency exchange agreement.

SCHEDULE V

Outside Completion Dates for Units (along with description and location of Units)

| Phase 1 Townhomes - Irvington | | | |
|---|---|---|---|
| Unit # | List Price | Above SF | Price PSF |
| 1 | $1,584,000 | 2,620 | $604.58 |
| 2 | $1,589,000 | 2,620 | $606.49 |
| 3 | $1,599,000 | 2,620 | $610.31 |
| 4 | $1,649,000 | 2,620 | $629.39 |
| 10 | $1,774,000 | 2,620 | $677.10 |
| 11 | $1,999,000 | 2,620 | $762.98 |
| **Total** | **$10,194,000** | **15,720** | **$648.47** |



THE WALK AT MARKERIDGE – SITE PLAN